ORDER.
WALKER, District Judge.
On July 11, 1994, the government obtained a forty-two count superseding indictment against eighteen defendants, charging them for their involvement in a heroin smuggling organization allegedly headed by Pius Ade-men. Much of the evidence that was used to indict the defendants was acquired as a result of a wiretap authorized by a judge of this court on July 29,1993.
On September 16, 1994, Ailemen filed a motion to suppress the evidence obtained ft’om the wiretap due to the government’s failure to comply with the procedural requirements of 18 U.S.C. § 2518. This motion was referred to Magistrate Judge Wayne D. Brazd on November 29,1994.
After the parties exchanged several rounds of briefing, the magistrate conducted a seven-day evidentiary hearing, commencing on December 16, 1996. On May 22, 1997, the magistrate issued a one hundred twenty-nine page report in which he recommended that the court grant defendants’ joint motion to suppress. After receiving an extension of time and relief from the page limits of the local rules, the government filed a one hundred eight page objection to the magistrate’s report and recommendation (“Obj.”). Defendants filed a response on August 18, which was followed by a reply on August 22. The court conducted a hearing on the matter on August 27, 1997. Upon consideration of the papers submitted by the parties and the arguments presented at the hearing, the court hereby ADOPTS the magistrate’s recommendation that the court GRANT defendants’ joint motion to suppress evidence obtained by electronic surveillance.
I
The referral of matter to a magistrate is governed by the United States Magistrates Act, 28 U.S.C. §§ 631-639. Subparagraph 636(b)(1)(A) of the Act permits a district court to designate a magistrate to “hear and determine” pretrial matters other than certain enumerated dispositive motions, such as a motion to suppress. Motions to suppress *1231 are governed by § 636(b)(1)(B), which provides that “a judge may [] designate a magistrate to conduct hearings, including eviden-tiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court of [the] motion.” The court must review de novo legal conclusions and challenged findings of fact.
In making its de novo determination, the court considers the record which has been developed before the magistrate. See United States v. Raddatz, 447 U.S. 667, 676, 100 S.Ct. 2406, 2412-13, 65 L.Ed.2d 424 (1980). The court may accept or reject the magistrate’s credibility determinations, recognizing that the magistrate is in the better position to assess the credibility of the witnesses he sees and hears. See Raddatz, 447 U.S. at 681 n. 7, 100 S.Ct. at 2415 n. 7; United States v. Mejia, 69 F.3d 309, 316 (9th Cir.1995). De novo review does not mean that the court must hold a new hearing to determine credibility disputes or grant further argument. See id. at 676, 100 S.Ct. at 2412-13; United States v. Koenig, 912 F.2d 1190, 1192 (9th Cir.1990). Instead, the court must scrutinize the record and make its own decision what reliance to place on the magistrate’s proposed findings and recommendations. Raddatz, 447 U.S. at 676, 100 S.Ct. at 2412-13.
II
In recognition of the highly intrusive nature of electronic surveillance, Congress devised strict procedures for the authorization of wiretaps. See United States v. Smith, 893 F.2d 1573, 1582 (9th Cir.1990) (citing United States v. Bailey, 607 F.2d 237, 241 (9th Cir.1979)). At issue in this case is the necessity requirement of 18 U.S.C. § 2518(l)(c), which requires an application for interception of a wire, oral or electronic communication (“wiretap”) to include “a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.” Before approving a wiretap, the issuing court must satisfy itself that traditional law enforcement methods are unlikely to succeed or are too dangerous to attempt. 18 U.S.C. § 2518(3)(c).
Consideration of alternative law enforcement methods is central to the issuing court’s necessity inquiry. See United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir.1985). Although an investigative agency need not exhaust all possible investigative techniques before requesting a wiretap, United States v. Homick, 964 F.2d 899, 903 (9th Cir.1992), it must demonstrate that “normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time.” United States v. Spagnuolo, 549 F.2d 705, 710 (9th Cir.1977). Where ordinary investigative techniques have not been employed, the affiant must show that employment of such techniques “reasonably appear unlikely to succeed if tried or to be too dangerous.” Id. Boilerplate assertions that the standard is met based on an agent’s knowledge and experience will not suffice. Id. Instead, the affidavit must contain an “adequate factual history of the investigation and a description of the criminal enterprise sufficient to enable” the issuing court to determine on its own whether there is the requisite necessity for the use of a wiretap. See id. The court’s inquiry should be guided by common-sense and practical considerations. United States v. Echavarria-Olarte, 904 F.2d 1391, 1396 (9th Cir.1990).
When law enforcement officers circumvent the procedural requirements of 18 U.S.C. 2518(l)(c), courts must suppress the evidence obtained from the illegal wiretap. Courts, for instance, will suppress evidence derived from a warrant issued on the basis of an affidavit that contains false statements regarding necessity. See, e.g., United States v. Ippolito, 774 F.2d 1482 (9th Cir.1985). A reviewing court, however, may not throw out evidence of a crime simply because a law enforcement officer misrepresents some facts to the issuing court. See Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Suppression is appropriate only if: (1) the affidavit contains misstatements or omissions made with the intent to deceive the issuing judge, or with a reckless disregard for the truth, that were mate *1232 rial to the necessity determination; and (2) the affidavit, after the misstatements are deleted and the omissions are inserted, does not disclose the requisite necessity for a wiretap. See Ippolito, 774 F.2d at 1485-87.
Ill
The government alleges that Pius Ailemen is a heroin smuggler who entices attractive women to courier drugs into the United States from international locations by promising them money and the opportunity to travel. The government first investigated Ailemen in 1987 and indicted him in 1989 on six counts, including conspiracy to distribute heroin. The jury acquitted Ailemen of all but a charge for making a false statement in a passport application. Ailemen was released from prison sometime around October 1991.
In October 1992, DEA agents Robert Sila-no and William de Freitas commenced a second investigation of Ailemen after Aaron Mouton agreed to serve as a confidential informant so that the government would reduce the amount of time that his brother would have to serve in prison. The investigation employed the services of Carl Estelle and John Gutierrez, two officers assigned to the Alameda County Narcotics Task Force.
On October 30, 1992, Mouton introduced Estelle, an experienced undercover investigator, to Ellis Quarshie, an intermediary for Ailemen. After Quarshie told Estelle that Ailemen was interested in exchanging heroin either for money or cocaine, Estelle assured Quarshie that he would get back to him. Estelle waited more than a month before he next contacted Quarshie.
Estelle met with Quarshie at his home on December 3, 1992, at which time Quarshie gave Estelle a sample of Ailemen’s heroin and told him that Ailemen was prepared to do business. The two met again the next day to discuss prices. Quarshie and Estelle had several telephone conversations between December 6 and December 10, throughout which Estelle pretended to be in Los Ange-les.
Quarshie and Estelle met in person again on December 10 and 11. Five agents surv-eilled the second meeting and, as a result, identified the Park Bellevue Tower in Oakland as Ailemen’s residence. The agents further discovered that Nordahl Washington was the building’s on-site manager. After determining that Washington was completely trustworthy, the agents learned some important information about Ailemen. Washington described Ailemen’s apartment, identified two vehicles that Ailemen drove, provided cellular and residential telephone numbers for Ailemen and reported that Ailemen always used money orders to pay his $1,400 monthly rent.
Estelle and Ailemen met for the first time in person on December 12, 1992, after Estelle purchased an ounce of heroin from Quarshie at Quarshie’s house. Estelle and Ailemen discussed the possibility of a trade of cocaine for heroin and Ailemen mentioned that he needed to go to New York to get more heroin. Estelle told Quarshie that he would keep in touch.
Estelle and Quarshie had several telephone conversations between December 18, 1992, and January 8,1993, during which time Estelle pretended to be in Chicago, then Miami, looking for cocaine for Ailemen. Estelle told Quarshie on January 8 that he would be back in the Bay Area by January 11 and that he would contact him then. Despite the fact that Quarshie left messages with Mouton for Estelle almost daily for nearly four weeks, Estelle did not contact him until February 3,1993.
In the meantime, agent Gutierrez led efforts to conduct surveillance at Ailemen’s home. On December 14, Gutierrez met with John Shahoian, the property manager of Ailemen’s apartment, who told Gutierrez that he and Washington would assist the investigation in any way possible. Washington gave Gutierrez a key to the building and an access device for entering the garage. The investigators later installed a pen register, which records the numbers of incoming calls, on the two telephone lines Ailemen used from his apartment. On January 8, 1993, the DEA obtained the first of three subpoenas through which it acquired the billing statements for Ailemen’s cellular phone. Later that month, the investigative team installed a *1233 hidden video camera in the hallway outside Ailemen’s apartment and arranged for a mail cover from the United States Postal Service. The agents later replaced the original video camera with a tape delay model. Neither camera produced a clear picture so it was difficult for the agents to identify the people who appeared in the footage.
On February 3, 1993, Estelle returned Quarshie’s calls and met with him to arrange a 100 gram heroin purchase. Quarshie told Estelle that Ailemen was “so ready for you,” that he had come down to Quarshie’s house asking for Estelle, and that “he was really waiting for you.” Obj. at 26. Estelle met with Ailemen and Quarshie at Quarshie’s house on February 9, 1992. Estelle told Ailemen that Colombians from Miami were interested in trading cocaine for heroin and might be willing to meet with Ailemen in the Bay Area. Ailemen declined the offer, but later told Estelle that Ailemen’s heroin was located in New York and he suggested the possibility of meeting the Colombians there. Ailemen also told Estelle that he began to fear that Estelle was a government agent when Estelle disappeared for so long, but that Estelle dispelled these fears with his recent purchase. Ailemen also explained to Estelle at that meeting how he used white female couriers because they do not attract police suspicion and he discussed with Estelle the possibility of sending some of his couriers to Tijuana to purchase some cocaine.
Estelle returned to Quarshie’s house on February 11,1993, and purchased 100 grams of heroin directly from Ailemen. Ailemen told Estelle that the heroin had arrived in New York at the same time as another plane that had been hijacked. The heroin was forwarded to San Francisco several hours later. Ailemen suggested to Estelle that Ailemen could get more heroin from Miami.
On February 16, 1993, Estelle called Quar-shie to tell him that Estelle wanted to employ one of Ailemen’s couriers to transport to Chicago the 100 grams of heroin that Estelle had just purchased from Ailemen. Quarshie gave Ailemen’s cellular telephone number to Estelle. Quarshie and Estelle arranged for a courier to transport Estelle’s heroin to Chicago. Ailemen mentioned to Estelle that he would get some cocaine from some people in Los Angeles. In addition, Ailemen offered to sell Estelle 100 more grams of heroin so that he could pay off a debt; Estelle declined the offer.
On February 19, 1993, Estelle met Aile-men, Quarshie and courier Kellee Cooper at Quarshie’s house. Cooper and Estelle traveled by cab to the airport and sat next to each other on the airplane trip to Chicago. In Chicago, Cooper relayed the heroin to Sue Mitchell, an undercover DEA agent who was posing as the inexperienced courier hired by Estelle to transport the heroin from Chicago to Miami. Cooper gave Mitchell detailed instructions about how to smuggle drugs and how to act if stopped by law enforcement officials. The conversation and exchange were recorded on video and audio tape.
At the close of the exchange, Estelle had a telephone conversation with Ailemen in which Ailemen again urged Estelle to buy more heroin from him and Estelle said he would call Quarshie in a few days. Estelle did not contact Quarshie or Ailemen for about a month.
On February 24, 1993, the investigative team secured a warrant to install a pen register on Ailemen’s cellular phone number. On February 26,1993, surveillance agents saw a BMW that was registered to Lorelei Washington, the girlfriend of alleged co-conspirator Nathaniel Iheukwu, parked in front of Ailemen’s apartment building. The agents followed Ailemen and “his associate,” who was later identified as Nathaniel Iheukwu, to a check cashing business in Oakland despite the fact that Ailemen used counter-surveillance driving techniques.
On April 15, 1993, Assistant United States Attorney Nandor Vadas, who had been involved in both Ailemen investigations, presented the case to the grand jury. Agent Silano testified to the grand jury, among other things, that “we have approximately seven couriers to date identified that we feel that are current from the last investigation that are possible hits.”
On May 11, 1993, a representative of Aile-men’s cellular phone company contacted agent Silano and told him that Ailemen had *1234 paid his $2,000 phone bill in cash and had taken money out of a bag that appeared to contain another $8,000 in cash. The investigative team temporarily disabled the pen register on Ailemen’s cell phone on May 27, because they learned that Ailemen complained to his cellular phone company that he was experiencing a 1-3 second service delay.
On June 11, 1993, Nordahl Washington contacted officer Gutierrez to alert him to the fact that Ailemen had hired a private investigator who apparently told Ailemen that he discovered a video surveillance camera hidden in the hallway. Ailemen expressed concern that he was being investigated. Washington assuaged Ailemen’s fears by telling him that he was just paranoid. Ailemen had not disturbed the monitor and video recorder.
Based on this investigation, agent Silano presented his affidavit in support of the application for a wiretap to the issuing judge on July 29, 1993. The issuing judge signed the proposed order authorizing the wiretap later that day.
IV
The magistrate identified more than seventeen misstatements and omissions in the affidavit submitted to the issuing judge. Numerous of these, or combinations of them, support suppression. The court focuses on five.
A
The first set of misstatements concerns the scope and resiliency of the Ailemen “organization.” After describing Ailemen’s 1989 international heroin trafficking organization, the affidavit states that “[i]n 1990 Ademen was acquitted of all narcotics violations in the Northern District of California leaving his heroin trafficking organization intact.” Aff. at 8. To convey the impression that other law enforcement agencies were aware of, but unable to infiltrate, Ailemen’s continuing smuggling enterprise, the affidavit reports: “According to the Oakland Police Department Intelligence Unit, Ailemen is presently the largest volume heroin dealer in the City of Oakland area.” Aff. at 9.
Both of these statements are false. The government and AUSA Vadas admitted that the government had no basis to believe that Ailemen’s organization continued to operate intact and undeterred by the 1991 prosecution. See TR 6-1305:10-22 and 6-1307:1-21. More importantly, the Oakland Police Department Intelligence Unit had no file and no information at all about Pius Ailemen or his organization. Although the government dismisses the misstatement about the size of the Ailemen organization as mere puffery, it appears more likely that this was a calculated attempt to exaggerate the difficulty of penetrating the Ailemen organization using traditional investigative techniques. By falsely attributing to the Oakland Police Department Intelligence Unit a statement that Aile-men was the largest heroin dealer in the City of Oakland, the affidavit gave the false impression that other law enforcement authorities had failed in their efforts to investigate and crack Ailemen’s organization. Although this misstatement standing alone would not deprive the affidavit of the requisite necessity for a wiretap, it assumes an increased significance in light of its position at the beginning of the affidavit and the misstatements and omissions that follow.
B
Despite the fact that the affidavit stated that a wiretap was necessary to identify Aile-men’s eo-eonspirators and aiders and abettors, see Aff. at 57 and 62, the affidavit presented to the issuing judge omitted the names of at least seven persons whom the government knew, or should have known from phone records, were linked to the Aile-men organization. See Report and Recommendation at 1276-78. These alleged participants, all suspects in the 1989 investigation, are: Nathaniel Iheukwu, Lorelei Washington, Victor Onuagulchi, Tina Tauer, Tiffany Valentine, Kali Knapp and Monetta White.
1
The government contends that it cannot be held responsible for failing to disclose these seven participants because the government had no legal obligation to do so. Although the government implicitly admits that these *1235 persons were suspects in the 1989 investigation, it states that “[t]he hard fact remains that the government never had enough evidence to charge them with any federal offense.” Obj. at 56. The government then cites to United States v. Kahn, 415 U.S. 143, 151, 94 S.Ct. 977, 982, 39 L.Ed.2d 225 (1974), for the proposition that “Title III [of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518] requires the naming of a person in the application or interception order only when the law enforcement authorities have probable cause to believe that individual is ‘committing the offense’ for which the wiretap is sought.” Obj. at 56 (emphasis added).
This case is different. In Kahn, the Supreme Court was construing 18 U.S.C. § 2518(l)(b)(iv), which requires that the application state “the identity of the person, if known, committing the offense and whose communications are to be intercepted.” Unlike the necessity requirement of § 2518(l)(c), which is directed primarily to protecting the individual whose phone will be tapped, section 2518(l)(b)(iv) is concerned largely with the privacy interest of persons other than the wiretapped individual whose privacy is curtailed by the fact that government agents are listening to their conversations; section 2518(l)(b)(iv) must be read in conjunction with § 2518(8)(d) which gives the issuing judge discretion to notify such persons that their conversations are being surv-eilled. See United States v. Donovan, 429 U.S. 413, 423 n. 11 and 430, 97 S.Ct. 658, 666 n. 11 and 669, 50 L.Ed.2d 652 (1977). Because the provisions serve different purposes, section 2518(l)(b)(iv) can be enforced even in the absence of a violation of the necessity requirement of § 2518(l)(c) and vice-versa.
Nor does § 2518(1)(b)(iv) create an outer limit on the names of persons included in the wiretap application so as to curtail the necessity inquiry. Cf. United States v. Martin, 599 F.2d 880, 885 (9th Cir.1979), portions overruled on other grounds by United States v. DeBright, 730 F.2d 1255, 1256 (9th Cir.1984) (rejecting proposition that Kahn requires that only those for whom there is probable cause to believe that person is committing criminal activity may be named in wiretap application). Where, as here, the identities of persons suspected to be involved in a criminal conspiracy with the subject of the wiretap are relevant to the necessity determination, the government is not relieved by § 2518(l)(b)(iv) of its obligation to reveal such information pursuant to § 2518(l)(c). “In eases where probable cause is doubtful as to some conversers, an investigative agency should be encouraged to name more, rather than fewer, participants in the application.” Martin, 599 F.2d at 885.
2
The government also claims that the seven omissions are immaterial because it is entitled to apply for a wiretap “to uncover the sources of supply, details of the operation, and sufficient evidence to convict beyond a reasonable doubt.” Obj. at 58. In other words, even if the wiretap was not necessary to learn some information that could not be discovered by traditional means, the wiretap was necessary to iron out all of the details of the conspiracy. This argument cannot be taken too far.
A determination whether an omission or misstatement is material requires the reviewing court to hypothesize about the effect of such knowledge on the issuing court. Ippolito, 774 F.2d at 1485-86; see Franks, 438 U.S. at 156, 98 S.Ct. at 2676-77. The reviewing court must put the challenged misstatements and omissions to one side and determine whether there remains sufficient content in the warrant application to support a finding of necessity. Ippolito, 774 F.2d at 1486-87; see Franks, 438 U.S. at 171-72, 98 S.Ct. at 2684-85. “If it would have no effect, then the misstatement [or omission] would not be material.” Id. at 1486.
The government takes an unduly cramped approach to materiality. In its wiretap application, the government listed numerous purposes for the wiretap, ranging from the identification of co-conspirators to the development of admissible evidence against them. See Aff. 57 and 62. It now contends that a misstatement or omission is not material so long as it can identify one legitimate purpose for the wiretap that is not *1236 implicated by the removal of the alleged misstatement. While this might be an appropriate standard for materiality in the context of a single misstatement or omission, it is not appropriate where there are numerous misstatements and omissions and these falsehoods, when aggregated, undermine the issuing court’s necessity determination.
The rule proposed by the government would permit law enforcement officers to escape the requirements of § 2518(l)(c) because the government can always identify some detail of the conspiracy, no matter how trivial, that could not have been discovered through traditional law enforcement techniques.[1] On the government’s view, there would be situations where the affidavit would not be found to satisfy the necessity requirement when all of the misstatements and omissions are corrected, but the reviewing court could not make this determination because no single misstatement or omission is material in the sense that it alone dooms the affidavit. Not only is this an odd definition of “material,” but it thwarts the purposes of § 2518(l)(c) if construed in this manner. In any event, there are two material omissions which, considered independently, require suppression of the evidence derived from the illegal wiretap. See parts IV-C and IV-E.
3
When viewed in the context of the other misstatements and omissions, the court finds that the omission of the identities of the seven participants in both Ailemen conspiracies was material to the issuing court’s necessity determination. It is almost certain that the issuing court did not consider the necessity requirement to be met simply because the government lacked sufficient evidence to convict beyond a reasonable doubt. Instead, the affidavit gave the appearance that the wiretap was necessary to discern the identities and roles of Ailemen’s co-conspirators and the scope and method of his organization. Aff. at 57 and 62. If the government had revealed to the issuing judge that it had discovered the identities of seven suspected participants in Ailemen’s organization through traditional investigative methods, he would have recognized that the government could learn a great deal about the roles of these participants, as well as the identities of others, without resort to a wiretap. See part V. In the view of the undersigned, the issuing judge would not have authorized the wiretap if he knew how quickly the government had been able to identify the suspected participants in Ailemen’s organization through traditional investigative means.
Furthermore, in light of the government’s statement that “normal investigative procedures have not and likely cannot succeed in establishing the identities of the co-conspirators and aiders and abetters of Pius Ademen (other than as set forth herein),” Aff. at 65, and at its overall attempt to portray the Ailemen organization as impervious to traditional investigative techniques, the court finds that the omissions were made with reckless disregard for the misleading effect it would have on the issuing judge.
C
The affidavit was also drafted to mislead the issuing judge about the ability of agent Estelle to penetrate the organization and learn more about its scope and sources of supply. In the section of the affidavit devoted to “Use of Informants and Undercover Government Agents,” agent Silano stressed the need for the wiretap to identify Ailemen’s suppliers and his distribution network. Aff. at 59. The section begins with a warning about the ineffectiveness of undercover agents in situations in which the subject lacks confidence in them; its bulk is devoted to “instances where the undercover agent was not brought into the complete confidence of the subjects.” The affidavit thus created the misleading impression that Ailemen was distrustful and elusive with the undercover agent and that the undercover operation was unlikely to develop into a fruitful source of information.
1
In reality, undercover agent Estelle had gained the confidence of Ailemen in a remarkably short period of time. By mid- *1237 February 1993, after spending less than two months of continuous contact with Ailemen,[2] agent Estelle was: permitted to work directly with Ailemen in a couriering operation to Chicago; repeatedly offered large amounts of heroin; and offered the possibility of traveling to New York with Ailemen to buy narcotics from Ailemen’s people there. Aile-men even met directly with Estelle on two occasions and he explained to Estelle the reasons why Estelle dispelled Ailemen’s concerns that his new buyer was a cop.[3] The necessity section of the affidavit omits these important details.
It is true, as the government contends, that the factual section of the affidavit, although omitting the other details, mentioned the possibility of the New York meeting and the trip by Estelle to Chicago. Aff. at 36 and 39-45. But the possibility of the New York meeting, was buried in a mass of detail about the discussions between Quarshie and Estelle that consumed nearly thirty-five pages of the sixty-five page affidavit. Aff. at 10-45. Placement of this important information is notable as much for what it concealed, as for what it revealed. In fact, the government took Ailemen’s suggestion of a trip to New York quite seriously and set up a team of agents prepared to pose as Colombians to meet Ailemen and his people in New York. TR 4-919:12-19 (testimony of agent Silano). Agent Silano’s explanation for not going forward with this operation is unilluminating (“because we did not want to meet in New York”). TR 4-919:20-22. The government did not share with the issuing judge the seriousness of the prospects for the New York meeting and its promise for advancing the investigation. Quite the opposite, the government gave a gloomy portrayal in the necessity section of agent Estelle’s undercover investigation, see Aff. at 58-59, thereby cloaking the real promise of Estelle’s investigation from the issuing judge. As the Ninth Circuit put it in another ease, the portion of the affidavit devoted to “Exhaustion of Alternative Investigative Techniques” was “artfully drafted with the intent to mislead the [issuing] judge.” United States v. Simpson, 813 F.2d 1462, 1471 (9th Cir.1987) (quoting district court).
2
The government argues that the omitted details of Estelle’s involvement in the investigation of Ailemen were immaterial to the issuing judge’s finding of necessity. Even if the government had included the alleged omissions, the government contends that the wiretap still would have been necessary to identify all of the defendant’s co-conspirators, the entire scope of the conspiracy and all methods of transporting drugs. Obj. at 91. Specifically, the government contends that the magistrate engaged in impermissible second-guessing of investigative activities when he considered the possibility of Estelle traveling with Ailemen to New York because Estelle believed that the trip would not be fruitful and might be dangerous based on his years of investigative experience. Obj. at 71 and 74.
The government’s criticisms of the magistrate are misplaced. In United States v. Spagnuolo, 549 F.2d 705 (9th Cir.1977), the Ninth Circuit discussed the role that an agent’s law enforcement experience should play in his obligation to reveal facts pertaining to the exhaustion of traditional investigative tactics to the issuing judge. The Ninth Circuit declared that the affidavit’s description of the investigative tactics that have been tried must be “sufficient to enable the district judge to determine, independently of an agent’s assertions with respect to his or her other agents’ experiences, that ordinary investigative techniques very likely will not succeed or that their use will imperil life or in some other specific way be too danger *1238 ous.” Id. at 710 (emphasis added). The court went on:
To delay the wiretap order while ordinary techniques are employed or to undertake to educate a district judge to enable him to appreciate their level of experience no doubt appears to such agents as a waste of time and resources. Their perception may be accurate, but Congress has deprived it of decisive influence. The particularized showing here described is necessary. The district judge, not the agents, must determine whether the command of Congress has been obeyed.
Id. at 710-11. The government cannot circumvent this requirement by citing to the post-hoc rationalization of officer Estelle that he thought the trip to New York would be futile or dangerous. If at the time the affidavit was submitted to the issuing judge, Estelle thought a trip to New York would not pan out or be too dangerous, the government’s obligation was to disclose Estelle’s views and his reasons to the issuing judge. Surely, the government cannot undo its failure to have made this submission by now using Estelle to second guess the magistrate.
For instance, the issuing judge should have been informed in the necessity section of the affidavit, or clearly in the fact section, that Ailemen suggested the possibility of a rendezvous in New York with his narcotics suppliers. Such further use of the confidential informant might very well have led to penetration of Ailemen’s entire enterprise, including the source of Ailemen’s supply and the identities other major co-conspirators. See part V. It was reckless for the government to portray the undercover efforts of Estelle as a failure and to conceal the leads it chose not to pursue.
D
The government discovered two other un-pursued leads that were not reported to the issuing judge. On December 11,1992, Washington, the confidential informant who was never named in the affidavit, disclosed to officer Gutierrez that Ailemen always paid his $1,400 monthly rent with money orders. On February 26, 1993, investigative agents followed Ailemen to “a money laundering, excuse me, scratch that, a cheek cashing establishment, alleged money laundering place.” Grand Jury Testimony of Agent Si-lano, Ex 17 at 31. Nowhere in the affidavit does the government disclose to the issuing judge that its investigation turned up these fruitful sources of information. Nor does the government discuss these omissions in its objections to the magistrate’s report and recommendations.
These omissions were reckless and material. It appears that the government failed to mention the money orders because doing so would have required the disclosure of Washington as a second confidential informant. As the on-site manager of Ailemen’s apartment, Washington was a well-placed lookout for the government. Washington could monitor the comings and goings at Ailemen’s apartment and could speak to Ademen directly without arousing suspicion. Washington also made himself avadable as a source of information regarding the layout of the apartment and assisted the investigative team in setting up and maintaining video survedlance of Ademen’s front door. This second confidential informant was a great resource in the undercover investigation of Ademen. Although Washington provided the investigative team with a wealth of information over more than six months of the investigation and was a potential source for more, he was not mentioned or identified in the affidavit submitted to the issuing judge.
The failure to disclose the discovery of the check cashing facility was also reckless. Law enforcement agents learned about the check cashing business after they successfully followed Ailemen to the facility despite Ademen’s use of counter-survedlance driving techniques. The affidavit conspicuously omits this discovery in its discussion of the results of physical surveillance. Worse stiH, the discussion of physical survedlance in the necessity section misleads the reader to believe that no such evidence was ever found. See Aff. at 60 (“In this particular case, surveillance succeeded only in corroborating “Pius’” travel to undercover meetings and heroin purchases, but revealed no evidence of the secret meetings he conducted or the private plans for delivery and distribution of *1239 heroin.”). The government was at least reckless in omitting any reference to the money orders or check cashing business. This omission was material to the necessity determination. See part V.
E
In April 1992, Sidney Gladney, now a convicted member of the Ailemen conspiracy, was arrested in Canada on charges of “masterminding a 2 kilo smuggling attempt through Canada.” Ex 70. The affidavit disclosed that: (1) the government had probable cause to believe that Gladney was committing narcotics offenses, Aff. at 3; (2) Ailemen had made ten phone calls to Gladney at his home and office from April 15 to July 28,1993, Aff. at 52-53; (3) Gladney was identified as an associate of Pius Ailemen in the 1989 investigation, id.; and (4) Gladney has a May 1992, arrest for heroin distribution, id. at 53. The affidavit, however, does not include crucial facts which link Gladney to Ailemen and which make clear that the government should have learned more about the Canadian investigation before submitting an application for a wiretap. AUSA Vadas prosecuted both the 1989 and 1992-93 investigations of Ailemen, so he knew that Gladney was a suspect in the earlier investigation and thus had reason to know, or at least suspect, a connection when Gladney’s name resurfaced several times in 1992-93. AUSA Vadas was familiar with Ailemen’s modus operandi of using female couriers to transport heroin across international borders and he knew that Gladney “had been stopped I believe at Toronto airport with two female couriers body-carrying heroin into Canada.” TR 6-1302:21-23. In light of these known similarities between Alemen’s operation and Glad-ney’s Canadian arrest,[4] it was reckless for the government not to have disclosed in the affidavit that it failed to explore fully the details of Gladney’s illegal activities in Canada.
The government contends that the Canadian investigation was immaterial, and characterizes it as a “dead end,” because neither of the female couriers arrested in Canada knew about Ailemen’s source of supply and “Glad-ney never cooperated with the Canadian authorities.” Obj. at 87-88. The government, however, could not have known at the time the issuing judge issued the warrant that Gladney would be uncooperative. A frequently used law enforcement tactic in drug cases is to encourage co-conspirators to “rollover” on each other under threat of criminal prosecution and in exchange for sentencing consideration. The issuing judge would have insisted that the government explore whether this traditional law enforcement tactic held any promise in this case if he had known that a man closely linked to the Alemen organization had been arrested for smuggling heroin through Canada using Ailemen’s modus operandi and was available to Canadian authorities.
V
Having considered which misstatements and omissions were relevant to the issuing court’s necessity determination, the reviewing court must consider for itself whether the corrected affidavit demonstrates the requisite need for a wiretap. The court may begin with “the specific circumstances that render normal investigative techniques particularly ineffective.” Ippolito, 774 F.2d at 1486.
In the section of the wiretap labeled “Need for Interception of Wire Communications; Exhaustion of Aternative Investigative Techniques,” the affidavit identifies three types .of information that the government could not obtain through traditional means: (1) the sources of Ailemen’s heroin supply, Aff. at 58 and 59; (2) the identities of co-conspirators and aiders and abettors, id. at 57 and 62; and (3) the financial structure of the organization, see id. at 58. At the conclusion of the section, the affidavit includes the following boilerplate language:
For the reasons set out above, it is my opinion that normal investigative procedures available to law enforcement in the investigation of narcotics violators have *1240 been tried and have not been fully successful, are not reasonably likely to succeed if tried, or are too dangerous. It is my belief that the only reasonable way to develop the necessary evidence to discover and prosecute the persons involved in the above-described organization, to identify their locations and methods of operation, their sources of supply, and their financiers, managers, and supervisors, is to commence intercepting wire communications occurring to and from the cellular telephone number * * *. Normal investigative procedures have not and likely cannot succeed in establishing the identities of the co-conspirators and aiders and abettors of Pius Ailemen (other than as set forth herein), their places of operation for their importation and transportation of controlled substances throughout the various states, and their times, places, schemes, and methods for importation, selling, buying, possessing, concealing, delivering, distributing, or paying for controlled substances.
Id. at 64-65. Such generic language is far from specific about the inability of traditional methods to uncover specific information. The Ninth Circuit explicitly prohibited such “sidestepping” of the necessity requirement with general allegations about “drug conspiracies.” Ippolito, 774 F.2d at 1486. In any event, the court finds that the three main categories of information, as well as the smaller details, sought by the wiretap could have been discovered by traditional means.
A
Once the omissions regarding agent Estelle’s investigation and the Canadian investigation of Sidney Gladney are inserted, there was no need for the wiretap to identify the sources of Ailemen’s heroin supply. This was not a case in which the undercover agent aroused suspicion that he was a police officer, cf. United States v. Blanco, 1994 WL 695396, at *6 (N.D.Cal. Dec. 8, 1994); nor a case where a prolonged investigation proved unable to gain the defendant’s complete trust, cf. United States v. Spagnuolo, 549 F.2d 705 (9th Cir.1977) (nine month undercover operation unable to gain target’s trust); United States v. Commito, 918 F.2d 95 (9th Cir.1990) (ten month investigation). Instead, after only two months of continuous contact, agent Estelle was invited to work with Ailemen in a couriering operation and Ailemen admitted that he no longer thought Estelle was an undercover agent.
For instance, Ailemen suggested the possibility that Estelle travel with him to New York to meet with Ailemen’s suppliers. Although such undercover operation would have required members of the investigative team to leave its home turf, the trip almost certainly would have revealed the New York sources of Ailemen’s drug supply.
Nor was such undercover work likely to be “too dangerous,” as was suggested by agent Estelle three years after the investigation. The government knew that the Ailemen organization was not violent and that its members did not carry weapons. See Report and Recommendation at 1285-86; TR 1-196:14-20; TR 2-283:14r-19; TR 5-1073:9-14. Any potential danger could have been alleviated by the use of federal agents in New York who could even out the “home court advantage.” The fact that federal agents in New York were unwilling to assist their Bay Area counterparts cannot create the necessity required for a wiretap. Had the affidavit candidly revealed the up side of agent Estelle’s investigation, the court would have found that resort to a wiretap to learn the sources of Ailemen’s supply was unnecessary. Cf. United States v. Simpson, 813 F.2d 1462 (9th Cir.1987).
This determination is buttressed by the information available with respect to the Canadian investigation of Sidney Gladney. In that investigation, Canadian agents identified two-Pakistani sources of multi-kilo quantities of heroin who were doing business with Pius Ailemen in April 1992. Report and Recommendation at 126. With the assistance of Canadian authorities, the government could have made an effort to determine if Sidney Gladney would reveal any details of Aile-men’s organization. A wiretap was not necessary until after the government had pursued these leads.
*1241 B
The affidavit also omits the names of seven persons whom the government knew, or should have known, were participants in both the 1989 and 1992-93 Ailemen conspiracies. This means that at the time the government filed its application for a wiretap, it knew the names of thirteen persons whom it believed were linked to Ailemen. To learn the names and roles of the other co-conspirators, the investigators could have installed pen registers on the phones of at least some of these suspects, put covers on their mail, surveilled them or explored their financial transactions. Before the government took these conventional steps, there was no need for a wiretap to identify Ailemen’s co-conspirators.
C
The government also failed to follow leads regarding the financial structure of Ailemen’s organization. Ailemen paid his monthly rent by money orders which should have been traced to their origin. In addition, the government should have investigated the check cashing business, which it believed to be a money laundering facility, to obtain further information about the flow of Ailemen’s drug proceeds. A probe into the money orders and check cashing facility, neither of which was revealed in the affidavit, could have uncovered a wealth of information regarding the financial structure of Ailemen’s organization. In sum, the specific facts withheld from the issuing judge about this particular investigation reveal that traditional techniques were not exhausted or too dangerous and could have led the investigators to the details they sought by installation of the wiretap.
VI
Due to the large number of misrepresentations and the deceptive conduct of the government throughout the wiretap application and review process, the suppression motion now before the court is not amenable to a piecemeal analysis. And the magistrate did not take such an approach. Instead, the magistrate viewed the misrepresentations in their totality and in light of his determinations about the credibility of the government’s witnesses. The magistrate’s approach was on target. Only by isolating the numerous misrepresentations contained in the affidavit and considering each one alone and separate from the others is the government able to convince itself that its conduct does not warrant suppression. But when the misrepresentations in the affidavit are viewed together and in the context of the government’s overall effort to obtain and preserve its wiretap, it becomes evident that the government agents engaged in a deliberate attempt to mislead the court and subvert the purposes of 18 U.S.C. § 2518.
By enacting the necessity requirement of section 2518(l)(c), Congress sought to limit the use of wiretaps to situations in which traditional investigative techniques have been tried but found unlikely to succeed. See Legislative History of Omnibus Crime Control and Safe Streets Act of 1968, 1968 U.S.Code Cong, and Admin. News 2112, 2190-91. In this case, the government launched a successful investigation that uncovered several promising investigative leads. Bather than pursuing these leads with traditional methods, the government sought a wiretap.
To obtain judicial authorization for the wiretap, the government could not reveal the full potential of its traditional investigation. The affidavit misstated several facts; it omitted and buried others. Indeed, the magistrate identified more than seventeen such misrepresentations, almost all of which were concentrated in the nine pages of the affidavit devoted to necessity.
Not coincidentally, the necessity section was laden with boilerplate language and a one-sided account of the failures of the investigation. The affidavit does not at the outset describe the specific goals of the investigation and then explain why traditional investigative methods are unlikely to achieve those goals. Instead, the necessity section concludes with a laundry list of sought-after information and borrows language from section 2518(l)(c) to the effect that “it is my opinion that normal investigative procedures available to law enforcement in the investigation of narcotics violators have been tried and have not been fully successful, are not *1242 reasonably likely to succeed if tried, or are too dangerous.” Aff. at 64-65. The generic quality of the necessity section coupled with its one-sided account of the defects in the ongoing investigation effectively misled the issuing judge about the promise of traditional investigative methods.
The court is therefore left with a decision about how to interpret the government’s behavior. Under other circumstances, the misleading character of the necessity section might be chalked up to carelessness or neglect on the part of the affiant. If the affiant simply omitted details and used boilerplate language in a hasty attempt to conserve time due to some exigent circumstance, suppression might not be appropriate. The conduct of the affiant at the evidentiary hearing before the magistrate, however, suggests a more disturbing endeavor.
During the seven-day evidentiary hearing conducted in December, the magistrate had an opportunity to observe the demeanor of the law enforcement agents and to assess their credibility. The magistrate observed that “[affiant-agent Silano] sometimes openly looked to government counsel before offering an answer, apparently either hoping for an objection or looking for a clue about how to proceed. * * * Agent Silano’s testimony was marked too little by forthrightness and too much by an unbecoming concern about the legal significance of answers to questions.” Id. The court should defer to the credibility determinations of the magistrate unless presented with evidence or reason for a new evidentiary hearing. See Raddatz, 447 U.S. at 681 n. 7, 100 S.Ct. at 2415 n. 7. The government has presented no evidence or reason to disturb the magistrate’s findings in this regard. Indeed, at the hearing on this matter, the government did not contend that an evidentiary hearing was necessary.
When the deceptive character of the affidavit is considered in light of the agent’s conduct at the evidentiary hearing, a pattern of behavior intended to obtain and protect the wiretap emerges and shows that the government acted without respect for the necessity requirement of § 2518(l)(c). The pre-wire-tap investigation in this case uncovered promising leads that would have obviated the necessity for a wiretap. The government claimed in the affidavit that normal investigative efforts were unlikely to reveal the sources of Ailemen’s heroin supply; in fact, Canadian authorities had already discovered two Pakistani sources and agent Estelle had the possibility of meeting others in New York. The government claimed that normal investigative efforts were unlikely to reveal the identities and roles of Ailemen’s co-conspirators; the investigative team had already identified seven persons whose names had surfaced in connection with both Ailemen investigations and whom the government suspected were Ailemen’s agents. The government claimed that normal investigative efforts were unlikely to reveal the financial structure of Ailemen’s organization; it did not bother to research what it knew were obvious money laundering techniques.
Aware that full disclosure of these leads to the issuing judge would deprive the government of its wiretap, the affiant either omitted the leads or concealed them' under a mass of unnecessary detail in the fact section and a gloomy portrayal of the investigation in the necessity section. When called to account for his actions by the magistrate, the affiant demonstrated what the magistrate found was an effort to conceal the truth. Deceptive behavior by government agents to mislead the issuing judge subverts the purposes of section 2518(l)(c). Under these circumstances, the court has no alternative but to suppress the unlawfully obtained evidence. See 18 U.S.C. § 2518(10)(a); see also Legislative History of Omnibus Crime Control and Safe Streets Act of 1968, 1968 U.S.Code Cong, and Admin. News 2112, 2160 (“To bring criminal sanction into play, it is necessary to develop legally admissible evidence. Due process requires no less.”).
For the foregoing reasons, the court ADOPTS the magistrate’s recommendation that the court GRANT defendants’ joint motion to suppress evidence obtained by electronic surveillance.
IT IS SO ORDERED.
REPORT AND RECOMMENDATION RE DEFENDANTS’ MOTION TO SUPPRESS EVIDENCE ACQUIRED DURING AND AS A RESULT OF WIRETAP
BRAZIL, United States Magistrate Judge.
*1243 TABLE OF CONTENTS
I. PROCEDURAL BACKGROUND AND RECOMMENDATION..............1243
II. LEGAL STANDARD....................................................1244.
III. CONTEXT.............................................................1245
IV. SUMMARY OF PRINCIPAL FINDINGS.................................1246
V.FINDINGS OF FACT: A CHRONOLOGICAL PORTRAIT OF THE INVESTIGATION AND OF AILEMEN’S RESPONSE TO THE UNDERCOVER OPERATION................................................1249
VI. THE CREDIBILITY OF THE AFFIANT AND ITS ROLE IN RESOLVING THE ISSUES PRESENTED BY DEFENDANTS’ MOTION; ADDITIONAL FINDINGS OF FACT BASED ON TESTIMONIAL CREDIBILITY..............................................................1260
VII. THE AFFIDAVIT: MATERIAL MISSTATEMENTS......................1274
A. The Identities of Other Participants..................................1275
B. “Danger” and the Use of Normal Techniques.........................1285
C. In 1990 Ailemen Was Acquitted, Leaving His Heroin Trafficking Organization Intact.................................................1286
D. The Largest Volume Heroin Dealer in the City of Oakland Area........1288
E. Duration of Use of Video Camera....................................1288
F. Use of Informants and Undercover Agents............................1289
G. Consensual Monitoring.............................................1293
H. Physical Surveillance...............................................1295
I. None of the Named Interceptees Is Known to Be Represented by Counsel............................................................1297
VIII. THE AFFIDAVIT: RECKLESSLY MISLEADING INFORMATION THAT WAS MATERIAL TO THE NECESSITY DETERMINATION The Interview of Francis Idialu..........................................1298
IX. THE AFFIDAVIT: ADDITIONAL MATERIAL OMISSIONS Resources Not Utilized and Leads Not Pursued...........................1301
Keesha Duncan.........................................................1301
Robert Tinney..........................................................1302
Mrs. B. Aghayere and Tracey Asemota ...................................1302
Leads Through the Hijacking............................................1303
DHL, UPS, and Federal Express Records.................................1303
Travel Records.........................................................1304
Financial Records......................................................1304
The Canadian Case in Which Sidney Gladney Was Charged................1308
X. CONCLUSION AND RECOMMENDATION..............................1314
I.
PROCEDURAL BACKGROUND AND RECOMMENDATION
As requested by the District Court, I conducted an evidentiary hearing on the defendants’ joint motion to suppress the evidence acquired during and as a result of the wiretap that District Judge D. Lowell Jensen first authorized on July 29, 1993. In authorizing the wiretap, Judge Jensen relied on a 69 page “Affidavit In Support of Application” (hereafter referred to and cited simply as the “Affidavit”) that was executed and filed that same day, July 29, 1993. The affiant was Special Agent Robert J. Silano, who had been the chief case agent in the investigation in which the wiretap was to be used. At the same time Agent Silano submitted his affidavit, the formal “application” for the wiretap was submitted by Assistant United States Attorney Nandor J. Vadas, the prosecutor who was assigned primary responsibility for this matter from its inception until about the time Judge Jensen initially authorized the wiretap. (TR 6: 1304).
The evidentiary hearing on this joint defense motion consumed some six and one-half days — -December 9 through December 16 of 1996 and February 3, 1997.[1] Hundreds of pages of exhibits were admitted. The tran *1244 script of the proceedings (cited here as TR) consumes about 1,450 pages. The post hearing briefing, which was substantial, concluded on March 7, 1997, with the filing of a supplemental reply brief by defendant Nathaniel Iheukwu. At that point the matter was deemed submitted.
Based on the findings of fact that are made below, as well as the legal reasoning described herein, I RECOMMEND that the District Court GRANT THE DEFENDANTS’ JOINT MOTION TO SUPPRESS the evidence obtained during and as a result of the wiretap that Judge Jensen first authorized on July 29,1993.
II.
LEGAL STANDARD
The defendants’ motion is based on the contention that in securing authorization for the wiretap the government violated the “necessity” requirement that Congress interposed as a precondition to use of this kind of investigative tool. That requirement is articulated in paragraphs (l)(b) and (3)(c) of 18 U.S.C. § 2518. Through these paragraphs, Congress required applications for wiretaps to include, among other things, “a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including ... [ (l)(c) ] a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.” Under paragraph (3)(c) of the same statute, a district judge cannot authorize use of a wiretap unless, among other things, he or she determines “on the basis of the facts submitted by the applicant that----normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.”
Under the applicable authorities, defendants may challenge the issuance of an order authorizing a wiretap through a three-step analytical process. First, they must prove that the affidavit on which the issuing judge relied contained misstatements or omissions. Second, they must prove that the misstatements or omissions were either intentional or the product of recklessness. Third, they must show that if the misstatements were deleted or corrected, and if the information that was omitted was added, a district court would conclude that the required showing of “necessity” for the wiretap had not been made (thereby making the intentional or reckless misstatements or omissions “material” to the “necessity” determination). See United States v. Ippolito, 774 F.2d 1482 (9th Cir.1985); and Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).
According to the Ippolito court, the “necessity” requirement reflects a eongressionally mandated (statutory) presumption against authorizing a wiretap. It is only by making the requisite showing of necessity that the government can overcome that presumption. Id., at 1486. Moreover, to be sufficient to overcome the presumption, a showing of necessity
“must allege specific circumstances that render normal investigative techniques particularly ineffective or the application must be denied, [citations omitted] The reason for requiring specificity is to prevent the government from making general allegations about classes of cases and thereby sidestepping the requirement that there be necessity in the particular investigation in which the wiretap is sought. The District of Columbia Circuit observed that: “we must be careful not to permit the government merely to characterize a case as a “drug conspiracy” ... that is therefore inherently difficult to investigate. The affidavit must show with specificity why in this particular investigation ordinary means of investigation will fail.’ ”
The Ippolito court proceeded to point out that in determining whether the government has satisfied the necessity requirement district courts must use a “practical and common sense approach,” applying a “standard *1245 of reasonableness.” Under this approach, “law enforcement agencies need not exhaust all conceivable alternative procedures before resorting to a wiretap, [but] the government must show, by a full and complete statement ... that normal investigative techniques employing a normal amount of resources have failed to make the ease within a reasonable period of time.” Id.
For the reasons explained at length below, I have concluded that the affidavit that the government submitted to Judge Jensen in this case fell far short of being “a full and complete statement” about the status of the investigation at the time the wiretap was sought. The affidavit included material misstatements, made either intentionally or recklessly. As important, the government omitted from the affidavit, intentionally or recklessly, a great deal of information that was material to a necessity determination. If the false and foreseeably misleading statements had been corrected and the omitted information had been added, Judge Jensen would not have authorized the wiretap — because he would have concluded that the government had not yet made the required “good faith effort” to generate the evidence it needed through normal investigative techniques. Id. Instead, it would have been clear to Judge Jensen that, relative to the alleged magnitude of the case and the “high priority” of the investigation, the government had not devoted reasonable resources over a reasonable period of time to normal investigative methods.
III.
CONTEXT
The recommendation made here implicates values and interests of sufficient moment to warrant additional prefatory comment. First, it is important to me that all parties understand that I take no pleasure in making either the findings or the recommendation that are presented in the pages that follow. If my recommendation is accepted, the government will not be able to use a great deal of evidence — evidence that might implicate several defendants in criminal conduct that is profoundly despicable. The findings and recommendations made in this Report are informed by no sympathy for persons who commit drug offenses and no joy over the effects this Report may have on the government’s ability to make its case against the remaining defendants.
I also take no pleasure in passing judgment on the good faith and/or competence that attended the preparation and presentation of the affidavit and the testimony given in the evidentiary hearing. I make these judgments about the work and words of others only because I am required to do so by my job. And I profess no infallibility. Both my charge and the reach of my resources are limited: I only draw inferences based on reason from evidence. I cannot “know” with absolute certainty that my inferences are accurate or that my judgments are fair. It is not my place to pass ultimate moral judgment — rather, I apply a legal standard to the record that counsel have developed.
It also is important to emphasize that I understand that the legal standard that is applicable here is not perfection — and that the vantage point from which the pertinent judgments are to be made is not the full clarity of 20/20 hindsight. The applicable law leaves reasonable room for human error (as reflected in phrases like “practical and common sense” and “standard of reasonableness”). And the “necessity” requirement cannot be construed literally' — it does not mandate that the government exhaust every normal investigative technique or that the affiant for a wiretap disclose to an issuing judge every nook and cranny of an investigation or every conceivable lead not followed. Rather, what the law requires is a good faith and substantial effort to acquire needed evidence by traditional means, or a showing either that there is insufficient likelihood that such an effort would be successful or that it would be unacceptably dangerous. After making such a good faith effort or determination, the law requires the government to submit an affidavit that gives the issuing judge a fair, essentially accurate picture of the status of the investigation, of what the government has tried to do, what it has learned, and which apparently promising investigatory avenues it has not pursued (before seeking authorization to use the wire *1246 tap). It is because I have concluded that the affidavit presented to Judge Jensen falls far short of achieving these fundamental purposes that I recommend suppression of the evidence acquired through and as a result of the wiretap.
While the necessity requirement demands something considerably less than perfection, it must have some real meaning, and a responsible court has no choice but to order suppression when, as here, the affidavit clearly fads to meet the standards that derive from that requirement.
There is one additional set of considerations that must be borne in mind by judges who are addressing the kinds of issues raised here and by law enforcement agents who are drafting affidavits for wiretaps. The district judges to whom these kinds of affidavits are presented face, at least in many urban courts, pressing and diverse demands on their clearly limited resources. Many (unlike Judge Jensen) have no background in criminal law. Many will not have a refined understanding of the subtleties of the necessity requirement. And in many instances, the government will present the affidavit the same day it hopes to begin the wiretap. Judges, of course, are not required to complete their reviews on a timetable set by the investigators, but many judges feel constrained to try to respond promptly to what they assume is a real law enforcement need.
Given these foreseeable facts of judicial life, it is wholly unrealistic to expect most district judges to spend hours and hours of assertive analytical effort dissecting and probing affidavits like this. It is reasonable to expect reviewing judges to be conscientious, and to read the affidavits carefully, but the affidavits must be crafted in a way that will permit a conscientious district judge to understand all the essential elements of the investigatory situation without committing an unreasonable number of hours to the effort. This means that the affidavits must be straightforward (clear, direct, and succinct) about the matters that are most important to the necessity determination. They must be drafted to communicate clearly and quickly the actual state of the investigation and of the government’s knowledge. In short, the foreseeable circumstances in which many district judges will be reviewing these kinds of affidavits place a real premium on quality and honesty in drafting. Knowing that a wiretap can threaten core values in our society and that a reviewing district judge will be forced to rely heavily on the product of their work, the government’s agents and lawyers should make extra efforts to be sure their affidavits fulfill Congress’ expectations.
I make these observations because I was able to understand many of the important shortfalls in this affidavit, to see through the mass of minutiae to some of the core realities of the investigatorial situation, and to identify important internal inconsistencies, only after a great deal of careful analysis and, in some instances, only with the aid of adversarial briefs and testimonial elucidation.[2] As I will make clear with specific examples in sections that follow, the structure and content of Agent Silano’s affidavit tend to obscure important facts about the state of the investigation. And in some important instances words in the necessity section are inconsistent with details in the body of the description of investigatorial undertakings. Moreover, in some places the phraseology in the affidavit is ambiguous or misleading— making accurate understanding very difficult. Standing alone, these characteristics of the affidavit might not be sufficient to warrant suppression under the standards established by Franks and Ippolito, but joined, as they are, with so many material misstatements and omissions, they reinforce my conviction that the only legally appropriate response to defendants’ motion is to grant it.
IV.
SUMMARY OF PRINCIPAL FINDINGS
The affidavit that the government submitted to Judge Jensen on July 29, 1993 was *1247 fundamentally misleading and was drafted either with intent to conceal facts that were critical to the necessity determination or with reckless disregard for whether the affidavit would have that effect. In combination, material misstatements and omissions, internal inconsistencies, ambiguous phraseology, the fact that much of the affidavit was devoted to a recitation of obviously unnecessary details about a limited set of interactions with two defendants, and the timing of the presentation of the affidavit to Judge Jensen (several months after the government had stopped virtually all of the significant investigatory work on the case that was not related to analysis of use of telephones) compel the conclusion that the affidavit, intentionally or recklessly, obscured or concealed (1) how modest the commitments had been to normal investigative techniques, (2) despite the modesty of these commitments, how many alleged co-conspirators or aiders and abettors, as well as how many likely interceptees, the government had been able to identify, (3) how many leads and significant investigative opportunities the government had before the wire went up but chose not to pursue, and (4) how early the government shifted the focus of its investigation away from other, traditional investigative work and toward preparing for the wiretap.
On the basis of evidence described below, I find (1) that the government in fact devoted less than two months of serious undercover and surveillance work to this investigation before it decided to shift the investigatorial center of gravity to the wiretap,[3] (2) that that work had been remarkably successful and held considerable promise, (3) that the government chose not to pursue many potentially significant investigatory leads that it had developed, or with reasonable competence should have developed, well before it sought authorization for the wiretap — and that some of these leads clearly would have yielded valuable information about the sources of the drugs in which Ailemen was trafficking, (4) that the decision to rely on the wiretap as the principal investigatory tool was made no later than the first week in March of 1993— almost five months before the application was submitted, and (5) that after that time the only investigatory efforts of any consequence were directed toward analysis of telephone communications.
I also find that the affidavit was drafted, intentionally or recklessly, in a way that effectively obscured all of these facts from Judge Jensen’s view. It encouraged him to infer, erroneously, that the government had devoted considerable resources to this “high priority” [4] investigation, that the undercover operation had enjoyed only very limited success because Ailemen remained elusive and distrustful, that substantial investigatory work through traditional techniques continued to be undertaken during March, April, May, June and July of 1993,[5] and that the government had precious few promising leads that were amenable to normal (non-wire) investigation at the time the affidavit was submitted.
The affidavit did not disclose how much the government knew about the connections (in personnel and operations) between the instant case and the case it had unsuccessfully prosecuted against Ailemen in 1989 and 1990. Nor did the affidavit disclose that the agents who worked on the 1993 case devoted appreciably less than full time to it before *1248 the wiretap application was presented,[6] that resources from other law enforcement agencies were available but not used, that after the first two undercover buys, in which the government spent a total of $27,000, the agents decided that they would not spend any additional money in drug transactions with the defendant (even though the government believed he regularly engaged in transactions involving much larger quantities of heroin and much larger sums of money), that virtually all of the limits on the government’s interaction with the defendant (through the undercover agents and the principal confidential informant) were self-imposed, that no meaningful effort had been devoted to exploring the financial aspects of Ailemen’s activities (or the financial aspects of the activities of any of the other suspected members of his “organization”), or that the lead case agent for the DEA allegedly felt that other DEA offices and other federal law enforcement agencies had not been responsive to his informational needs and would not commit significant resources to this case unless and until a wiretap was installed. All of these facts would have been material to the necessity determination by the district judge — and the government’s failure to disclose them was the product of at least recklessness.
It also is significant that the center of informational gravity in the affidavit is fundamentally misleading. The affidavit is dominated by a plethora of unnecessary detail about two sets of interactions between the undercover agent and Pius Ailemen or Ellis Quarshie.[7] The two periods of substantial interaction were December 3 through December 12, 1992, and February 3 through February 19, 1993. More than 30 pages of the affidavit is devoted to description of the details of conversations and conduct during these two periods — details that were obviously unnecessary for any of the purposes for which the affidavit was submitted.
For example, the probable cause requirement of 18 U.S.C. § 2518(3)(a) clearly could have been satisfied with a much shorter, more focused presentation of the basic facts about the two sales by Ailemen to the undercover agent. Nor were most of these details necessary to show that “particular communications” concerning the alleged offenses would be obtained through the proposed interceptions;[8] the affidavit devoted another nine pages to material pertinent to that requirement.[9] The fact that so much of the affidavit was devoted to such clearly unnecessary detail invites an inference that its purpose was not to meet any requirements imposed by the law, but to create a false impression about the magnitude of the effort committed to normal investigatory techniques — and to distract the reviewing judge’s attention from the fact that potentially important leads had not been pursued and from the fact that during the last several months before the affidavit was submitted the only consequential effort in the case was devoted to analysis of use of the target phone.
Finally, it is important to point out the location, in the affidavit, of the most troublesome omissions, misstatements, and misleading presentations. It is not insignificant that the defects in the affidavit that are most consequential to the necessity determination appear in two critical places: (1) in the background section, near the beginning, where the basic predicates that will inform the reading of the remainder of the text are set forth, and (2) in the “necessity” section, ie., that portion of the affidavit where the government purports explicitly to summarize the circumstances that give rise to the “Need for Interception of Wire Communications; Exhaustion of Alternative Investigative Teeh- *1249 ñiques.” Affidavit at 57-65. Reckless omissions and errors in these two parts of the affidavit have greater impact than they would in other areas. Moreover, because the bulk of the affidavit is burdened by the inclusion of so much obviously unnecessary detail, the drafters of this affidavit could have foreseen that a reviewing judge would not be likely to detect inconsistencies between the summaries presented in the “necessity” section and the facts and evidence set forth so laboriously in the central portions of the affidavit.
V.
FINDINGS OF FACT: A CHRONOLOGICAL PORTRAIT OF THE INVESTIGATION AND OF AILEMEN’S RESPONSE TO THE UNDERCOVER OPERATION[10]
I find the following facts.
The first federal investigation of alleged drug trafficking by Pius Ailemen began in 1987. The lead case agent was the DEA’s William Iseri. Agent Silano was not assigned to that case and did no work on it, but had heard a little about it.[11] The principal prosecutor was Nandor Vadas, who also was the principal prosecutor assigned to the current case until the end of July of 1993.
In the earlier case, undercover agents negotiated drug transactions with Ailemen and learned that he used young, white, female couriers to transport heroin from overseas into and around the United States. Many of the these couriers were identified,[12] and some gave the prosecutors considerable information about how Ailemen smuggled drugs. See, generally, Exhibits 2 — 9. The first investigation also developed information implicating Sidney Gladney, Nathaniel Iheukwu, Loreli Washington, and Victor On-uaguluchi in Ailemen’s trafficking. During the undercover part of the investigation, an agent had been able to develop a “very good rapport” and a trusting relationship with Ailemen quickly; in fact, Ailemen had offered to take two undercover agents to Amsterdam to meet with a man who Ailemen said was exporting large quantities of heroin to the United States.[13] TR 1:98; Ex. 3 at 16.
The trial in the first case against Ailemen occurred in 1990. The jury convicted him only on one count, for intentionally making a false statement in a passport application. He was acquitted on all the drug charges after presenting, largely through his own testimony, what amounted to a duress defense. He was sentenced initially to five years in prison, but that sentence was appealed. By October of 1991 he had been released from prison, and when the investigation that led to the current charges began (in the late summer/early fall of 1992) he was on parole.[14]
The investigation that led to the filing of the complaint in the instant action began in October of 1992. Agents Robert Silano and *1250 William de Freitas decided to open this investigation after Aaron Mouton,[15] a private citizen who agreed to serve as a confidential informant in the hope that by helping the government he could reduce the time his brother would spend in prison, gave the agents enough information about himself and about Pius Ailemen to persuade the agents that it was appropriate to pursue this matter.
By about mid-October, 1993, arrangements had been made to secure the cooperation of two officers assigned to the Alameda County Narcotics Task Forces: John Gutierrez and Carl Estelle. TR 6:1171; TR 5: 1072-75. Officer Estelle was designated to serve in an undercover capacity; his assignment was to try to develop a relationship with Pius Aile-men and to learn as' much as he could about Ailemen’s drug trafficking and his “organization.”
On October 30, 1992, Mr. Mouton, the confidential informant, introduced Estelle, who was pretending to be interested in drug transactions with Ailemen, to Ellis Quarshie, whom Mouton knew was prepared to act as an intermediary to Ailemen. During this meeting, Estelle expressed interest in buying heroin from Ailemen and Quarshie told Estelle that Ailemen generally dealt in large amounts of heroin. Quarshie indicated that he would provide Estelle with a sample of the heroin that Ailemen had for sale; Quarshie also told Estelle that Ailemen was looking for a source of cocaine. At the close of this meeting, Estelle told Quarshie that Estelle “would be getting in touch with Quarshie through” Mouton. Aff. at 11.
Estelle made no effort to contact Quarshie for more than a month. On December 2, 1992, Mouton telephoned Quarshie at his place of work and asked if Estelle could call Quarshie. Quarshie agreed. Ex. 20. On December 3, 1992, Estelle called Quarshie at work and arranged to meet Quarshie at his house that evening. Quarshie gave Estelle his home phone and address. When Estelle went to Quarshie’s house that night, Quar-shie gave him a sample of the heroin that Ailemen had for sale. Aff. at 11-12. Quar-shie also indicated that Ailemen was ready to do business — but that Quarshie “wanted to get Estelle and Pius together because he (Quarshie) didn’t want to be in the middle of the future transactions.” Aff. at 13.
Later in the evening of December 3, 1992, Quarshie contacted Estelle by phone and asked to meet the next day. On December 4, 1992, when Quarshie and Estelle met, Quar-shie gave Estelle the price that Ailemen would charge for one ounce of heroin ($6,000) and told Estelle (again) that Ailemen was ready to do business. Quarshie also told Estelle that after the first or second transaction, Ailemen would be “willing to front one half’ of the heroin Estelle purchased. Aff. at 13-14; Ex. 77. At this meeting Quarshie “again stated that he (Quarshie) would prefer that ‘Pius’ and UCA Estelle do their own business so that Quarshie would not be responsible for the heroin if something went wrong.” Aff. at 15.
On December 7, 1992, Aaron Mouton reported to the DEA investigators that Quar-shie had repeatedly been trying to reach him by phone, apparently anxious to arrange for drug transactions between Ailemen and Estelle — but that Mouton had not returned the calls. TR 2:326-27.
Between the 6th and the 10th of December Quarshie and Estelle had several phone conversations, during which Estelle pretended to be in Los Angeles. Aff. at 15-18. On December 10, 1992, Estelle went to Quarshie’s house for a second time and received yet another sample of heroin, this from the new batch that Ailemen had for sale. On this occasion Quarshie told Estelle that the heroin was transported by couriers who body-wrapped it. He also told Estelle, again, that Ailemen would front half the heroin after the first transaction had been completed. Aff. at 18-20; TR 2:238. The next day Quarshie and Estelle met again. In addition to giving Estelle more information about prices and making arrangements for the one-ounce purchase on the 12th, Quarshie told Estelle that Ailemen got heroin from New York. Aff. at 20-22.
*1251 By following Quarshie, agents had identified the apartment building (the Park Belle-vue Tower) in Oakland where Ailemen resided. Officer Gutierrez identified the on-site manager of the apartment building, Nordahl Washington, then checked with other officers to determine whether Mr. Washington could be trusted with confidences. On December 11, 1992, after learning that Mr. Washington was completely trustworthy, officer Gutierrez visited the Park Bellevue Tower to introduce himself to Mr. Washington and to ask for information about Pius Ailemen. TR 6:1181— 83; 1203. During this visit, Mr. Washington identified and described the layout of the apartment in which Ailemen lived, provided two of Ailemen’s telephone numbers (one for the residence, one for his cellular phone), reported that Ailemen always used money orders to pay his $1,400 monthly rent, alerted officer Gutierrez to the fact that Ailemen’s apartment was one of only three in the building that was equipped with an alarm, and identified two vehicles that Ailemen drove. Ex. 22 (and Gov.’s Y); TR 6:1182 — 83.
The next day, December 12, 1992, undercover agent Estelle drove to Ellis Quarshie’s house to purchase the ounce of heroin. After Quarshie handed him the heroin, Estelle paid Quarshie the $6,000 in cash, plus a $200 bonus for making the arrangements with Ailemen. Gov.’s Ex. S; Aff. at 23-24. Shortly after Quarshie counted part of the money, Ailemen phoned and told Quarshie that he was on his way over and wanted to meet Estelle. Ailemen also spoke with Estelle on the phone. A few minutes later Ailemen arrived at the house. In the ensuing conversation he told Estelle that he wanted to acquire two to four kilos of cocaine for distribution in Europe and that he would be willing to trade heroin for cocaine if Estelle was interested in handling the transaction that way. Estelle indicated that he would contact possible sources in Los Angeles and try to supply the cocaine that Ailemen needed. Ailemen also told Estelle that he was going to New York to get more heroin, that he had about one kilo for sale now, that he preferred selling heroin in kilo or half-kilo amounts, and that he would like to see Estelle make purchases at that level so he could get the wholesale price from New York. Gov.’s Ex. S.
During this conversation Ailemen also told Estelle that his name was Pius and that Estelle could call him “P.” Id. Before Estelle left this meeting he told Quarshie that he would call him within an hour to let him know whether he (Estelle) would be able to supply the cocaine that Ailemen wanted. Id.; Aff. at 27. Later that day Estelle called Quarshie to tell him that the cocaine he thought he might be able to get for Ailemen was not available because it already had been distributed. He also told Quarshie that he would be going to Chicago for a while but would keep in touch. Gov.’s Ex. E.
On December 14, 1992, officer Gutierrez made another visit to Nordahl Washington at the Park Bellevue Tower. When he arrived he saw a black male leave the building and get into the BMW that Washington had identified as one of the cars Ailemen used. Washington told Gutierrez that the man who drove off in the ear was an associate of Ailemen’s. Officer Gutierrez subsequently learned that the man he saw on this occasion was Nathaniel Iheukwu. TR 6:1194-95. Later in the day on December 14th officer Gutierrez used the license plates of the vehicles that Nordahl Washington had identified to learn from DMV records that the white BMW was registered to “Lorelo [sic, really Loreli] M. Washington.”[16] Ms. Washington was the common law wife of Nathaniel Iheukwu. Ex. 5-B at 30. Iheukwu and Loreli Washington had been identified by the DEA in the 1989 investigation as likely participants in Ailemen’s drug trafficking. Ex. 5-B at 29-30. Gutierrez’ research through DMV records on the 14th also disclosed that the Alfa Romeo that Ailemen drove was registered to Kelly Lambert, who also had been identified as a likely participant in Ailemen’s drug trafficking in the 1989 investigation. Ex. 23; Gov.’s Ex. Y; Ex. 5-B at 29.
During this visit on December 14, 1992, Nordahl Washington gave officer Gutierrez a key to the building (common areas) and an access device for entering the garage. Ex. 23; TR 6:1182-83. Officer Gutierrez also *1252 had a conversation at this time with John Shahoian, the property manager of the complex, who “stated that he [and Nordahl Washington] would assist in anyway possible.” Ex. 23; TR 6:1184.
By December 8, 1992, Agent Silano, with some assistance from Agent de Freitas, had drafted the proposal to have the investigation of Pius Ailemen and his trafficking associates designated as an OCDETF matter (Organized Crime Drug Enforcement Task Forces). At least two-thirds of this proposal consisted of a virtually verbatim copy of the body of the proposal for OCDETF designation of the earlier investigation that DEA Agent William Iseri had written in December of 1988.[17] By December 21, 1992, this second investigation of Pius Ailemen had been approved as an OCDETF matter — with seven different federal law enforcement agencies (in addition to the DEA and the Alameda County Narcotics Task Force) agreeing to participate.
Sometime in December of 1992 the investigators installed a pen register on the two phone lines that Ailemen used from his apartment. Ex. 17 at 35.
Undercover agent Estelle and Ellis Quar-shie spoke over the phone five times between December 18, 1992 and January 8, 1993. During this period Estelle pretended to be in Chicago, and then Miami, and pretended to be looking for cocaine for Ailemen. Quarshie told Estelle several times that Ailemen had asked about Estelle and wanted to do more business with him. During their conversation on January 8, 1993, Estelle indicated that he might want Ailemen to arrange to have heroin that Estelle would buy from Ailemen couriered to Chicago. Quarshie said he thought that could be arranged. Gov.’s Ex. E; Gov.’s Ex. J; Aff. at 27-28.
On January 8, 1993, the DEA issued the first of three subpoenas through which it acquired the billing statements for Ailemen’s cellular phone. Aff. at 49.[18]
Even though he told Quarshie (over the phone) on January 8, 1993, that he would be back in the Bay Area by January 11th, and would contact Quarshie then, and even though Quarshie left some twenty messages for him, undercover agent Estelle made no effort to contact Quarshie — and had no contact with him — between January 8,1993, and February 3, 1993. Gov.’s Ex. J; Aff. 28-29. During this period, Quarshie had contacted Aaron Mouton, the confidential informant, “almost every day” — primarily, it appears, in search of a source of cocaine for Ailemen. Ex. 29. Quarshie also contacted Mouton about eight times in February. Id.
In the latter part of January, Mouton met Ailemen face to face on two occasions. On one of these occasions Ailemen was “in the presence of his/her [sic] spouse.” Ex. 29. On the other occasion, January 21, 1993, Mouton met with. Ailemen and Quarshie at the latter’s house. Ailemen told Mouton that he wanted to obtain two kilograms of cocaine from Estelle — and that he was willing to trade heroin for that amount of cocaine. Ailemen “seemed to be desperate to obtain the cocaine” and indicated that if he could not get it from Estelle he would get it “from his people in Los Angeles.” Ex. 53. Aile-men also tried to use Mouton to respond to Estelle’s request (made initially on January 8th through Quarshie) for help couriering heroin to Chicago. He told Mouton that he could arrange to have the heroin couriered to Chicago for Estelle and that he could have it delivered there within six hours. He also gave Mouton some information about how he packaged the heroin (for couriering) to conceal its odor. Id.
In late January of 1993 the investigative team took steps to install a hidden video camera in the hallway outside Ailemen’s apartment and to secure a mail cover from the Postal Service. The application for the mail cover was submitted on January 28th, but took almost a month to process — so gathering information through the mail cover did not commence until about February 22,1993. Aff. at 54-56; TR 4:808. In sharp contrast, the camera outside Mr. Ailemen’s apartment appears to have been installed on the day Chief Magistrate Judge Langford signed the *1253 authorization order (January 25, 1993). Aff. at 53; Gov.’s Ex. Y. Arrangements already had been made through Nordahl Washington and John Shahoian, the property managers, for the investigators to use a “trash/broom closet” on Ailemen’s floor of the building to support this surveillance. TR 6:1183, 1187-89. Sometime in February the agents replaced the “regular video camera” that they initially installed with a “tape delay” model. Officer Gutierrez was required to go to the building frequently to replace the tape. TR 6:1187-90; Gov.’s Ex. Y.[19] Neither video camera produced a clear picture — so it was difficult for the agents to identify the people who appeared on the footage. TR 6:1189-90.
On February 3,1993, the agents re-activated the undercover part of their investigation when Carl Estelle finally returned one of Quarshie’s numerous calls. Gov.’s Ex. F; Aff. at 28. After a brief phone conversation, Estelle went to Quarshie’s house, where the two men had an extended interchange. Estelle said that he had not been able to obtain the cocaine that Ailemen wanted and that he did not want to play middle-man between Pius and the Colombians from Miami (now allegedly the most likely source of cocaine)— so he would agree to arrange a meeting between Ailemen and the Colombians, then bow out of the action. Then Estelle expressed an interest in buying 100 grams of heroin from Ailemen and having Ailemen arrange to have one of his couriers get the heroin to Chicago for him. Quarshie indicated that Ailemen appeared to feel that he could work with Estelle and that Ailemen would be willing to arrange for the courier. Gov.’s F. Quarshie also told Estelle that Ailemen was “so ready for you,” had come down to Quarshie’s house asking for Estelle, and that “he was really waiting for you----” Id. Estelle said he would want to meet the woman who would serve as the courier and Quarshie assured him that Ailemen would be agreeable to that.
The next day, February 4, 1993, Quarshie advised Estelle, over the phone, that the price for the 100 grams of heroin that Estelle wanted to buy from Ailemen would be $21,-000. Aff. at 31.
The next conversation between Estelle and Quarshie was on February 8, 1993. Estelle asked if Quarshie had a heroin sample or if Ailemen was available to meet that night. Quarshie said that Ailemen was busy with other matters, but that “he really wants to see you” and that maybe they could arrange for a meeting the next day. Gov.’s G.
On February 9th, Estelle met Quarshie and Ailemen at Quarshie’s house. Estelle told Ailemen that the Colombians from Miami were interested in trading cocaine for heroin and might be willing to meet with Ailemen in Monterey or in the Bay Area, but Ailemen said he did not want to meet with anyone from Miami because the likelihood of government surveillance was too great. Later in the conversation Ailemen told Estelle that Ailemen’s heroin was located in New York and suggested that “if the Colombians are serious, that it’s possible that we could meet out there.” Gov.’s T. Estelle and Aile-men also discussed the possibility of buying cocaine from Tijuana — and Ailemen suggested that he and Estelle pool some money and send some of Ailemen’s female couriers to Tijuana to buy the cocaine. Ailemen also explained how he used white female couriers because the authorities are not suspicious of them. Id. Estelle asked Ailemen for the price of 100 grams — and Ailemen asked Estelle why he wasn’t buying in larger quantities. Id.
Earlier on February 9th officer Gutierrez had gone to Ailemen’s apartment building to change the video tape. While in the building, he spoke with Nordahl Washington, who informed him that Ailemen had had a lot of visitors the preceding Friday and Saturday evening, and that one of Ailemen’s guests on Friday had been a white female in her twenties who drove a 1980’s model Volkswagen *1254 with a license plate number that Washington gave officer Gutierrez. After returning to his office, officer Gutierrez learned through DMV records that the vehicle that Washington had identified was registered to Tina Louise Tauer. Gov.’s Y. Tina Tauer had been identified by the DEA during the 1989 investigation as a likely criminal associate of Ailemen’s — and the DEA’s NADDIS[20] file on her included this entry from April of 1990: “Allegedly involved heroin trafficking with Tiffany Valentine for Pius Ailemen org.” Ex. 86; Ex. 48.
On February 11, 1993, Estelle went to Quarshie’s house, where he purchased the 100 grams of heroin (for $21,000) directly from Ailemen. Gov.’s U; Aff. at 37-38. During the accompanying conversation, Aile-men told Estelle that the heroin had arrived at about the same time as a hijacked plane and that all the attention was on the hijacked plane. He also told Estelle that the heroin had arrived in the Bay Area from New York at about three or four o’clock on the afternoon of February 11th. Gov.’s U; Aff. at 38. Ailemen further told Estelle that if Estelle’s people in Miami wanted heroin, Ailemen could get it there. In addition, he indicated that at that time he “had six to eight kilos of heroin, and that he wanted to get a warehouse to keep the dope in one day.” Id. Toward the end of the conversation Estelle expressed an interest in getting cocaine from the suppliers in Tijuana; Ailemen said that he could easily send “his girls to Tijuana to pick up the cocaine.” Id. Finally, Estelle told Ailemen that in the upcoming week he (Estelle) would like to meet with Ailemen and the “girl” who would courier the heroin Estelle had just bought to Chicago.[21] Aile-men indicated that all he needed was a half-day notice. Id.; Aff. at 38-39.
The next contact between undercover agent Estelle and the defendants occurred on February 16,1993, when Estelle called Quar-shie to tell him that Estelle wanted to courier the 100 grams of heroin to Chicago that Friday, February 19th. Gov.’s H. After a brief conversation, Quarshie called Ailemen, then paged Estelle. When Estelle returned the call, Quarshie, without any prompting or encouragement from Estelle, gave Estelle Ailemen’s phone number (the cellular phone) and asked Estelle to call Ailemen. Quarshie told Estelle that Ailemen was expecting Estelle’s call. Id. Estelle then called Ailemen. In addition to confirming that Estelle wanted to courier the 100 grams of heroin to Chicago on the 19th, Ailemen asked Estelle if he had been able to locate the cocaine that Ailemen wanted. When Estelle said no, Ailemen indicated that he would travel to Los Angeles on the 17th of February, the next day, to get what he needed there. Then Ailemen indicated that because he had to pay someone right away he wanted to sell Estelle (or his people) another 100 grams of heroin. Aile-men also indicated that if Estelle’s people would arrange for payment to Ailemen’s courier in Chicago (that Friday, after she transported Estelle’s 100 grams), Ailemen would charge only $16,500 for the second hundred grams (instead of the $21,000 that Estelle had paid on February 11th). Id. Estelle said he needed to make a call to cheek with his people and that he would get right back to Ailemen.
Less than ten minutes later, Estelle called Ailemen again. He told Ailemen that his people did not want to purchase more heroin at that juncture. Instead, they wanted to “check ... out” the heroin Estelle had recently bought from Ailemen. Ailemen indicated again that he was going to Los Angeles the next day — but assured Estelle that he would bring the courier for the Chicago trip to Quarshie’s house early Friday morning so Estelle could meet her and so they could finalize the details for transporting the heroin. Id.
On Thursday, the 18th of February, Estelle called Quarshie (twice) to confirm arrangements for transporting the heroin to *1255 Chicago the next day. During one of these conversations, Estelle indicated that after the trip to Chicago he would be out of town for a while, but promised that he would have a bottle of liquor sent to Quarshie’s house so that Quarshie could celebrate the arrival of his wife (who was joining him from Africa). Gov.’s H.
On Friday, February 19, 1992, at about 5:30 a.m., Estelle rode in a cab (driven by another undercover agent) to Quarshie’s house. Gov.’s V; Ex. 17, at 23. A few minutes after he arrived, Quarshie, Ailemen, and a white female courier, Kellee Cooper,[22] arrived at Quarshie’s house. Estelle gave the purported heroin (the investigators had substituted a look-alike substance for the real heroin — so what was transported to Chicago was in fact not heroin) to Ailemen, who gave it to Cooper, who put it inside the front part of her pants. As Ailemen put Estelle and Cooper in the cab for the ride to the airport, he again urged Estelle to buy more heroin. Gov.’s V; Aff. at 40.
The cab, still driven by the undercover officer, took Estelle and Cooper to the airport, where they purchased tickets to Chicago.[23] During the flight, Estelle sat next to Cooper and told her that they would be met in Chicago by the female courier who would transport the heroin to Miami. Estelle indicated that he had not moved drugs in this way before, so his courier would ask Cooper for instructions. Cooper told Estelle that “lately she has been working with new girls (couriers) who were very calm.” Gov.’s V. She also told Estelle that she had been working with Ailemen for a long time, that she had transported both drugs and money for him, and that she had been to many cities, including London. Id.
Once in Chicago, Estelle and Cooper went to the O’Hare Marriott Hotel, where they met undercover DEA agent Sue Mitchell (working out of the Chicago office) — who was posing as the courier Estelle had hired to transport the heroin from Chicago to Miami. Mitchell took Estelle and Cooper to a room she had rented in the hotel — a room in which the DEA had installed a video (and audio) camera. TR 3:546; Ex. 17 at 27. On tape, Cooper gave Mitchell and Estelle detailed instructions about how to smuggle drugs and how to act if stopped by law enforcement agents. She emphasized to Mitchell the importance of keeping the narcotics on her person — of never putting the drugs she was smuggling in her purse or “in anything that would be away from her.” Gov.’s V; Aff. at 43; TR 3:546-48.
Estelle paid Cooper $1,000 for her work as a courier and gave her money to buy a return ticket. Gov.’s Y. At Estelle’s suggestion, Cooper called Ailemen from the hotel room. After telling Ailemen that nothing had gone wrong, she put Estelle on the phone. Ailemen again urged Estelle to buy more heroin, and again said he could arrange to have it couriered to Chicago or Miami. Estelle assured Ailemen that he (Estelle) would call Quarshie in a few days. Gov.’s Ex. V; Aff. 43-44. There is no evidence that Estelle made that promised call — in fact, he apparently had no contact with Quarshie for about a month. Gov.’s W.
Despite Ailemen’s obvious eagerness to engage in additional transactions with Estelle, the willingness with which he and Cooper had explained how they smuggled drugs and cash, and Ailemen’s apparent trust of Estelle, the undercover agent made no effort after February 19, 1992, to buy drugs from Aile-men, to sell drugs to him, to trade drugs with him (cocaine for heroin),[24] to “joint venture” *1256 a purchase from Tijuana, to meet Ailemen in New York, or to get him together with any purported buyers (from Miami, Chicago, Los Angeles or anywhere else). Agent Silano testified in the hearing before me that his supervisor at the time, Larry Holifield, refused, after the trip to Chicago, to permit the investigative team to spend more money in drug transactions with Ailemen. TR 5:1002-1004; TR 5:992.
On February 23, 1993, the core members of the investigative team, agents Silano and de Freitas, as well as officers John Gutierrez and Carl Estelle,[25] met to discuss the overall status of the investigation. They “discussed and exchanged information, surveillances for the next few weeks, and future plans. [They] then observed the video recording regarding the courier transport to Chicago, once in the hotel room.” Gov.’s Y (Gutierrez’ report dated 23 Feb. 93). I find, based on the major turn the investigation took after this meeting, as described below, as well as Agent Silano’s admission that he began drafting the affidavit shortly after the Chicago trip,[26] that it was at or shortly after[27] this meeting that Agent Silano decided to seek authorization for a wiretap and decided to shift the center of the investigation away from undercover and traditional field work and toward interception of Ailemen’s telephone conversations.
On February 24, 1993, the day after the meeting described in the previous paragraph, the investigative team secured authorization from Chief Magistrate Judge Langford to install a pen register on Ailemen’s cellular phone number. Aff. at 45.[28]
During a surveillance on February 26, 1993, agents saw the BMW that was registered to Loreli Washington parked in front of Ailemen’s apartment building. They also saw Ailemen and “his associate” (later identified as Nathaniel Iheukwu)[29] using a telescope from Ailemen’s apartment to scout the *1257 area around the building before they went downstairs and drove together in the BMW (using evasive, counter-surveillance driving techniques) to a check cashing business on Webster and Broadway in Oakland. Ex. 34; Gov.’s Y. Later in the day Gutierrez spoke with Nordahl Washington, who gave him information about movement of furniture in and out of Ailemen’s apartment and about “The Packaging Store” from which the furniture had come. Gov.’s Y.
The investigative team made its last effort to surveil Ailemen on March 3,1993. Agents again followed him from his apartment; again he rode in the BMW registered to Loreli Washington, and again his companion appeared to be Nathaniel Iheukwu. During the first part of the surveillance the agents saw Ailemen and Iheukwu carry “large canvas bags” to the BMW and drive to an address in downtown Oakland. Then Aile-men and Iheukwu drove back to Ailemen’s building. After a brief period there, they drove to San Francisco, where they met a young, attractive, light complected black female[30] and went into a restaurant. The driver of the BMW again had used counter-surveillance driving techniques — but they were unsuccessful, as the law enforcement team was able to keep track of Ailemen and his companion at all times. The surveillance was terminated, after less than two hours, when Ailemen and his two associates went into the restaurant. Ex. 47; Gov.’s Ex. Y.
On March 8, 1993, when he was at Aile-men’s apartment complex to change the video tape, Gutierrez saw Ailemen “and his associate” (again, apparently, Nathaniel Iheukwu) arrive in the BMW registered to Loreli Washington and enter the building. Gov.’s Y. When he visited the building on March 11, 1993, again to replace the video tape, Gutierrez was given information by Nordahl Washington about a white female associate of Ailemen’s who had visited the building about a week earlier. Washington provided the year, make, model, color, and license plate number of the vehicle the woman had driven. Gov.’s Y.[31]
On March 18, 1993, as promised earlier, Estelle sent a bottle of Courvoisier to Quar-shie so that he and his wife could celebrate her arrival from Africa. An undercover officer, Stephanie Lovett, posing as Estelle’s girlfriend, made the delivery, by herself, to Quarshie’s house. She was there less than five minutes. Six undercover officers surv-eilled this delivery — apparently for the purpose of assuring Lovett’s safety. Gov.’s K and Gov.’s W (these exhibits are identical).
On March 23, 1993, while he was on the premises to change the video tape, Gutierrez saw Iheukwu drive the BMW registered to Loreli Washington out of the parking garage in Ailemen’s apartment building. Gov.’s Y.[32]
The investigators abandoned efforts to record traffic into and out of Ailemen’s apartment on video tape (through the camera in the hall) at the end of March of 1993. Gutierrez and Silano testified that the camera remained in use until June 11, 1993, when a private investigator that Ailemen had hired discovered it,[33] but the documentary record strongly supports an inference that no taping *1258 occurred and no tapes were changed after March 27, 1993. See, Exs. 84 and Gov.’s Y.
On April 8, 1993, Estelle and undercover agent Lovett, still posing as Estelle’s girlfriend, went to a restaurant for a social dinner with Quarshie and his wife. During the dinner, “Quarshie stated that ‘Pius’ on numerous occasions had asked about UCA Estelle doing more ‘dope dealing’ (business). ‘Pius’ was very interested in continuing to do more business (dope dealing) due to the loss of some of his (‘Pius’) customers.” Ex. 73, third page from the end; Aff. at 44-45.
On April 15, 1993, Assistant United States Attorney Nandor Vadas for the first time presented evidence arising out of this investigation to the grand jury. Agent Silano was the principal witness. Ex. 17. He described substantial parts of the investigation up to that point and gave the grand jurors detailed information from the principal undercover transactions. In addition, he stated that he was “presently preparing an affidavit to try to monitor Mr. Ailemen’s cellular telephone. We’re in the process of doing that now.” Ex. 17 at 41. He also told the grand jurors about the size ($1,800 to $3,000 per month) of Ailemen’s cellular phone bill and about his suspicion that Ailemen paid those bills with money orders that he obtained at the check cashing business to which he had been followed. Ex. 17 at 35, 43-44. He indicated, however, that he had not “gotten back yet” information about these negotiable instruments. Id.
During his testimony Agent Silano also disclosed that the investigators had underway substantial efforts to gather data about and to analyze Ailemen’s use of his cellular phone and the phone lines in his apartment. The agent told the grand jury, for example, that examination of the data generated by the pen register on Ailemen’s home phones showed “an extensive array just from states in New York, Washington D.C., Mexico, Houston, Texas, Sweden, Nigeria, Baltimore, Savannah, Georgia, Chicago, Newark, United Kingdom, including London, Canada, Brazil.” Ex. 17 at 35. Significantly, he also suggested that he was feeling some frustration with the level of responsiveness he was receiving from other DEA offices. While his team had requested “our parent offices in different states and different countries to obtain subscribers of the phone calls that [Ailemen had] been making,”[34] he reported that he was
“still awaiting some of these subscribers to come back. You know, they trickle in.
We have overseas offices in approximately 127 different countries in the world, DEA does, and a lot of time, through our telegraph system and individuals being on leave and stuff, these things don’t come in as fast as we need them.” Ex. 17 at 35 and 36.
Even without all the information they needed from other offices, however, the analysis of the phone records had revealed apparently important calls to identifiable numbers in New York and “the Maryland area”[35] at the time Ailemen was negotiating the sale of the 100 grams to Estelle (which also was the time Ailemen received a shipment of heroin through Kennedy Airport in New York). Ex. 17 at 19-20, 35-36.
In his testimony to the grand jury on April 15, 1993, Agent Silano also reported that (1) Ailemen had been followed to “a money laundering, excuse me, scratch that, a check cashing establishment, alleged money laundering place,”[36] (2) that he had a United Mileage Plus account (which the agents had not yet researched),[37] (3) that he used Sun Trips travel agency (that the agents had not yet checked out),[38] (4) that Ailemen and his associates might be using “a financial group called the Benham Group” and the College Savings Bank of New Jersey,[39] (5) that Aile-men had been “receiving Express Mail packages extensively to his house,” which “could *1259 be an array of things,” but the OCDETF group hadn’t yet “really explored that with Federal Express or UPS or these other carriers,”[40] and that (6) “concerning couriers, we have — we have approximately seven couriers to date identified that we feel that are current from the last investigation that are possible hits.” [41] Agent Silano further stated that an alert for all these couriers had been posted through the El Paso Intelligence Center (EPIC) — so that if any of them came into this country using their real name (or a known alias) they could be stopped and questioned or their movements tracked. Ex. 17 at 37.
Finally, Agent Silano told the grand jury that during one of their undercover meetings Ailemen had told agent Estelle that “around the end of January, he [Ailemen] had about a million dollars worth of heroin that was taken off by the police,”[42] and that the investigative team had learned that on January 30th a Nigerian man named Francis Idialu, “who gives an Oakland address,” was arrested at Kennedy airport in New York when he was caught trying to smuggle 1.65 pounds of heroin into this county. Ex. 17 at 37-38. The agent told the grand jurors that the investigative team was “in the process of interviewing this individual”[43] to see if he could provide information about Ailemen’s trafficking organization generally or about events that had transpired in this ease. Ex. 17 at 38.
On May 8, 1993,[44] Quarshie contacted confidential informant Aaron Mouton and told him that Ailemen wanted to do more business. Mouton allegedly construed this inquiry to reflect Ailemen’s interest in buying cocaine from Mouton. In a debriefing two days later, agents Silano and de Freitas told Mouton to tell Quarshie that Ailemen should contact Estelle. Gov.’s L.
On May 11,1993, a representative of Cellular One contacted Agent Silano to inform him that on that day Ailemen had paid his $2,000 phone bill in cash — and had taken the money out of a bag that appeared to contain some $8,000 in additional cash. Gov.’s M.
During the week of May 25, 1993, Agent Silano asked Aaron Mouton to contact Quar-shie in order to learn which “dialects” Aile-men used in his drug trafficking. Gov.’s Ex. N. Mouton contacted Quarshie, who told him that he and Ailemen spoke in “pigeon English” in order to conceal the nature of their conversations from law enforcement and from other drug traffickers. Id. Silano wanted this information so he could arrange to have the appropriate interpreter(s) available during the wiretap. TR 4:838-39; TR 5:955-56.
On May 26,1993, a representative of Cellular One contacted the investigative team to report that Ailemen had complained to a customer service representative that he was experiencing a 1-3 second delay in service and that he thought his phone was being monitored. Aff. at 47. On May 27, 1993, in response to this information, the agents temporarily “turned off’ the pen register on Ailemen’s cell phone. Id.
On June 3, 1993, agents Silano and Gerva-eio, accompanied by AUSA Nandor Vadas, traveled to New York to interview Francis Idialu in the presence of his attorney. During the interview Mr. Idialu told the investigators that he had not been in the Bay Area since 1989, that he had resided in Brooklyn for several years, and that he no longer had “any contacts and/or associates in the Oakland, California Bay Area.” Ex. 81, report dated 6/17/93. He also told the investigators that on two occasions, both after he had left the Bay Area, he had attempted to smuggle heroin into the United States. On the earlier occasion, he had ingested balloons; on January 30, 1993, he had transported the heroin *1260 in his suitcase. Nothing he said during the interview even remotely suggested a connection with Pius Ailemen. Id.; Ex. 42; TR 4: 840-51.
On June 11, 1993, Nordahl Washington contacted officer Gutierrez to alert him to the fact that a few days earlier Ailemen had told Washington that he knew his phone was tapped, that he knew he was being watched, and that he had hired a private investigator who had discovered the camera hidden in the “exit” sign in the hallway near the entrance to his apartment. That day Gutierrez examined the monitor and video recorder in the broom closet and found that nothing had been disturbed there. Gov.’s Y, second to last page.
On June 16, 1993, Gutierrez began making arrangements with the manager of an inn near Ailemen’s apartment building to secure rooms from which the wiretap operation could be logistically supported and monitored. Gutierrez also learned on this date from Nordahl Washington that Ailemen had continued to press for information about the camera and about whether the government had had a warrant to install it. Gov.’s Y, last page.
Sometime in the first half of June of 1993 Agent Silano submitted what was both the first and the final draft of the affidavit to AUSA Nandor Vadas for his review. Up to that point, Agent Silano had been assisted in drafting the affidavit only by a legal technician, who helped add some “boilerplate” passages that were routinely used in affidavits of this kind. Agent Silano had not submitted rough drafts of any portions of the affidavit to Mr. Vadas earlier in the spring. When he finally had a chance to review Agent Silano’s affidavit, Mr. Vadas made virtually no changes. In about mid-June he and Agent Silano sent the proposed wiretap affidavit to authorities at DOJ and DEA in Washington for review, feedback, and approval. Government counsel in Washington asked the local investigators to update the information in the affidavit that was based on analysis of Aile-men’s use of the telephone, but required no other changes. TR 1:159-162; TR 2:250, 394, 412-418.
The only other documented activity in this case before the affidavit was submitted to Judge Jensen consisted of two short debriefings of Aaron Mouton, the confidential informant. One occurred on June 22, 1993, but the report from this meeting discloses nothing about what Mouton told the investigators. Gov.’s Q.[45] The last contact between Quarshie and Mouton before the affidavit was submitted occurred on July 19, 1993. On this occasion Quarshie asked Mouton for information about another person to whom Ailemen was considering selling heroin.[46] He also told Mouton that Ailemen “was sitting on a lot of shit,” meaning that he had “a lot of heroin in supply.” During the same conversation Quarshie also asked Mouton if Estelle was in town. Gov.’s R.
On July 29, 1993, Agent Silano presented his affidavit in support of the application for the wiretap to Judge Jensen. The district judge signed the proposed order authorizing the tap that same day. Ex. I-A.
VI.
THE CREDIBILITY OF THE AFFIANT AND ITS ROLE IN RESOLVING THE ISSUES PRESENTED BY DEFENDANTS’ MOTION; ADDITIONAL FINDINGS OF FACT BASED ON TESTIMONIAL CREDIBILITY
One of the most sensitive and painful parts of the task I have been assigned is to make determinations about the credibility of Special Agent Robert Silano, whose affidavit is the target of the challenge in the defendants’ motion. I would prefer, personally, not to address this matter. But the legal standard *1261 that I must apply leaves me no choice. The law commands me to determine whether there were material misstatements in or omissions from Agent Silano’s affidavit and, if there were, to decide whether they were made “knowingly and intentionally, or with reckless disregard for the truth.” Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978).
Before turning to other matters related to this inquiry, I feel constrained to emphasize that I do not question the sincerity of Agent Silano’s commitment to law enforcement, the energy he brings to his work, generally, or the personal sacrifices he makes in order to advance the government’s legitimate interests. In fact, I suspect that the shortfalls that I have found in his presentations are much more likely attributable to excesses of enthusiasm and infirmities in self-restraint than to some sinister ulterior design. But the central issues raised by defendants’ motions are not about ends; they are about means. In a democracy it is imperative that the use of governmental power be constrained by emotional, intellectual, and moral discipline. I take no pleasure in reporting that that discipline has been wanting in this matter.
Before examining specific aspects of Agent Silano’s affidavit I turn to examine his credibility in three closely related arenas: his testimony in the evidentiary hearing over which I presided, his testimony before the Grand Jury that ultimately indicted the defendants in this case, and the application he submitted requesting that this matter be designated an OCDETF[47] investigation. This examination is necessary because it is probative of matters at the center of my task. If Agent Silano made, intentionally or recklessly, false statements in these other settings, especially if those falsehoods relate to subjects about which defendants’ contend Agent Silano made false or misleading presentations in his affidavit, the likelihood increases that the errors or omissions in the affidavit were the product of recklessness or intent to deceive. Moreover, repeated instances of recklessness or intellectual sloppiness in these other, closely related settings would constitute some evidence that the entire investigation that Agent Silano directed was handled without the care, the intellectual discipline, and the patience that the law requires. More specifically, repeated instances of recklessness in these other environments would make it somewhat more likely that recklessness accompanied both important decisions about how to conduct the investigation and about what to tell Judge Jensen about those decisions.[48] Patterns of recklessness could help explain why, for example, Agent Silano decided not to pursue obvious leads and instead to turn prematurely to the wiretap as the principal investigatory tool in this case.
The OCDETF proposal is the first (in historical time, not in significance for our purposes) of these related settings in which Agent Silano appears to have recklessly made misrepresentations about important matters. OCDETF designation creates a mechanism through which an investigation can utilize and coordinate the expertise and the resources of a large number of law enforcement agencies. TR 1:124. Both the 1988-89 and the 1992-93 investigations of Pius Ailemen and his associates were designated as OCDETF matters. I reviewed in camera both of the applications (December 1988 and December 1992) for this designation. See “Order In Response to Defendants’ Motion to Compel Production of Two OCDETF Proposals,” filed December 20, 1996. Agent Silano did not prepare the first application, but he saw it before he and Agent de Freitas prepared the application for the 1993 case. Most of the application for the 1993 case consists of a virtually verbatim reproduction of the substance of the application for the 1989 case. But the limit *1262 ed newr material that was added to the application for the 1993 case contained two closely related false statements: that “Ailemen is presently a fugitive on the false statement charge and an INS deportation offense,” and that the DEA “is attempting to identify his new residence in the Oakland, CA area.”[49] At the time this application was submitted, Agent Silano knew where Ailemen lived and that he was not a fugitive on “the false statement charge.” Agent Silano also knew that Ailemen had been convicted of that charge, sentenced to prison, served his time, and released into parole supervision. TR II at 51-52;[50] TR 4:768; TR 3:611; see also Ex. 17 at 4.
Agent Silano also made a significant misrepresentation in the testimony he gave to the Grand Jury when it first considered this matter. Testifying on April 15, 1993, Agent Silano made the following statement: “Also during one of the undercover meetings, Pius tells Carl [the undercover agent] that around the end of January, he had about a million dollars worth of heroin that was taken off by the police.” Ex. 17, at 37-38. The agent went on to explain that the investigators had learned that on January 30th a courier carrying 1.65 pounds [kilos?] of heroin “on their person” had been arrested at John F. Kennedy airport in New York. Based on these leads, he said, “[w]e’re in the process of interviewing” the person who was arrested. Ex. 17, at 38. A moment later, in response to a question posed by the government’s lawyer (Nandor J. Vadas), Agent Silano again asserted that Ailemen had told the undercover agent that “he lost a large amount of heroin during the latter part of January....” Id.
As Agent Silano admitted during the evi-dentiary hearing, neither he nor anyone else associated with this investigation ever had any evidence that Pius Ailemen had ever told the undercover agent or anyone else (1) that he (Ailemen) had lost “about a million dollars worth of heroin,” or any “large amount of heroin,” or that (2) the police had seized any amount of heroin with which Ailemen was connected at any time in New York or at John F. Kennedy airport. Nor was there any basis for an inference that Ailemen had mentioned any kind of drug-related arrest in connection with a shipment of heroin through JFK. TR 2:426; TR 3:535-36; TR 4:890, 898-99.
Further, there never had been any evidence that the “courier” to whom Agent Sila-no was referring, Francis Idialu,[51] was carrying the heroin “on his person.” Instead, he had carried the heroin in luggage that had been provided by the person for whom he was attempting the smuggling. Ex. 42; TR 4:847. While it is not clear that Agent Silano knew at the time he gave his grand jury testimony in mid-April that the heroin had been carried in luggage, there is nothing in the record that indicates that there was any basis for an inference, at any time, that Mr. Idialu had carried the heroin “on his person.” This allegation, however, was of some consequence, because Agent Silano had emphasized to the grand jury that for many years Ailemen’s couriers, who generally were white women, carried his heroin on their persons (in body wraps) — and “never ... in items that are away from you like a purse or a suitcase.” Ex. 17 at 24 and 28-29; TR 3: 537-38.
These important representations to the grand jury were made recklessly. It also was reckless for Agent Silano to suggest to the grand jury that there was any substantial likelihood that Mr. Idialu was connected with Mr. Ailemen — or that interviewing Idialu would yield evidence of significance to the Ailemen case. "What Ailemen had told the undercover agent was that his heroin had come through JFK airport at the same time a hijacking was underway — so all the atten *1263 tion was on the hijacking, making it easier to get the heroin through JFK without detection and then on to the Bay Area. Mr. Ailemen made it clear to the undercover agent (whose report made it clear to Agent Silano) that the hijacking and the movement of heroin through JFK had occurred on February 11, 1993 — some two weeks after Mr. Idialu was arrested with heroin in his suitcase on January 26, 1993. With the most modest of efforts, Agent Silano would have learned that the hijacking that occurred on February 11, 1993, was the first hijacking at that airport in some 16 years. TR 4: 897-98; Ex. 75.
At the time Agent Silano testified before the grand jury he had some reason to believe that Mr. Idialu was Nigerian and that at some point in the past he had some ties to the Bay Area. TR 4:841. But all of the other information he had or should have had about Mr. Idialu and the circumstances of his arrest contradicted an inference that he was connected with Mr. Ademen — and the reasoning process by which the agent purported to have connected Mr. Idialu and Mr. Ade-men was infected by errors of considerable magnitude.
There was an additional troubling aspect of Agent Sdano’s testimony before the Grand Jury on April 15, 1993. In the context of explaining the problems with the evidence produced by a hidden camera in the hallway outside Mr. Ademen’s apartment the Agent made the following statement: “The light quality isn’t really that great and the problem we’re having too is trying to identify these people was, like I said, we don’t have an outside survedlanee, so it’s hard to get license plate numbers on these visitors. And there’s no logs downstairs where these visitors sign in and out. They just have to clear the door, you know, the security person.” Ex. 17, at 40.
This testimony is misleading about the state of the agents’ knowledge and fads to disclose an important source of information about the persons who visited Mr. Ademen and about the vehicles that he and they used. Whde earlier in his testimony he had reported that the investigators knew about three different types of vehicles Mr. Ademen used, he implied that that knowledge was the product of physical survedlances conducted in connection with undercover meetings. Ex. 17 at 21 — 22. Nowhere in his grand jury testimony (or in the affidavit he later submitted to Judge Jensen) did Agent Sdano mention Nordahl Washington, “the on-site manager of the Park Bellevue Tower,” where Mr. Ademen resided, or John Shahoian, the property manager for that budding. Exhibits 22 and 23.
This omission is significant because months earlier Mr. Shahoian had agreed to “assist in anyway possible,” (Ex. 23) and Nordahl Washington had been providing investigators with valuable information about Ademen, his visitors, the vehicles they used, and license plates since December 11, 1992. Exhibits 22-25; TR 6:1182-86, 1194-95, 1201-1204; TR 2: 376-77; TR 3: 607-610. Nor is it likely that the assistance Nordahl Washington had been providing simply slipped Agent Sdano’s mind when he was testifying about the alleged difficulty the agents were having identifying the persons who visited Mr. Ademen and the cars he and they used. Immediately after describing this difficulty, Agent Sdano told the grand jurors that the investigators had “some information he’s [Ademen] receiving Express Mad packages extensively to his house.” Ex. 17, at 40. That information, as Agent Sdano knew, was provided by Nordahl Washington. TR 3: 608-609.
I turn now to a substantiady more disconcerting matter: the several instances during the evidentiary hearing in which Agent Sda-no offered testimony “with reckless disregard for the truth.” Franks v. Delaware, supra at 155-56, 98 S.Ct. at 2676. Before discussing specific statements, I am constrained by my role in this matter (preparing a Report and Recommendation for a District Judge who had no opportunity to observe witness demeanor and other testimonial dynamics) to comment generady on the character of Agent Sdano’s testimony. In my view, Agent Sdano’s testimony was marked too little by forthrightness and too much by an unbecoming concern about the legal significance of answers to questions. There often were long pauses between questions and his *1264 answers. He took what seemed to me to be excessive periods studying documents (on the stand) before indicating he was ready to respond to questions. He sometimes openly looked to government counsel before offering an answer, apparently either hoping for an objection or looking for a clue about how to proceed. Moreover, as illustrated below, the substance of his testimony was more than occasionally marked by evasion, mobility, or inconsistency.
Agent Silano repeatedly attempted to understate his knowledge about the first prosecution of Pius Ailemen (what we are calling the 1989 case) and his exposure to the files from that matter. His testimony about what he knew about the first case, and when he learned it, was riddled with inconsistencies and evasions. To provide the District Court with a clear sense of this matter, it is necessary to quote at some length from pertinent testimony.
Defense counsel first raised this subject by asking: “You were familiar with the [‘89-90] case despite not having done any work on it?” Agent Silano responded: “No, I wasn’t.” Then defense counsel asked: “You had not heard of it whatsoever?” Agent Silano answered: “No.” After this exchange, I asked Agent Silano: “In that case [‘89] through the time of that acquittal, had you ever heard of Pius Ailemen?” Agent Silano replied: “Not by the name of Pius Ailemen, no.” Whereupon I asked: “So you had heard of him by some other name?” And the agent responded: “Yes.” Which made it necessary for me to ask: “And what was that name?” Agent Silano replied: “Mohammed Popoola.”
When I asked what the agent had learned about the 1989 case in connection with the name Popoola, he said that because the matter was being investigated by agents in the same DEA group (Group III), he “had occasion to peripherally find out about a case that was titled Mohammed Popoola,” only learning in the late summer of 1992 that the person prosecuted under that name was Pius Ailemen. TR 1: 152-154. A minute or so later, defense counsel asked: “Prior to the acquittal in 1990, what exposure did you have to that case under any name?” Agent Silano replied: “Nothing.” I then felt constrained to ask: “You didn’t know anything about it?” To which the witness responded crisply: “No.” Then I said: “I thought you just told me that you had some exposure to that case through the name Popoola.” The agent responded by saying: “You said after the acquittal, correct?” And I said: “No, I’m still focusing on prior to the acquittal.” At that point Agent Silano proceeded to declare that, prior to the acquittal: “I had heard mention to the name Mohammed Popoola Investigation a few times, but I never really focused on what it was about.” TR 1: 154-55.
In addition to being afflicted by a pronounced shortfall in straightforwardness, this testimony is likely false.
There is no evidence (other than Agent Silano’s uncorroborated assertion) that either the investigation or the prosecution of the earlier case against Pius Ailemen was styled, known as, or casually referred to under the name “Mohammed Popoola.” All the evidence of which I am aware supports a finding that the authorities used the name “Pius Ailemen” when referring to the defendant in the 1989 prosecution. While the NADDIS file on Pius Ailemen lists “Mohammed Po-poola” as one of his many aliases,[52] the only name used for him in the 1988 application for OCDETF designation was “Pius Umahion Ailemen,” which is the name given to the “Targeted Organization” and to the “Principal Prospective Defendant.” And while the name Pius Ailemen, or simply “Ailemen,” is used many times in that first OCDETF application, the name “Popoola” never appears.
Similarly, a major “Report of Investigation” (DEA Form 6) that the lead agent for the earlier case (William Iseri) prepared on November 9, 1988, indicates that the “File Title” for the investigation is “Ailemen, Pius Umahion.” As with the OCDETF application, this Report refers to the defendant repeatedly and only as Pius Ailemen, or simply “Ailemen,” and never uses the name “Po- *1265 poola.” Ex. 2. Moreover, while aliases were noted, the name under which the defendant was prosecuted in both the complaint and the indictment in the 1989 case was Pius Aile-men. See, e.g., Ex. 3. Notably, while the prosecutorial documents associated with the 1989 case consistently refer to the defendant as Pius Ailemen, the OCDETF application for the 1993 case, written principally by Agent Silano,[53] uses the name “Popoola, Mu-hammed Musiliu (AKA AILEMEN, Pius).” Given this documentary record, it is more probable than not that the name under which Agent Silano heard about the 1989 case was not Popoola, but Ailemen.
I further find that Agent Silano gave false testimony about his exposure, before he submitted his affidavit to Judge Jensen, to the DEA file or files that were developed in connection with the 1989 ease. When first asked about whether he had reviewed materials from the 1989 case before he submitted the affidavit, Agent Silano indicated that his only pre-wire sources of information about the earlier case were NADDIS printouts (Ex. 86) and Assistant United States Attorney Nandor Yadas, who had been the lead prosecutor in the earlier matter and who served in the same role in the 1993 case through the end of July, 1993. TR 1: 180-184. Agent Silano explained that he decided that he should not review the documents in the files from the earlier case because he felt there was a risk that if he used information from those files the 1993 prosecution might be barred or compromised in some way by the Double Jeopardy Clause. TR 1: 181; TR 4: 761-62. After some probing by defense counsel about this alleged motive for not reviewing the files from the first case, I put the question directly to Agent Silano: “So you never looked through the old case file?” Agent Silano answered: “Not until way after the arrests had been taken off.”[54] TR 1: 183. That answer is belied by the record.
First, I note that when he appeared before the grand jury on April 15, 1993, some three and one-half months before he submitted his affidavit to Judge Jensen, Agent Silano had in his possession and asked if he could “pass around [to the grand jurors] the different forms of identification that were seized in the last investigation.” Ex. 17, at 37 and 45. When confronted with this fact during the evidentiary hearing before me, the agent admitted that in addition to the NADDIS printouts, he had “a small group of picture files” from the files of the earlier case. TR 2:245-46. But he continued to insist that the only documentary material he had seen from the earlier case consisted of the NADDIS printouts and this small group of photographs of identification documents. TR 2:246.
That statement also was false. As I have already reported, the OCDETF application for which Agent Silano was primarily responsible, and which he presented in person in December of 1992 to the OCDETF coordinating body,[55] consisted largely of an essentially verbatim reproduction of most of the text of the OCDETF application that Agent Iseri had prepared in December of 1988 for the first case. The application for the 1993 case could not have been prepared without extensive and careful examination of the 1989 application. See, Order in Response to Defendants’ Motion to Compel Production of Two OCDETF Proposals, filed December 20, 1996. It was not until the fourth day of his testimony in the evidentiary hearing, after it became clear that I would be reviewing in camera both of these OCDETF proposals, that Agent Silano acknowledged that he had in fact had possession of the earlier proposal before he filed his affidavit in support of the wiretap application. TR 4:906.
In addition to the references to the identification documents discussed above, other aspects of Agent Silano’s testimony to the grand jury in April of 1993 indicate that he had more information about the 1989 case. He reported that both Kelly Lambert and “Kelly” [sic] Cooper were identified as couriers for Ailemen in the 1990 trial and that ‘We have a bunch of them ID’d, too.” Ex. 17, at 30-31. Later in his testimony he declared: “concerning couriers ... we have *1266 approximately seven couriers to date identified that we feel that are current from the last investigation that are possible hits.” Id. at 37. He also claimed, in connection with the identification documents, to have “extensive” information about the couriers’ use of aliases. Id.
Further evidence of the implausibility of Agent Silano’s assertion that he had never looked through the files from the 1989 case is contained in two reports that were prepared by representatives from two of the other law enforcement agencies who participated in both the 1989 case and the 1993 investigation under the OCDETF umbrella. The first of these reports was written by Frank M.- Ger-vacio, a Customs agent who had played only a minor role in the 1989 investigation but who was his agency’s lead representative on the OCDETF team for the 1993 matter. Despite not having played a major role in the earlier case, it is clear that in early 1993 Agent Gervacio had a great deal of information about the 1989 case and the investigation that supported it. Some of this extensive information is set forth in a report that Agent Gervacio typed on January 13, 1993. Ex. 18. This report suggests that Agent Silano was a source of information at least about the 1992-93. investigation. While the direct source of the material about the 1989 case that Agent Gervacio included in this report might have been reports prepared by the Customs agent who had been assigned to the earlier OCDETF group,[56] it seems unlikely that Gervacio would have had this information while the head of the 1992-93 investigative team, Agent Silano, did not.
The second report that is relevant here was prepared on March 12, 1993, by David Moss, the INS agent who was assigned to the OCDETF team for the 1993 case. Since Agent Silano was the head of this OCDETF team, and since at this point Agent Moss was at best a peripheral player in the investigation, it is not unreasonable to assume that the generalizations in this report either came from Agent Silano or were consistent with information he provided. Thus, it is significant that Agent Moss wrote, in the second sentence of this report, that “This OCDEFT [sic] investigation was predicated upon information developed during the course of OC-DEFT [sic] Investigation # NW-CAN-042” (the 1989 case). Agent Moss’ report also indicated that additional information about the 1989 case was accessible in a specifically identified INS report.
In combination, the evidence described above compels a finding that Agent Silano’s statement that he never looked through the old case file until well after the arrests in the ‘93 case was false.
There is another aspect of Agent Silano’s testimony about the 1989 case that was false. After articulating the notion that it was concern about the Double Jeopardy Clause that inspired his decision not to look at the files from the earlier investigation, Agent Silano was asked whether he had shared that “double jeopardy concern with Nandor Vadas?” The agent’s response to this question was: “Yes, I did. And I think that’s the reason why OCDETF assigned him as the case attorney for the second investigation, because he had availability and information from the first case.” TR 1: 181. A moment or two later, after some questioning by counsel designed to point out the tension between the agent’s view that he should know as little about the evidence from the earlier case as possible while the prosecutor was chosen because he knew so much about that matter, I asked this question: “Did you tell Mr. Vadas that you were nervous about double jeopardy implications?” Again, Agent Silano responded in the affirmative: “Yes. We talked about it when he was first assigned the investigation. I wanted some guidance concerning that because I didn’t know how far we could go using the other information from the case.” When I followed up by asking what Mr. Vadas had told him in response to this expression of concern, Agent Silano said: ‘Well, he basically advised me in a situation-by-situation basis.” TR 1-182. Much later in the hearing, when one of the defense lawyers re-visited this subject, Agent Silano *1267 confirmed both that he had been concerned that “having access to information from the prior ease might in some way taint or jeopardize this investigation” and that Mr. Vadas shared this concern. TR 4:762.
When Mr. Vadas was called to the stand, he flatly contradicted this unequivocal but curious testimony by Agent Silano. Defense counsel asked Mr. Vadas: “Did Agent Silano tell you that he didn’t want to look at the old files of the case because of his concerns about double jeopardy?” Mr. Vadas’ answer was “No.” Then defense counsel asked: “Had he mentioned something like that to you, you would have said to him, ‘That’s ridiculous,’ I take it?” Mr. Vadas replied: “Yes.” TR 6: 1818-19. I find Mr. Vadas’ testimony about this matter substantially more credible that Agent Silano’s testimony. It follows that I also find that Agent Silano’s assertions that he discussed his double jeopardy concerns with Mr. Vadas, and that Mr. Vadas shared them, were false.
I further find that Agent Silano testified falsely when he indicated that he had tried to use information from the NADDIS database to identify the persons who had given the government information against Mr. Ailemen in the first case. TR 1:188; TR II 7:31-34.[57] The basis for this finding is that the NAD-DIS printouts produced by the government contain no information of this kind — and no hint that other printouts from this data base might contain such information. Ex. 86; also see Silano’s testimony in TR II at 34.
Agent Silano also appears to have given inaccurate testimony about how he first learned that Sidney Gladney had been a suspect in the 1989 investigation. When asked relatively early in the hearing about this matter, the agent reported that his “original means of awareness of Mr. Gladney” was a printout from the NADDIS data base. TR 2:255. The most obvious evidentiary source of difficulty for this testimony is that the only printout about Sidney Gladney from that data base that the government produced from its files was not requested until July 28, 1993, one day before the affidavit was submitted to Judge Jensen. Ex. 86. Since both Agent Silano and Mr. Vadas testified that the affidavit was sent to Washington for review and approval at least three weeks before it was submitted to Judge Jensen,[58] and that after its return from Washington the only changes made to it involved updating information from the analysis of the telephone records, and since the affidavit contains substantive accusations against and information about Mr. Gladney that are independent of any telephone analysis, it is a certainty that Agent Silano did not first become aware of Mr. Gladney and his connection with the earlier prosecution of Pius Ailemen from this NADDIS printout.
Some of the most troubling, least consistent, and least plausible testimony offered by Agent Silano was about what he knew, and how he allegedly tried to learn more (before submitting the affidavit to Judge Jensen), about the charges and evidence against Sidney Gladney in a case on which he had been arrested by Canadian authorities in the spring of 1992. To begin our account of this matter, we examine Agent Silano’s testimony about when he acquired information from NADDIS printouts and what he learned from them about Mr. Gladney. The government has produced all the NADDIS printouts that were in its files (for this case). Agent Silano could not verify that these are the only printouts from that data base that were generated during this investigation,[59] but why some would have been generated and not preserved escapes me. The printouts that were preserved were generated in June, July and August of 1993. Ex. 86. The printouts that were presented to me for in camera inspection included none that were generated before June of 1993. This documentary evidence is consistent with one testimonial assertion by Agent Silano: he affirmed at one juncture in the hearing that *1268 “the only NADDIS printouts I can definitely say that I or that I had someone run for me were the potential interceptees.” TR 2:273. But just minutes earlier, Agent Silano testified that he had “looked up the NADDIS files from the first case ... prior to even beginning preparing an affidavit for the wire tap,” and he testified that he had decided to begin writing that affidavit in mid-February of 1993. TR 2:250-51; see also Ex. 17, at 41.
Agent Silano also testified, more than once, that “the only information [he] had regarding Sidney Gladney [in connection with the Canadian prosecution] for the first affidavit were two lines in a NADDIS printout.” TR 2:272; TR 2:259. This assertion is false. Agent Silano contradicted it himself on more than one occasion. For example, he testified much later in the hearing that “someone” had told him, before the wiretap application, that two couriers were arrested with Gladney on the Canadian charges and that the arrest had been made in Toronto. TR II, at 30-31. The NADDIS printout made no reference to couriers and did not identify the city in Canada where Mr. Glad-ney had been arrested. Ex. 86.
Agent Silano further testified that, before he submitted his affidavit, he had received information from the DEA office in New York about a debriefing of an informant who allegedly was connected in some way with the Canadian case against Mr. Gladney, but that that report revealed visually nothing about the substance of the allegations in that prosecution. TR 2:400-401; TR II at 38-42. In addition, Agent Silano testified that before the affidavit was submitted “we contacted the solicitor, or the prosecutor in Canada, that was handling the investigation. Mr. Vadas had some calls with the solicitor there, or the prosecutor.” TR 2:402 — 403. Curiously, Agent Silano also testified that Mr. Vadas told Agent Silano nothing about what he learned during those conversations. TR 2: 408.
Agent Silano also testified repeatedly about how much effort he put into trying to get information about the Canadian case against Mr. Gladney before the affidavit was submitted to Judge Jensen — and how frustrated he became over the non-responsiveness of the DEA office in Ottawa. See, e.g., TR 4:909; TR 5:958-59. He claimed that he began as early as April of 1993 to try to get the information, and that during the pre-wire period he personally called DEA officials in Canada “over ten times” to try to persuade them to contact the Canadian authorities to get information about the Gladney prosecution. TR 4: 783; TR 2: 401405; TR 5: 958-59.
At one point he said that in response to these calls the DEA office in Ottawa contacted the Royal Canadian Mounted Police, who provided the phone number of the Canadian prosecutor in Toronto who was handling the case against Mr. Gladney. TR 2: 403404. It was thereafter that Mr. Vadas, according to Agent Silano, had some telephone conversations about the Canadian case with the prosecutor there. TR 2: 404.
Even though he claimed that the OCDETF team had the phone number of the Canadian prosecutor who was handling the case against Mr. Gladney, and even though he claimed that Mr. Vadas had multiple phone conversations with that prosecutor before Judge Jensen authorized the wiretap, Agent Silano insisted that the prosecutorial team here in northern California learned virtually nothing about the Canadian case until months after the wiretap was in place. He said, for example, that Agent de Freitas had tried to persuade the Canadian liaison to the DEA to acquire reports about the Canadian case, but no such reports were delivered. TR 2:401 — 409; TR 4:783-86. It was not until October of 1993, according to Agent Silano, when Agent de Freitas and officer Estelle flew to Toronto to retrieve information in person, that the authorities here had access to any written material from the prosecution there. Id. When asked why he had not sent an agent to Canada to retrieve information about the Gladney prosecution before he submitted the wiretap affidavit, he responded:
“There wasn’t a request pre-affidavit because of all the things that were going on relative to the investigation. At our earliest opportunity, which was sometime in, I think it was the beginning of October, that’s when the two agents were there.” TR 2:409
*1269 I do not find credible the gravamen of Agent Silano’s testimony about the efforts the investigatorial team allegedly made — before they submitted the affidavit to Judge Jensen in late July of 1993 — to acquire information about the Canadian prosecution of Mr. Gladney. This finding is supported by several evidentiary and inferential considerations. First, I note that Agent Silano contradicted some of his own testimony about these matters. The most obvious example surfaced when he was being cross-examined about why DEA agents could not have retrieved from public records in Toronto the considerable information that had been developed about both Sidney Gladney and Pius Ailemen in the preliminary hearings that were held in the Canadian case between late September of 1992 and early February of 1993. TR 5:943. The following exchange occurred during Agent Silano’s testimony about this issue:
Q.....Are you saying to the .court that the DEA agents who are already in Canada could not go to Toronto and access public records of criminal proceedings?
A. I didn’t say that, sir.
Q. That’s what I’m asking you. Could they have?
A. Sure, they could have, but they did not.
Q. Did you ask them to?
A. Yes, I did.
Q. And those are drug — •
The court: I’m sorry, do you recall now specifically asking a DEA agent in Ottawa or anywhere else before July 29th, 1993 to go to Toronto and look at the public records?
The witness: I didn’t — I didn’t specifically ask a DEA agent if I could go look at the records.
The court: No, no, I’m asking you whether you asked some other agent, someone already in the Ottawa office to go over there and look.
The witness: No, I never made — I never made a specific request for an agent to travel to Toronto to obtain those records. No, I did not. TR 4:908.
It is particularly troubling that the truth about this situation emerged only after the court intervened in this examination.
Next, I note that late in his testimony Agent Silano contradicted his earlier assertion that, in response to his calls, the DEA office in Ottawa contacted the RCMP, who provided the phone number of the Canadian prosecutor. After the exchange reproduced in the preceding paragraph, defense counsel asked Agent Silano what requests of Ottawa DEA he was talking about. The agent responded:
A. What I wanted the agent in Ottawa to do was to contact the RCMP in Toronto, whoever the case agent was on the Glad-ney investigation, to contact myself or Agent de Freitas and for the solicitor to contact Mr. Vadas or the attorney that was assigned to the ease.
Q. And it was your understanding that that agent or those agents in Ottawa did not follow through on your request? Right?
A. Yes, before July 29th, 1993. TR 4:909.
Testimony by Nandor Vadas is arguably the most significant source of evidence undermining the credibility of Agent Silano’s account of efforts the OCDETF team allegedly made to retrieve information from Canada before the affidavit was submitted to Judge Jensen. In essence, Mr. Vadas testified that, even though he knew, pre-wire, that Gladney had been arrested in Toronto for trying to smuggle a large quantity of heroin through Canada with female couriers who body-wrapped the drugs,[60] Vadas nonetheless saw no significant connection between the Canadian case and the investigation of Mr. Ailemen, so he took no steps to acquire information about the Toronto prosecution. TR 6:1277-78, 1301-1302, 1336 — 1341. More specifically, Mr. Vadas testified that he had no recollection of conversations with Agent Silano about the Canadian situation, no recollection of Agent Silano telling him that he (Silano) had made phone calls to the Ottawa office of the DEA to try to get information, *1270 and no recollection of Agent Silano soliciting his help with efforts to get information from Canada. Mr. Vadas also testified that if Agent Silano had raised this subject, Mr. Vadas would have told him that they had to initiate a formal request through DOJ in Washington — and that if he had had a conversation about this matter with Agent Sila-no he likely would remember it — which he did not. TR 6: 1336-41. Most significantly, Mr. Vadas testified that he had made no attempt at all to acquire information about that case. Id. Clearly, he never had any telephone conversation with any Canadian prosecutor about the case in Toronto against Mr. Gladney.
There are additional reasons for rejecting Agent Silano’s account of the efforts to acquire information about the case against Mr. Gladney in Toronto. Most obviously, there is no reason to infer, and certainly no evidence in the record that would indicate, that either the DEA office in Ottawa or the Canadian law enforcement authorities would have any incentive not to cooperate fully with requests for assistance of the kind Agent Silano said he made. While resource constraints might prevent these agencies from responding immediately, it is important to bear in mind that Agent Silano said that he began making these requests in April, more than three months before he submitted the affidavit. And the investigation he headed was self-described as “high priority” — a big case involving allegations of a long history of international smuggling of very large amounts of heroin. Certainly he would have communicated these facts to the folks in Ottawa — and it beggars imagination to assume that they simply would have ignored him for several months, as he ultimately testified.
After the wiretap had been in place for more than two months, when the two agents went to Canada, they got the information they wanted, without any apparent resistance. Later, Canadian authorities even flew to San Francisco to deliver additional information about the Canadian case. Most instructive about the willingness of the Canadian authorities to work with their American counter-parts, however, is the fact that on their own initiative, in November of 1992, prosecutors from Canada contacted the Intelligence Unit of the Oakland Police Department and provided them with key information about the Canadian charges. Ex. 70 (a Constable Remington, with phone number provided, advised the Oakland Police Department that Gladney had been “arrested for masterminding a 2 kilo [heroin] smuggling attempt through Canada” and had recruited a female courier using the pretext that she would be smuggling diamonds.)
For all these reasons, I find that Agent Silano did not testify truthfully about the extent of the prosecutorial team’s efforts to acquire information about the Gladney case in Canada before he submitted his affidavit to Judge Jensen. I further find he and the other members of the investigative team made little or no effort, before they applied for authorization to install the wiretap, to acquire that information. In addition, I find that if they had made a reasonable effort, they would have acquired, before July 29, 1993, the information that they ultimately retrieved in October of 1993.
Further, I reject Agent Silano’s assertion that the reason he did not ask an agent to go to Canada before the wiretap was authorized was that the OCDETF team was too busy with the other aspects of the investigation and that the earliest opportunity for such a trip was in October of 1993. On grounds that I detail in another section of this Report, I find that the investigative team was doing relatively little in this case in March, April, May, June and July of 1993 — and that the efforts to generate evidence that were underway during that five-month period focused primarily on Ailemen’s telephone communications. This work was done in substantial measure by an “analyst” — so the field agents, especially Gutierrez and Estelle, were left with virtually nothing to do on this case. Nor is there any evidence that agents de Freitas or Gervacio were committing significant time to this investigation during the spring and early summer of 1993.[61]
*1271 Moreover, the assertion that it was a lack of time that prevented the OCDETF team from sending someone to Canada is belied by the fact that Silano and Vadas decided that they had ample'resources in early June to send three people (two agents and one lawyer) to N.Y. to participate in an interview of Francis Idialu — an undertaking that was foreseeably much less likely to generate useful information and leads than a trip to Canada to explore the Gladney ease. For all these reasons, and despite Agent’s Silano’s testimony to the contrary, I find that there were ample personnel resources and that there was plenty of time, well before the affidavit was submitted to Judge Jensen, to send at least one agent to Canada to acquire what would have been very important information about the Gladney ease.[62]
Similarly, I reject (as false) Agent Silano’s assertion that, before Judge Jensen authorized the wiretap, Silano made substantial efforts to secure assistance from other OC-DETF team agencies but received very little of the cooperation and support he sought. See TR 2: 382-85. This contention is belied most fundamentally by the fact that the OC-DETF structure has been in existence for many years and is the self-conscious product of a recognition by participating agencies that in “high priority,” complex cases, there is a real need to pool and coordinate both resources and expertise from many different sectors of the law enforcement community. TR 1: 124; TR 1:177. In this case, no fewer than seven federal agencies, in addition to DEA and the Alameda County Narcotics Task Force, committed themselves formally (by having their separate representatives initial the OCDETF proposal) to support this investigation. Furthermore, the proposal that the OCDETF coordinating body approved in December of 1992 projected the use of three DEA agents, 2 county/local investigators, and one agent each from ATF,' INS, IRS, USAO, and the USCS (the FBI, the United States Marshall’s Service, and the USCG also signed off on the OCDETF proposal — and at least the FBI and the Marshall’s Service eventually contributed resources — but not until after the wiretap was in place). TR 1:177-78. It also is instructive to note that 38 people, representing seven different law enforcement agencies, participated in the minimization debriefing that the investigatory team sponsored just as it was launching the wire interception. Ex. 76.
There is more than circumstantial evidence that contradicts Agent Silano’s contention that before the wiretap was authorized[63] he made substantial efforts to secure cooperation but was rebuffed or ignored. It is clear, for example, that Silano made no effort to call on the services of the FBI before he submitted his affidavit to Judge Jensen. TR 2:382. Moreover, Frank Gervacio, who was the Customs Agent assigned to this matter, testified that before the affidavit was submitted to Judge Jensen he was called upon to contribute “very little” to this case. He could not point to any particular use of his skills or expertise, or his agency’s resources, that the leaders of this investigation sought before the wiretap was authorized. He indicated, however, that if he had “been asked to perform any investigative method or technique,” he would have “provided to the best of [his] ability those services.” TR 5: 104243. Gervacio’s testimony makes it clear, for example, that no effort was made, before the wiretap, to use the Financial Crimes Enforcement Network that he could access to look for evidence about how or where Ademen or any of the other suspects moved the large amount of money that the government suspected was involved in the multi-kilo drug transactions associated with the “Ade-men organization.”
*1272 Agent Silano also offered contradictory testimony about efforts, before the wiretap was in place, to use the resources of the INS and the IRS. At one juncture, the agent, said that his team did not actually utilize the services of the INS until well after the wiretap was approved by Judge Jensen. TR 2: 381-382. But a few minutes later he said he had asked the INS for records of “certain individuals,” but that the agency never responded. When pressed, he changed his testimony again, conceding that, before the wiretap was authorized, he actually asked INS for records about only one suspect— Pius Ailemen. TR 383-387. Similarly, when questions were first posed about the role of the IRS Agent Silano said that he had sought, but not received, “some financial workups on some of the businesses that we suspected.” TR 2:385. Again, when pressed for specifics, he conceded that he had sought information only about one business, a check cashing store which Nathaniel Iheukwu and Ailemen had been seen visiting once.[64] And while the investigative team could .have sought income tax records for a large number of suspects prior to submitting the affidavit, it appears that no requests for this kind of information were made.[65] In the end, Silano could identify only two requests he had made of any other agency that were not satisfied before July 29, 1993: the request for information from Ailemen’s INS file and the alleged[66] request for the income tax returns for the check cashing business. TR 2: 390.
Testimony by Assistant United States Attorney Nandor Vadas also tended to contradict Agent Silano’s assertion that he devoted considerable effort to securing assistance from other agencies (and other offices of the DEA), but received little or no help before the affidavit was submitted. Mr. Vadas could not recall a single instance of Agent Silano asking for help securing assistance from any other law enforcement agency or any other DEA office, even though Vadas testified that it would have been part of his job, as the OCDETF attorney responsible for the case, to intervene if Agent Silano had complained about another agency’s unresponsiveness. TR 6: 1321-22. Mr. Vadas further testified that he could not even recall “any especially large bellyaching” by Agent Silano about other agencies’ performance during this investigation. Id. Moreover, Va-das testified that, unlike some other OC-DETF cases, where there were weekly meetings of agency representatives, there were few, if any, such meetings in this case before the application for the wiretap was submitted. TR 6:1324-25.
Given all this evidence, plus the fact that other agencies made substantial contributions to the investigation after July of 1993,[67] *1273 I find that, contrary to his claims during the evidentiary hearing, Agent Silano made relatively little effort, before July 29, 1993, to enlist the cooperation or to capitalize on the investigative resources of the other agency members of the OCDETF team (other than the Alameda County Narcotics Task Force— which supplied the services of officers Gutierrez and Estelle).
There is one additional subject of Agent Silano’s testimony that must be discussed here. Identifying the juncture in the evolution of this investigation at which Agent Sila-no began drafting the affidavit,[68] and the point (if different) where he decided to apply for the authorization, are arguably matters of some consequence to disposition of the defendants’ motion. Agent Silano was asked questions about these issues several times — and gave answers that were both equivocal and inconsistent. At one point in his testimony, Agent Silano was asked: “When was it, to the best of your recollection, that you started even in a rough manner drafting your affidavit?” The agent responded (after it was made clear that this question was directed to the affidavit that was submitted to Judge Jensen on July 29, 1993): “Probably around the time around April.” TR 2:411. But when asked essentially the same question earlier, by a different defense lawyer, Agent Silano gave a different answer:
Q. When did you first decide to start writing an application in that — or affidavit in support of wiretap?
(Pause in proceedings)
The Witness: Probably ... after the controlled delivery that we attempted to do in the middle of February. TR 2:250.[69]
Of these two answers, I find the latter much more likely accurate. Support for this finding comes in part from additional testimony the agent offered to help identify the stage in the investigation when he began working on the affidavit. Agent Silano testified that when he began drafting “[w]e had the camera up. We had the mail cover up.” Authority to install the camera had been secured on January 25,1993, and the application for the mail cover had been made on January 28, 1993. Aff. 53-54; 61-62. Agent Silano’s Affidavit makes it appear that the mail cover actually commenced on January 28, 1993, but during his testimony he eventually took the position that the gathering of evidence from the mail cover did not commence until four to six weeks after the application was submitted. TR 4:808. There is information in the Affidavit for covered mail beginning February 22, 1993 — so the work pursuant to the mail cover had begun by then. On all the evidence, however, I find that investigation through both the camera and the mail cover had been discontinued before the end of March, 1993. Id;[70] TR 4:811; Ex. 84. Because both the mail cover and the camera surveillance had been discontinued before the end of March, 1993, and *1274 because both were fully operational in February, it is much more likely that Agent Silano began working on the affidavit in February than in April.
There is additional, important circumstantial evidence to support my finding that Agent Silano began drafting the affidavit in the latter part of February, rather than in April. That is the evidence that it was very shortly after the transportation of the fake heroin to Chicago on February 19,1993, that the focus of the entire investigation shifted, dramatically, away from field work (the undercover operation and physical surveillance) and toward analysis of Mr. Ailemen’s telephone communications. That full shift in investigatory efforts suggests that by late February of 1993 Agent Silano had decided that the real future of this investigation would revolve around the wiretap.
During his testimony Agent Silano made a distinction between the decision to start drafting the affidavit and the decision to apply to the court for authorization to install the wiretap. He claimed that in a few other cases he had worked on drafts of wiretap affidavits that were never submitted to a district court in an application — and that when he began working on the draft in this case he was not sure that the investigative team would decide to submit the application to the district court.[71] But when pressed to identify the time frame within which he made the decision to actually seek wiretap authorization, he gave two different answers. At one point he said it was in June of 1993. TR 2:250. But at another point in his testimony he said “I would say probably maybe probably around May of 1993.” TR 1:164.
I find that both of these averments are false. I find that Agent Silano had decided much earlier, by no later than the second week in March, and probably by as early as February 23rd, that he would actually seek authorization to use a wiretap in this case. That finding is based primarily on another finding: that in late February and early March the investigation that Agent Silano directed took a major turn away from field and undercover work and toward gathering information about Mr. Ailemen’s use of telephone communications.[72]
There are other subjects about which Agent Silano offered incredible testimony during the evidentiary hearing — but most of those are related directly to statements in or omissions from his affidavit, so I will discuss them in the sections of this report that are devoted to the portions of the affidavit to which the implausible testimony is pertinent.
VII.
THE AFFIDAVIT: MATERIAL MISSTATEMENTS
In this section of my Report, I identify false or likely misleading statements in Agent Silano’s affidavit that I deem material[73] to the necessity determination and that either were known to be false or that were included with reckless disregard for their truth or falsity. In this section of my Report I also will identify some of the material information that was omitted from the affidavit— but only to the extent necessary to show that particular statements made in the affidavit were false. In the next section of this Report I will identify additional material infor *1275 mation that was intentionally or recklessly omitted from the affidavit.
This material is not presented in order of analytical significance, but in the order of its appearance in the affidavit.
I find that the averment in the affidavit that is most fundamental to the necessity requirement is false in significant respects and quite misleading. That averment appears in different forms in three places, but is essentially this: “Normal investigative procedures have been tried and failed, reasonably appear to be unlikely to reveal the full scope of the unlawful activities, the roles of the individuals involved, or the identities of the other participants if tried, or are too dangerous to employ.” Aff. at 4-5; see also Aff. at 57 and 65. I also find that Agent Silano knew, at the time he submitted his affidavit to Judge Jensen, that this averment was false in important respects and materially misleading. Given the success that the undercover operation had enjoyed, after commitments of relatively modest effort and resources to this “high priority” investigation of an alleged major international drug trafficking organization, and given the significant leads that were not pursued, it was at least reckless to affirm that “[normal investigative procedures] have been tried and failed” and appeared unlikely to be successful in the future. Because so much of the basis for my finding that this statement is false or materially misleading is set forth in other places in this Report, I will limit my discussion here to just two of the specific respects in which this general assertion could not have been responsibly made.
I will focus first on the assertion, as rephrased in the necessity section of the affidavit, that “[normal investigative procedures] have not and likely cannot succeed in establishing the identities of the co-conspirators and aiders and abettors of Pius Ailemen (other than as set forth herein)____” Aff. at 65. After considering the accuracy of that claim, I will examine the suggestion by Agent Sila-no that it might be too dangerous to continue to use normal investigative techniques to develop the evidence in this case.
A. The Identities of Other Participants
It was at least reckless to declare to Judge Jensen that “normal investigative procedures” have not and are not reasonably likely to disclose “the identities of the co-conspirators and aiders and abettors of Pius Ailemen (other than as set forth herein).” The fundamental difficulty with this assertion is that, through normal investigative techniques, the government already had identified at least seven[74] additional likely “participants” or “aiders and abettors” that Agent Silano did not disclose to Judge Jensen in the affidavit.
The affidavit failed to disclose to Judge Jensen that at least as early as April of 1993 the investigators believed that they had identified seven couriers who had been involved in the 1989 case and who were involved again in the trafficking that was the subject of the 1993 investigation. Among those not mentioned in the 1993 affidavit were Monetta White, Tiffany Valentine, Tina Tauer, and Kali Knapp (also known as Kali Hidalgo). The OCDETF team in 1988-89 had developed considerable evidence that Valentine, Knapp, and Tauer were directly involved in a complex scheme in which ten female couriers were used (in a two-stage operation) to attempt to import more than five pounds of heroin in this country. Three of the ten couriers (Rebecca Bruce, Norlita Tadeo, and Geraldine Langaman) were caught at O’Hare airport in Chicago, each carrying (body-wrapped) more than three pounds of heroin. Ex. 5-A at 8-9. The couriers that were arrested implicated Ailemen, provided the names of other couriers, and tried to defend their actions on the ground that they had been recruited to smuggle diamonds or jewels. See, e.g., Exhibits 3, 4, 5-A, and 79.
Before the affidavit in support of the wiretap was submitted in the 1993 case, members of the OCDETF team requested and received NADDIS printouts for Valentine, White, Tauer, and Langaman, among others. The printout for Geraldine Langaman included a hand-written notation that indicates that *1276 the government knew she had shared an address in San Rafael with three other suspects who had been involved with Ailemen in the past, Kali Knapp, Tiffany Valentine, and Kellee Cooper. Ex. 86. Analysis of Aile-men’s phone records showed that, during the 1993 investigatory period, he had been in contact with Monetta White, Kali Knapp, and Tina Tauer. TR 4:730-33; TR 5:969; Ex. 87. In fact, during the six months before the wiretap was authorized, Ailemen used his home phone to call (or try to call) Monetta White no fewer than 103 times, Tina Tauer no fewer than 65 times, and Kali Knapp at least four times. Ex. 87. It is likely that he called these people on other occasions during this period from his cellular phone — but I have not analyzed those voluminous records (Ex 49) for this purpose. How many times they initiated calls to Ailemen is unknown— as the government never sought (pre-wire) their phone records and never asked to install a pen register on any of their phones.
There was additional information that tended to tie these former couriers to Aile-men’s trafficking in 1992 and 1993. A car registered to Tina Tauer was reported (by Nordahl Washington) to have been driven to Ailemen’s apartment in early February of 1993.[75] Agent Silano admitted during the evidentiary hearing that, before the affidavit was submitted, he knew that Tauer was “still associating” with Ailemen and he believed then that she continued to work with Aile-men as a courier. TR 3:607-08; TR 4:793. He also admitted knowing that Kali Knapp had come up in the earlier investigation and “was on the apartment lease of Mr. Ailemen at the time, when we did the check of Mr. Ailemen’s apartment____” TR 4:794. In fact, Agent Silano testified that he decided not to try to interview either Tauer or Knapp because he believed they were still involved (like Keesha Duncan) in the Ailemen “organization” and would tip him off that he was being actively investigated. TR 4:793-95.
Among the suspected couriers not identified in the affidavit, the most glaring omission may be Tiffany Valentine — because of tile duration of her relationship with Ademen and the significance of the role she was believed to have played in the organization that was the target of the 1989 investigation. As early as August of 1989 Agent Iseri had described her to the grand jury as “the longest of all ... the female couriers ... that has traveled for Pius, and [she] was the coordinator on the trip in ‘88, handles any problems of any kind, or last minute arrangements regarding staying here (indicated), as well as in Africa---- She has taken ... numerous trips, overseas, England, Paris, Africa, different places.” Ex. 5-B at 14. Moreover, in 1988 and 1989 the DEA suspected that Valentine might have been involved in money laundering for Ademen. During that period the government actively investigated its suspicion that Ms. Valentine was involved in a credit card fraud and money laundering operation with a Jeffrey Waugh — but apparently this investigation never yielded enough evidence to support a prosecution. Ex. 5-B at 17-18.
Agent Sdano also faded to disclose to Judge Jensen that each of the separate NADDIS printouts for four suspects (two of whom, Lambert and Cooper, were named in the affidavit, and two of whom, Tauer and Loreli Washington, were not) included the fodowing statement: “0393 PER C/I CAPABLE OF SELLING KG QUANTITIES COCAINE AND LB QUANTITIES WHITE HEROIN; CONCEALED HEROIN ON PERSON OR LUGGAGE (R3-93-Z005 /030193).” Ex. 86.[76] When asked about these entries in the NADDIS system, Agent Sdano said he did not believe them or take them seriously, in part because the number (R3-93-Z005) that identified the source of this information was the number for his investigation — and he had no knowledge of any confidential informant (“C/I”) providing any such information. He admitted, however, that he had taken no meaningful steps to investigate the source of this information and that he had no idea how it got into the system or who the confidential informant *1277 was. He simply assumed that the information had been input by someone in Washington, D.C. TR II at 11-18.
There is additional support for the finding that it was at least reckless not to identify Knapp, Valentine, and White in the affidavit as suspected aiders and abettors or co-conspirators in Ailemen’s 1992-1993 drug trafficking. Records disclosing information about transfers of money by wire were readily available to the investigative team before, the affidavit was submitted. Inexplicably, however, the agents made no effort to obtain those records until months after the wiretap had been authorized. When finally acquired (through a grand jury subpoena), American Express Money Gram transaction reports showed that between October of 1991 and May of 1992 Kali Knapp had received more than $48,000 through 29 separate wire transfers, primarily from London (but also from Alexandria, Virginia — just outside Washington, D.C. — and New York), that Tiffany Valentine had received upwards of $40,000 through thirty-one separate wire transfers between 1991 and 1993, and that on one day in early May of 1992 Monetta White had received a total of $4,500 through three separate wire transfers from New York, N.Y. The American Express reports showed that none of these transfers exceeded $2,000. Ex. 54. These records should have taken on added inculpatory significance to the investigative team in light of their information that Aile-men had been out of custody since October of 1991. Gov.’s Y.
The government compounded the misleading effect of omitting so much of the information it had developed about other couriers by including, in the “necessity” section, a sentence that foreseeably invited Judge Jensen to conclude that the OCDETF team had in fact identified only one alleged courier. In the part of the affidavit that purported to explain the shortcomings of use of undercover agents and informants, Agent Silano affirmed that the suspects “have only disclosed the identity of one specific cornier[77] that concealed heroin and transported heroin into the United States.” Aff. at 58. In the context of the government’s failure to disclose that it had in fact identified several additional alleged couriers, I find that this sentence, while literally not false, is the product of self-conscious “artful crafting” that had the readily foreseeable effect of misleading Judge Jensen about an important aspect of the success of the investigation that had been based on “normal” techniques.
In addition to the couriers, the affidavit also failed to disclose that the government had uncovered significant evidence implicating three other persons in Ailemen’s trafficking: Nathaniel Iheukwu, his common-law wife Loreli Washington, and Victor Onuagu-luchi. Of these three additional suspects, the failure to disclose information about Mr. Iheukwu is the most troubling. Given the information I am about to describe, it clearly was at least reckless for the government not to have named Iheukwu in the affidavit as a probable co-conspirator and “person expected to be intercepted.”
It is important to emphasize, at the outset here, that the DEA strongly suspected during the 1988-89 investigation that Iheukwu was intimately involved in Ailemen’s drug trafficking. In August of 1989 Agent Iseri testified to the grand jury, in response to questions posed by OCDETF attorney Nan-dor Vadas, that Nathaniel Iheukwu and his sister, Catherine, Nigerians, were “directly involved with Pius Ailemen.” Agent Iseri proceeded to explain that he knew that this was true in part because he had received information from a DEA agent in Washington, D.C., that about a month earlier both of the Iheukwus, along with Loreli Washington, whom Iseri identified as Nathaniel Iheukwus’ common-law wife, were stopped by Canadian Customs authorities, working in concert with DEA agents, as they were attempting to cross the border between Canada and the United States. The authorities discovered during this stop that Iheukwu had in his possession two telephone numbers for Pius Ailemen (one current and one former), as well as the name, address and phone number *1278 of Kelly Lambert, a known Ailemen associate. Iseri went on to explain that Catherine Iheukwu was carrying documents that indicated that she had been in Washington, D.C., where she had “met with a woman or a man by the name of Kelly, Kelly Lambert, or Kellee Copper [sic], or a man. We don’t know. He obtained a package that was given to her, and we don’t know if it’s money or narcotics, but supposedly she had gone to Washington, D.C.” Ex. 5-B, at 29-30.
Agent Iseri further testified that analysis of phone records showed that Ailemen had called the Iheukwu-Washington residence “on several occasions” and that more information about the Iheukwus was being generated by the DEA office in Columbus, Ohio, where Catherine. Iheukwu had been working for the state government. Ex 5-B at 30.[78] Iseri also indicated that while the DEA did not know for sure what role Loreli Washington was playing in Ailemen’s trafficking, the agents were confident that “it’s very intimate as to what Nathaniel may be doing.” Id. Later in his testimony, Agent Iseri told the grand jury that the DEA suspected the Nathaniel and Catherine Iheukwu, as well as Jean and Victor Onuaguluchi, might know “a lot more” than the American couriers knew about Ailemen’s sources and the organization (if any) above him. Ex. 5-B at 41-42.
While Agent Silano professed to have had, intentionally, little knowledge of the evidence generated in the first investigation, he admitted that during the second investigation he had identified the people whom Ailemen telephoned more than occasionally and that he had asked Nandor Vadas, who certainly was familiar with the details of the first case, whether any of the people who surfaced through the phone analysis in the second case were known criminal associates of Aile-men’s. TR 4:701-706, 708-709, 720. Because, as I discuss below, phone analysis clearly pointed to Nathaniel Iheukwu as a major suspect in the 1993 ease, Agent Silano must have known, through Mr. Vadas, about the government’s evidence against and suspicions of Iheukwu in the first ease.
The information just described takes on added significance in light of the several ways that Iheukwu re-surfaced as a suspect in the 1992-1993 investigation. Based on information provided by Nordahl Washington and developed through surveillances, Agent Silano knew, well before he submitted his affidavit to Judge Jensen, that Nathaniel Iheukwu was “a frequent visitor” to Aile-men’s apartment. TR 4:747, 712. The OC-DETF team knew that the white BMW that was seen several times at the Ailemen apartment building was registered to Loreli Washington, Iheukwu’s wife. Gov.’s Y; TR 4:711-712; TR 3:612.
The evidence implicating Iheukwu through field surveillances reinforced the inference that he was knowingly involved with Ailemen in illegal activity. For example, during the surveillance on February 26, 1993, agents saw Iheukwu using a telescope (from inside Ailemen’s apartment) to scan the area around Ailemen’s building for 10-15 minutes before he and Ailemen left the building in Loreli Washington’s BMW. Ex. 34 and Superseding Indictment, filed July 11, 1994, page 8, alleged overt act 48. When the agents followed the car, driven by Iheukwu, they watched him engage in extensive counter-surveillance maneuvers as he took Aile-men twice (during the same trip) to a check cashing business. Ex. 34.
Agents again observed Iheukwu and Aile-men on March 3, 1993 — the last field surveillance directly of Ailemen during this investigation. On this occasion Iheukwu and Ailemen emerged from Ailemen’s building carrying large canvas bags. Iheukwu first drove Ailemen (again in the BMW) to a business in Oakland. Later, again employing obvious counter-surveillance driving techniques, he drove Ailemen to San Francisco, where they met a person fitting the description of Monetta White and went into a restaurant. Ex. 85, last report. The agents elected to discontinue the surveillance at that juncture.
*1279 Based in part on the information described above, Agent Silano was sufficiently suspicious of Iheukwu and his wife, before he submitted his affidavit to Judge Jensen, to obtain from the phone company records that would indicate the numbers dialed from their residence. TR 4:711-712. These records, if ever produced by the phone company, appear to have been lost. The government cannot locate them in its files. There is, however, another source of evidence that indicates that there was extensive phone contact between Ailemen and the Iheukwu/Washington household in the months before the government submitted the application for the wiretap. The toll records for Ailemen’s home phone and for his cell phone, records that the government acquired well before the wiretap was authorized, disclose that (1) in the seven months before July 29, 1993, there were 121 calls (or attempted calls) from Ailemen’s home phone to the Iheukwu/Washington home, and (2) during the ten months before July 29, 1993, there were 119 calls (or attempted calls) from Ailemen’s cellular phone to the Iheukwu/Washington home. Ex. 49; Ex. 87; TR 4:730-731; TR II at 55. Thus the government had evidence, even without records reflecting calls outgoing from the Iheukwu/Washington residence, that Ailemen contacted or attempted to contact Iheukwu and/or Loreli Washington at least 25-30 times per month. The government could not have believed that any legitimate business purpose supported this extensive contact— because the government believed that neither Ailemen nor Iheukwu had any legitimate business or work. TR 4:722, 739.
The affidavit that Agent Silano submitted to Judge Jensen made no mention of Nathaniel Iheukwu and did not suggest a connection between him and any of the considerable evidence that I have described in the preceding paragraphs. These material omissions were made at least recklessly. Agent Silano admitted that Iheukwu had been identified in the surveillances, admitted that he knew Iheukwu was a frequent visitor to Ailemen’s apartment, and admitted that he knew that Ailemen had called Iheukwu “on numerous occasions” before the application for the wiretap was submitted. TR 4:711-712, 731, 747. Agent Silano further admitted that, before he submitted his affidavit, he knew there was a possibility that the wiretap would result in intercepting conversations in which Mr. Iheukwu was a participant. TR 4:732. I find that there was more than just a possibility that the wiretap would capture conversations involving Mr. Iheukwu; it was a virtual certainty that that would occur, and that virtual certainty was fully foreseeable by the government. In fact, any competent analysis of the phone records the government had before the wiretap would lead to the conclusion that there was a much greater likelihood that the tap would capture Mr. Iheukwu conversations than it would capture conversations involving Robert Tinney, Keesha Duncan, or Kellee Cooper (all named as persons expected to be intercepted).
As with the suspected couriers discussed above, American Express MoneyGram records also contained some evidence of Iheukwu’s connection with Ailemen. If the OCDETF team had acquired those records before July 29, 1993, as it easily could have and clearly should have, the investigators would have learned that Nathaniel Iheukwu had wire transferred $2,500 to Pius Aile-men on March 4, 1993, and $950 to his brother (now a co-defendant in this case) Dele Ailemen on March 30, 1993. The OC-DETF team also would have learned from these records that Ailemen had wire transferred $1,500 to Iheukwu on August 14, 1992, and another $2,700 on September 15th of that year. Ex. 54. It was reckless for the investigators not to have acquired this information before they applied for the wiretap — and its absence from the affidavit, as further indication of what kinds of evidence could be gathered by traditional means, was the product of recklessness.
For all the reasons stated here, I find that Agent Silano failed, either recklessly or intentionally, to disclose in his affidavit the substantial evidence that had been gathered by traditional means against Mr. Iheukwu (or that easily could have been so gathered) and failed, intentionally or recklessly, to identify him as a person whom the government expected to intercept and in whose wiretapped conversations the government expected to find evidence of drug trafficking. I *1280 also find that these omissions clearly were material to the necessity determination.
But there is something even more disturbing about how the government abused its knowledge of Nathaniel Iheukwu in this affidavit. In the “necessity” section, as part of his effort to persuade Judge Jensen that there were severe limits on what could be learned through the use of informants and undercover agents, Agent Silano wrote the following sentence: “During surveillance in Oakland, another individual was observed who appeared to be involved in distribution of heroin and money laundering activities, however, the undercover agent was never introduced to him nor advised of his identity.” The “individual” referred to here clearly was Nathaniel Iheukwu. But the government never disclosed that fact, or the government’s knowledge of that fact, to Judge Jensen. Instead, the affidavit was written to create the false impressions (1) that the government had been unable to learn who this person was and (2) that the government would not be able to identify him without resort to a wiretap — because Ailemen had been so secretive and elusive in his dealings with the undercover agent. I find that the government intended to create these material false impressions — and that the inclusion in the affidavit at this juncture of this sentence is a prime example of self-conscious manipulation of the process of crafting the affidavit to mislead the district court about the limits both of the government’s knowledge and of what could be learned through informants and undercover operations.
Agent Silano’s affidavit also failed to disclose the evidence that had been gathered against Loreli M. Washington, Nathaniel Iheukwu’s common-law wife. As reported above, phone records showed that Ailemen had dialed the number at the Iheukwu/Wash-ington residence some 240 times in the ten months preceding the wiretap. The BMW registered to Loreli Washington was seen at Ailemen’s apartment on many occasions. Gov.’s Y; Ex. 85. And at least Mr. Vadas knew that the 1989 investigation had shown that Loreli Washington had ties to the Ade-men “organization.” Ex. 5-B at 29-30. Moreover, Agent Silano testified that before the wiretap was authorized the investigative team had learned Ms. Washington’s address and phone number and had requested (but failed to preserve) her phone records. TR 4:711-712.
In fact, Agent Silano was sufficiently interested in Loreli Washington to ask for a printout about her from the NADDIS data base on June 16, 1993, right around the time he claims that he and Mr. Vadas sent the proposed affidavit to Washington, D.C., for review at DEA headquarters and at the Department of Justice. Ex. 86. As noted above, the NADDIS printout for Ms. Washington indicated that a confidential informant had reported on March 1, 1993, that Ms. Washington was “capable of selling KG quantities cocaine and LB quantities white heroin; concealed heroin on person or luggage.” Ex. 86. While Agent Silano testified, as noted above, that he did not take this information seriously, the fact that somehow this information had made it into the NADDIS system, coupled with the fact that this information was attributed to the investigation in this case, tends to support an inference that the OCDETF team that was investigating Pius Ailemen in the spring of 1993 believed that Loreli Washington was deeply involved in Ailemen’s (and Iheukwu’s) drug trafficking. The same NADDIS printout also showed that Washington was the registered owner of the car in which Catherine I. Iheuk-wu had been arrested by INS officials in June of 1989. It was in connection with that border arrest that authorities had found on Nathaniel Iheukwu’s person the phone numbers of Pius Ailemen and Kelly Lambert. Ex. 5-B at 29-30.
Despite the evidence linking Washington with unlawful activity, and despite the fact that the tap of Ailemen’s cellular phone was extremely likely to result in interceptions of her telephone conversations, Loreli Washington (just like Nathaniel Iheukwu) was not mentioned once in Agent Silano’s affidavit and was not identified as a person expected to be intercepted. I find that these omissions also were material and at least reckless.
*1281 Another suspect who was not mentioned in the 1993 affidavit was Victor Onuaguluehi. Agent Iseri had developed information tying Onuaguluehi to Pius Ailemen during the 1989 investigation. During surveillances in that earlier ease agents had seen Onuagulu-chi in the company of Pius Ailemen and, apparently, Sidney Gladney. TR 1:34-35. In testimony to the grand jury on August 3, 1989, Agent Iseri reported that Ailemen, Victor Onuaguluehi, Sidney Gladney, Tiffany Valentine, and Natalie Hornsby (identified as a courier)[79] were associated with an im-portyexport business called “Timbuktu Fashions” [80] — a business that was owned by On-uaguluchi’s sister, Jean, and operated out of her home. In 1989, Gladney stated in an application that he had been a buyer for this business for five years, and Hornsby had indicated that Pius Ailemen was her boss at Timbuktu. Ex. 5-B at 6, 23, and 42; TR 1:74-75; Ex. 86; Ex. 3 at 10. Iseri told the grand jury that investigators had connected Gladney with the Onuaguluehis as early as 1988, when they were observed in a meeting at the Onuaguluchi’s residence. Ex. 5-B at 24. When he described Ailemen’s “organization” to the grand jury in August of 1989, Agent Iseri included Jean and Victor Onuag-uluchi in a section devoted to Ailemen’s “Nigerian associates.” Ex. 5-B, at 6. He also told the grand jurors that while the American couriers appeared to know little about the criminal organization “beyond Pius,” he suspected that “Jean and Victor [Onuagulu-chi] and Catherine and Nathaniel [Iheuk-wu],. .may know a lot more than these other girls.” Ex. 5-B at 41-42.
In December of 1988 the investigation of Ailemen’s trafficking was designated as an OCDETF matter and the United States Customs Service, among other agencies, formally joined the investigative team. About a month later, on January 13,1989, Agent Lori L. Pang, who was the Customs Service representative on the OCDETF team, caused an alert about Victor Onuaguluehi to be posted in the TECS[81] data base. This alert included the following information about Onuagulu-chi: “Alleged to be involved in heroin smuggling operation using female couriers. Copy all documents. Look for associates. Notify S/A Pang ASA at [FTS phone number]. Works in clothing shop called Timbuktu.” Ex. 36. The case number in this TECS entry indicates that this alert was made as part of the OCDETF investigation of Pius Ailemen. TR 5:1049; see also Ex. 79.[82] The purpose of the alert was to get customs agents at ports of entry to be on the lookout for Onuaguluehi and any associates, to pull him aside for questioning and to search him, and to notify Agent Pang promptly so that she could monitor his movements from overseas into this country. TR 5:1045-49. It is clear that someone in the federal law enforcement community had this TECS alert printed out in January of 1991 — but for what purpose is not clear. Ex. 36. The alert has remained in the TECS system through the present — and DEA agents had access to it (at all pertinent times) through another data base called EPIC (El Paso Intelligence Center). TR 1:52; TR 5:1048.
Evidence that the TECS alert served at least part of its intended purpose is reflected in the Declaration that Victor Onuaguluehi submitted in connection with this motion. Ex. 37. In that Declaration, Onuaguluehi states that he left this country to visit Nigeria each December between 1989 and 1991, and that he returned on each occasion through John F. Kennedy Airport in New York in January of the following year (so he returned through New York in January of *1282 1990, 1991, and 1992). He asserts that on each of these three occasions he was detained by Customs agents for 10-14 hours, his luggage was searched and x-rayed, and he was questioned extensively. During these detentions he was kept under constant surveillance, even when he had to leave the detention room to go to the bathroom (where an agent “observed me relieve myself.”).
While it is not clear that Agent Silano took the initiative to learn about the TECS alert, or that he knew about the detentions and interrogations that Mr. Onuaguluchi declares occurred, it is clear that the OCDETF team that Silano headed during the 1993 investigation easily could have had access to all the information generated during the earlier case, including the information generated by the Customs Service. See, e.g., TR 5:1029-1040; see also Ex. 18. It also is clear that during the several months before the government sought authorization for the wiretap in this case Ailemen had considerable phone contact with Victor Onuaguluchi. During this period Ailemen used his home phone to call (or to attempt to call) Onuaguluchi no fewer than 29 times — and that fact was clearly visible in the records the OCDETF team subpoenaed. Ex. 87. I do not know how much additional phone contact these two men had through calls placed from Ailemen’s cellular phone or calls initiated by Onuagulu-chi.[83] TR 5:969-970.
Moreover, Agent Silano admitted during the evidentiary hearing that he knew, before he submitted his affidavit, that Victor Onuag-uluchi had been a suspected criminal associate of Pius Ailemen in the 1989 case. TR 5:969-970. Nandor Vadas also admitted knowing this. TR 6:1354. Further, Agent Silano conceded that, despite this knowledge, and even though Onuaguluchi had surfaced so clearly in Ailemen’s phone records, no effort was made, before the wiretap was installed, to investigate Onuaguluchi by any traditional means. His phone records were not subpoenaed. He was not surveilled. No inquiries were made about his financial transactions or his employment. TR 5:970-71.
The government’s complete failure even to mention in the affidavit any of these suspects (Valentine, Tauer, Knapp, WTiite, Iheukwu, Loreli Washington, or Victor Onuaguluchi), or to describe any of the considerable evidence implicating them in Ailemen’s 1993 drug trafficking, takes on added significance in light of the fact that Agent Silano and AUSA Vadas purported to believe, and affirmed to Judge Jensen in Silano’s affidavit, that Ailemen’s acquittal on the drug charges in 1990 had left “his heroin trafficking organization intact” — free to continue operating through the date of the application for the wiretap. Aff. at S-9.[84] If the government really believed that Ailemen’s 1988-89 organization remained intact and continued to operate into mid-1993, it was grossly reckless not to disclose to Judge Jensen the fact that the 1992-93 investigation had developed, through traditional means, so much evidence implicating so many people who were alleged to have played roles in the earlier trafficking. If the old organization remained intact, and if the government had identified many of the players from that organization, the government could not say, truthfully, that “normal investigative procedures have not and likely *1283 cannot succeed in establishing the identities of the co-conspirators and aiders and abettors of Pius Ailemen (other than as set forth herein)____” Aff.at65.
The truth of the matter is that “normal investigative procedures” had identified many more of Ailemen’s co-conspirators than the affidavit disclosed — and because of the considerable overlap between the suspects in the earlier matter and in the instant case, traditional investigative techniques carried much more promise than the government disclosed to the District Court. Moreover, Silano and Vadas compounded the misleading effects of their failure to identify these seven additional suspects by failing to inform Judge Jensen that three of the six named intereep-tees (in addition to Ailemen) had been suspects in the earlier ease. While the affidavit acknowledged that Sidney Gladney “was identified as an associate of Pius Ailemen in the 1989 investigation,” it failed to disclose that both Kellee Cooper and Kelly Lambert also had been so identified — and that the evidence implicating them in the earlier trafficking had been more even more substantial than the evidence implicating Sidney Glad-ney.
In sum, while the affidavit asserted in one sentence that Ailemen’s old organization remained intact, it effectively concealed from Judge Jensen the extensive evidence that the 1992-93 investigation had developed that connected important players in both sets of alleged trafficking activities. Thus, the affidavit failed to disclose to Judge Jensen not only that the government had identified at least seven additional alleged participants in the 1993 trafficking, but also that the 1989 and the 1993 operations could be connected through at least nine suspected criminal associates of Ailemen’s.
The government tried to suggest during the evidentiary hearing that it was inappropriate to name suspects in an affidavit like this unless the evidence against them was substantial, and that this consideration might play a role in explaining the absence of so many names from this affidavit. While I freely concede that the government should not accuse people of criminal conduct without substantial inculpating evidence, there is no reason to believe that reticence based on relative weakness of evidence accounted in any way for the government’s failure to identify in this affidavit the seven suspects I have been discussing. The DEA had developed significant evidence impheating some of these unnamed suspects in two allegedly separate investigations. There is, however, a more compelling reason for rejecting this post-hoe effort at rationalization by the government. Among the six persons that the affidavit accused of criminal association with Ailemen and identified as expected interceptees, there were at least two (Robert Tinney and Keesha Duncan) as to whom the incriminating evidence was appreciably less substantial than the evidence the OCDETF team had gathered against Nathaniel Iheukwu — who was not named. Moreover, it is not clear that the evidence the government had against Tina Tauer was any less incriminating than the evidence it had against Duncan and Tinney. Furthermore, if the government had retrieved the financial records to which it had easy access, it would have acquired potentially more damning evidence against Tiffany Valentine and Kali Knapp.
It also is pertinent that during the eviden-tiary hearing AUSA Vadas expressed the view that the government in fact had only slight evidence tending to incriminate Sidney Gladney, in part because the investigative team allegedly had learned almost nothing about the facts and circumstances of the prosecution pending against Gladney in Canada. Bear in mind that Agent Silano had affirmed in the affidavit that Mr. Vadas had approved for submission to Judge Jensen that the government had “probable cause to believe that ... Sidney Gladney [and others] have committed, are committing, and will continue to commit the following offenses: importing a controlled substance ... distributing a controlled substance ... distributing and possessing with intent to distribute a controlled substance ... conspiracy to import and conspiracy to distribute controlled substances ... use of a communication facility to commit or facilitate the commission of the foregoing offenses ... and travel in interstate or foreign commerce to promote, manage, establish, or carry on ... a narcot *1284 ics trafficking enterprise.” Aff. at 3. It is in the context of the affidavit having made these very serious accusations that the following interchange between defense counsel and Mr. Vadas takes on appreciable significance.
Q. In terms of the inclusion in the affidavit of the fact of Gladney’s arrest, and in terms of including Gladney as a probable cause interceptee, can you indicate to us why those representations were made then?
A. Well, one, I think government lawyers err on the side of inclusion of all facts that may be peripherally important; and two, we did have some, if I’m not mistaken, pen register contact that might have been between Mr. Gladney and Mr. Ademen. There was a potential that he may be involved.
Q. So then, in terms of what the — Judge Jensen, you were asking Judge Jensen to rely on in reviewing the affidavit, the inclusion of the Canada ease did not have any relevance for the probable cause determination?
A. At that time I did not believe so, at the time the affidavit was submitted.
Q. Did you suggest Agent Silano to, therefore, strike it?
A No.
TR 6:1303.
As this exchange shows, the government was quite prepared to make probable cause allegations against and to identify as target interceptees persons as to whom the government purported to have only the slightest and most circumstantial incriminating evidence — much less damning evidence than the government had against Nathaniel Iheukwu.
For all these reasons, I reject the suggestion that the government omitted from the affidavit any mention of the seven suspects I have discussed out of concern that the evidence against them was insufficient to risk besmirching their names or invading their privacy.
Taking all the evidence before me into account, I am constrained to conclude that the reason Agent Silano did not disclose how much his team knew about Ailemen’s alleged co-conspirators, and about the extent of the linkage with the old case, is that he wanted to make the case for the “necessity” of the wiretap seem more compelling than it actually was.
If Judge Jensen could have seen how much had been learned about Alemen’s associates in a relatively short time through traditional means, he would have been much less likely to conclude that the government had shown that the wiretap was “necessary” within the meaning of 18 U.S.C. § 2518. If he had known how many repeat players were involved, he likely would have asked why the government had not used traditional investigative techniques to gather evidence directly about them and their roles. He likely would have pressed the government to explain, for example, why it had not placed pen registers on the phones of at least some of these suspects, why it had not tried to surveil them, why it had not put a cover on their mail, and why it had not tried to explore their financial transactions and business activities. He might well also have asked why some undercover work directly with some of these people was not undertaken. And, generally, if the affidavit had made the connections between the old case and the current investigation more visible (connections not just in personnel, but in modus), Judge Jensen is more likely to have asked whether leads had been developed in the old case that might be pursued through traditional methods in the new case — before resort was had to the wiretap.
Furthermore, if the affidavit had disclosed (1) how much recent telephone contact there had been between Ailemen, on the one hand, and, on the other, Iheukwu, White, Tauer, and Onuaguluchi, and (2) that the DEA had considered all four of these people likely criminal associates of Ailemen’s for years, it would have been obvious to Judge Jensen that each of these people was a likely inter-ceptee — despite the fact that the affidavit failed to name them as persons “expected to be intercepted.” The government concealed this information from Judge Jensen and, as a result, understated by a considerable margin the likely reach of the wiretap.
*1285 For all the reasons set forth above, I find that the government’s averment in the affidavit that “[normal investigative procedures] have not and likely cannot succeed in establishing the identities of the co-conspirators and aiders and abettors of Pius Ailemen (other than as set forth herein)”[85] was material and was made either with knowledge that it was false or with reckless disregard for whether it was true or false.
B. “Danger” and the Use of Normal Investigative Techniques
Several times in the affidavit the government indicated that one of the considerations that supported a finding of necessity was that traditional investigative techniques “are too dangerous to employ.” Aff. at 5, 57, 60, and 65. The affidavit suggested that “danger” was a real limitation on use of normal methods by ritualistically repeating, at least three times, and without any suggestion that it might not apply in this particular ease, the “too dangerous” language from 18 U.S.C. § 2518. In addition, while purporting to explain why the investigators could learn relatively little through physical surveillance, Agent Silano wrote that “[a]ny prolonged or regular surveillance of the movements of the subjects would most likely be noticed, causing subjects to become more cautious in their illegal activities, to flee to avoid further investigation and prosecution, or may cause a real threat to the life of the undercover agent or informants.” Aff. at 60 (emphasis added).
These incantations of the danger factor were fundamentally misleading, as the government knew, because there was no basis, at the time the affidavit was submitted,[86] for a belief that Pius Ailemen, Ellis Quar-shie, Nathaniel Iheukwu, Sidney Gladney, or any of their white female couriers ever had committed an act of violence, ever had threatened anyone with an act of violence, or ever had carried a weapon. The absence of any such evidence is especially noteworthy because Ademen and his alleged co-eon-. spirators had been investigated twice by the government — and those investigations had subjected the suspects’ conduct and criminal histories to scrutiny over a period that spanned some five years, between late 1987 and mid-1993.
During the hearing on this motion, both agents Iseri and Sdano admitted that they knew that Ademen was not a violent man. Iseri testified that he would not have been concerned about the physical safety of his undercover agents during the first investigation even if Ademen knew that his couriers were cooperating with the government. TR 1:116. Agent Sdano admitted that up to the time he submitted his affidavit to Judge Jensen there never had been even an adegation of violence by Pius Ailemen — in the earlier investigation or in the pending matter. TR 1:196. He further admitted that, as far as he knew, neither Ademen nor “any of the people associated with him” had ever made any threats “towards anybody” — and that not even any pat-downs had occurred in the course of the undercover interactions with Ademen. TR 2:283. And officer Carl Es-tede testified that before he began his undercover contacts with Quarshie and Ademen the only thing he ready wanted to know was whether “there was a violent background or if they knew he was capable of violence, or if anybody in that organization was capable of violence.” When he inquired about this, the other members of the team told him there was “none.” TR 5:1072-73.
Given this knowledge, the only ground the government had for concern about violence was generic, i.e., the knowledge that there is, as a general proposition, considerable violence associated with narcotics trafficking. The government faded to disclose to Judge Jensen, however, that its only ground for concern about violence was generic. Moreover, through Mr. Vadas, the government is charged with knowing that this kind of merely generic knowledge is not sufficient to sup *1286 port a finding of necessity. As the Ippolito court wrote some eight years before Mr. Vadas approved this affidavit for submission to Judge Jensen, the government’s showing of necessity must be based on the specific facts and circumstances of the individual investigation, and the “reason for requiring specificity is to prevent the government from making general allegations about classes of eases and thereby sidestepping the requirement that there be necessity in the particular investigation in which a wiretap is sought.” United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir.1985). The references to danger in Agent Silano’s affidavit constituted just such “general allegations about classes of eases”— and because there was no basis for concern about danger that was specific to this investigation, these generic allusions to danger were foreseeably misleading and had to have been made either intentionally or recklessly.
The incantations of concern about danger also were material — because a district judge reviewing an affidavit like this clearly would be more likely to conclude that the government had made the necessity showing if he or she believed that there was a real basis, in facts specific to the particular case, for concluding that additional use of agents in undercover work or in physical surveillance, or additional use of informants, “may cause a real threat to the life of the undercover agent or informants.” Aff. at 60. So, instead of suggesting that concern about “danger” imposed real limits on the use of traditional investigative methods, the affidavit should have disclosed that Ailemen never had been associated with violence and that concern for the safety of officers or informants would not limit use of undercover or surveillance techniques with him.
C. In 1990 Ailemen Was Acquitted,Leaving His Heroin Trafficking Organization Intact
Agent Silano began the “Facts and Circumstances” section of the affidavit by carelessly informing Judge Jensen that in April of 1989 Ailemen had been arrested on drug trafficking charges. Aff. at 8. In fact, Aile-men had not been arrested on the federal charges in April; he was not arrested on those charges until the fall of 1989. Ex. 3.[87]
After proceeding to inform Judge Jensen that in 1989 Ailemen had been involved in an organization that had used couriers to smuggle kilogram quantities of white heroin into the United States through London, Paris, and Amsterdam, Agent Silano affirmed that in “1990 Ailemen was acquitted of all narcotics violations in the Northern District of California leaving his heroin trafficking organization intact. To date [according to various sources of evidence], Ailemen is still involved in the sale, distribution, and smuggling of heroin into the continental United States.” The government had to have known that these two sentences, coming at the beginning of the “Facts and Circumstances” section, would create the impression that Ailemen was the head of an extremely resilient and sophisticated organization that would be most difficult for law enforcement to penetrate and crack. These foreseeably significant statements were made with reckless disregard for whether they were true or false.
I note first that the government failed to inform Judge Jensen that Pius Ailemen had been convicted in the 1990 trial of a passport crime and had been sentenced, ultimately, to 36 months in custody. Agent Silano had given this information to the grand jury several months before he submitted his affidavit to Judge Jensen. Ex. 17 at 4. This information is of some moment because it tends to contradict the impression (created by the information that was included in the affidavit) that Ailemen walked away from the first trial a free man and immediately resumed his role at the center of the drug trafficking operation that the first prosecution had failed to break.
*1287 There are, however, far more troubling aspects of the government’s affirmation that Ailemen’s acquittal in 1990 had left his “heroin trafficking organization intact” and that he had persisted in his drug trafficking activities continuously since then. When the analytical dust settles, I reach two conclusions: (1) that before it submitted the affidavit in this case the government had considerable evidence tending to link Ailemen’s 1993 activities with people whom the government had suspected in 1988-89 — but neither that fact nor the evidence supporting it was disclosed to Judge Jensen, and (2) the government had nothing approaching a reliable basis for affirming that whatever “organization” Aile-men was involved in before the 1990 trial had remained intact thereafter and had continued to operate — essentially unchanged and undeterred by the earlier prosecution.
As discussed earlier, the affiant in this case, Agent Silano, has maintained throughout these proceedings that he intentionally learned very little about the first case — so how he could affirm that the organization prosecuted in 1989-90 had remained intact is something of a mystery.
Second, I note that Nandor Vadas, the chief prosecutor in the earlier ease and, theoretically, a possible source of the notion that Ailemen was the head of an organization in the late 1980’s that remained intact through and after the 1990 prosecution, testified that he had not directed Agent Silano to review the files from the old ease because “I honestly thought at that time that the old case was pretty much dead, and that what we were looking at was a brand new series of events concerning Mr. Ailemen’s drug trafficking.” TR 6:1270. Mr. Vadas proceeded to explain that Ademen had been in custody for upwards of two years (following his arrest in the fall of 1989) and so “he had been out of the business for a good deal of time. There was no indication that from what we had originally gotten in terms of information that he had resurrected in any way his old previous drug trafficking organization.” TR 6:1271.
When questioning returned to this topic later in the hearing, Mr. Vadas declared that “certainly there were some names that were from the old organization who, of course, were rolled over, but for the most part it appeared to me to be a new heroin trafficking organization. We had basically burned out the old one.” TR 6:1305. Elaborating, he said he felt that the 1990 prosecution had “sort of stomped around there enough that I don’t think anybody in their right mind would have tried to resurrect what had been so thoroughly gone through by the government.” TR 6:1306.
It also is significant that the government has steadfastly maintained that it learned essentially nothing while working up and prosecuting the earlier case about Ailemen’s customers, sources, or anyone who might have been above him in the “organization” that was the subject of that investigation. See, e.g., the testimony of Agent Iseri at TR 1:107-112. When asked what he had learned in the first ease “about Mr. Ailemen, his source of supply, his drug trafficking organization, and his drug profits,” the lead prosecutor in the earlier case, Nandor Vadas, responded: “Again, very little.” TR 6:1261-62. Mr. Vadas went on to testify that the investigative team in the earlier case had uncovered information only about “the lower end of the organization; that is, the couriers who had couriered or messengered the heroin. But the other information we knew very little about.” TR 6:1262. Later he repeated that “who it was that he was actually working with at his own level or above we had never really been able to determine.” TR 6:1307.
Thus, according to Mr. Vadas’ testimony, the earlier prosecution had “burned out” the lower levels of the old organization[88] and had never learned anything about its higher levels. Since Mr. Vadas was the only member of the OCDETF team in the 1993 case who admitted to having substantial familiarity with the evidence generated in the first case, *1288 the government clearly had no basis whatsoever for affirming to Judge Jensen in the case at bar that the 1990 prosecution had left Ailemen’s alleged “organization” intact and that that “organization” had continued to traffic in drugs through the date of the submission of the affidavit. I find that this was a material misrepresentation and that it was made recklessly.
D. The Largest Volume Heroin Dealer in the City of Oakland Area
Right after affirming that the Ailemen “organization” had continued to smuggle and distribute heroin after the unsuccessful 1990 prosecution, Agent Silano proceeded to make another material affirmation recklessly. He declared: “According to the Oakland Police Department Intelligence Unit, Ailemen is presently the largest volume heroin dealer in the City of Oakland area.” Aff. at 9.
The evidentiary hearing disclosed the curious inferential route that Agent Silano apparently felt had justified the making of this significant assertion of alleged fact. As Agent Silano conceded, before being approached by members of the OCDETF team in the case at bar, the Intelligence Unit of the Oakland Police Department had no file on and no information at all about Pius Aile-men. Against that backdrop of total ignorance, officer John Gutierrez approached the Intelligence Unit and told someone there that the federal investigation had discovered that Pius Ailemen, who lived in Oakland, was trafficking in kilo-quantities of heroin on a regular basis. Then Gutierrez asked whether the Intelligence Unit knew of anyone else in Oakland who was dealing in heroin at that large-volume level at that time. The Intelligence Unit allegedly could identify no other local dealer who was trafficking at that level. It was this non-information, and nothing else, that supported Agent Silano’s obviously misleading affirmation that “[ajccording to the Oakland Police Department Intelligence Unit, Ailemen is presently the largest volume heroin dealer in the City of Oakland area.” Aff. at 9. See TR 4:878-80; TR 6:1173-75, 1208-09; Exs. 70 and 72.
There are three significant respects in which this recklessly made misrepresentation would foreseeably distort the district court’s consideration of the necessity issue. First, the allegation that Ailemen was the largest heroin dealer in the Oakland area — made right after the allegation that his organization had been unfazed by the 1989-90 federal prosecution — suggested that the criminal enterprise in which Ailemen worked was very large and sophisticated — facts tending to justify use of a wiretap. Second, Silano’s statement implied that the Intelligence Unit of the Oakland Police Department knew about Ailemen’s activities but that he had eluded prosecution by local authorities — another factor tending to support use of a wiretap. Finally, by identifying the Intelligence Unit as the source of this alleged fact (that Aile-men was the largest volume heroin dealer in the area), the affidavit indicated (falsely) that a core damning fact about Ailemen had been verified independently by a large local law enforcement agency, an agency that the district judge could be expected to assume was close to and knowledgeable about the local action. The suggestion that this key inculpa-tory fact about Ailemen had been verified independently would lend credibility to other inculpatory allegations made in the affidavit.
For all these reasons, I find that this allegation, the truth of which remains unknown today, was both recklessly made and material to the necessity determination.
E. Duration of Use of Video Camera
Pages 9 through 53 of the affidavit were devoted to details about the undercover operation and to setting forth some of the results of analyses of pen registers on and billing statements for Ailemen’s phones. While important information was omitted from these descriptions,[89] they contain no material misstatements. The next misstatements in the affidavit that were material to the necessity determination appear on page 54, where Agent Silano discussed use of the “court ordered[90] ... surveillance camera.” Fur *1289 ther evidencing the recklessness with which this affidavit was put together, on this one page Agent Silano gave Judge Jensen two different dates through which the government allegedly continued to use the camera — and both of these dates were wrong. Near the top of the page, Agent Silano affirmed that “[fjrom January 25, 1993, to this date [July 29, 1993], the activities of apartment 2002 have been videotaped.” Then, near the bottom of the page, Agent Silano affirmed that “[i]n May of 1993 the ab.ove camera was disconnected.”
During the evidentiary hearing, officer John Gutierrez reported that the camera remained in use until he removed it in mid-June, shortly after he learned from Nordahl Washington on June 11th that Ailemen’s private investigator had discovered the camera. TR 6:1190-91.
For reasons set forth in some detail earlier in this Report, I have concluded that the investigative team in fact stopped using the video camera in late March, 1993 — because it was not generating quality photos and because Agent Silano had decided by then to shift the focus of the investigation to the anticipated wiretap. But both of Agent Sila-no’s erroneous and mutually exclusive affirmations on page 54 of the affidavit misled Judge Jensen about how long the government had tried to use the camera to gather information about Ailemen and his associates — and falsely created the impression that substantial effort had been committed to this investigative tool even after the undercover and other surveillance activities had been terminated.
F. Use of Informants and Undercover Agents
In the “necessity” section of his affidavit Agent Silano purported to summarize the government’s use of informants and undercover agents in this case. Aff. at 58-59. This brief account was at least recklessly misleading in material ways and contained at least two known falsehoods.
The central message of this summary account was misleading. Agent Silano’s words create the impression that Ailemen was consistently secretive and elusive with the undercover agent and with the one acknowledged confidential informant — and that it was because of that secretiveness that no one who was working with the investigators had been able to earn Ailemen’s confidence and learn anything significant about his organization or operations. These are fundamentally false messages. As the findings of fact about the investigation show, undercover officer Carl Estelle had been able to gain direct access to Ailemen quickly and to learn a great deal, directly from Ailemen and his long-time courier Kellee Cooper, about where (New York and Los Angeles) Ailemen got his heroin and cocaine, how he had it smuggled, the magnitude of his trafficking, and how he liked to make his drug transactions.
Moreover, there were many indications that by mid-February Estelle had gained the confidence of Ailemen. Ailemen even spoke directly about how he would have been worried that Estelle was a cop if Estelle had wanted to buy too much heroin soon after their first small deal. Gov.’s U. More significantly, Ailemen sold directly to Estelle, worked directly with him on the couriering operation to Chicago, intimated that he wanted Estelle to warehouse a large volume of heroin for him, offered to jointly purchase cocaine from Tijuana, suggested that he would be willing to meet with Estelle’s Miami people in New York, and constantly badgered Estelle to buy much larger quantities of heroin.
Moreover, while the body of Agent Silano’s affidavit disclosed much (but by no means all, see below) of Estelle’s interaction with Aile-men, it did not disclose that virtually all the limits on the frequency and character of his interaction with Ailemen were self-imposed. What the affidavit fails to make clear is that it was Estelle and the OCDETF team, not Ailemen, who maintained effective control over the relationship. Judge Jensen was not told that it was Estelle (with Silano’s blessing) who decided how often he would be in contact with Ailemen and how much he would purchase, or that it was Estelle who played hard to get and who decided that there would be long periods during which he would pretend to be out of town and would remain out of touch. Nor did the affidavit make it clear that it was the investigative *1290 team that decided that Estelle would not pursue Ailemen’s offer to jointly buy cocaine in Tijuana, or his suggestion that he might meet in New York with Estelle and his purported “people” from Miami to orchestrate a larger deal.[91] Nor did the affidavit state that it was the investigative team that decided not even to try to make any more purchases of heroin from Ailemen after just the second buy — even though Agent Silano admitted that “going up a step in the quantity [of drugs purchased by the undercover agent] is one effective method of gaining the confidence of the target of an investigation.” TR 3:64. TR 3:648. See also TR 5:108 1109, 1126-28,1153-54.
Officer Estelle testified, for example, that after the 100 gram buy in mid-February the next logical step in the progression of his relationship with Ailemen would have been to purchase one half a kilo of heroin, which would have cost about $90,000. Even though Ailemen clearly was anxious to make such a sale, Estelle testified that agents Silano and Holifield “weren’t willing to risk that kind of money to see — to try to see where this dope is coming from.” They felt that they had learned too little from the first two smaller buys — so “they didn’t want to spend any more money like that.” TR 5:1153-54. While Agent Silano’s affidavit disclosed that Ailemen was interested in making additional sales, it did not disclose the full intensity and persistence of that interest[92] — or that the government had made a cost-benefit judgment in the latter part of February that terminated all meaningful efforts to gather evidence through undercover operations and that fundamentally re-oriented the investigation toward the anticipated wiretap.
As noted earlier, the section of the affidavit that purported to summarize use of informants and undercover agents also created very misleading impressions about how much the government knew about Ailemen’s suspected criminal associates. In this section Agent Silano declared that Ailemen and Quarshie had “only disclosed the identity of one specific courier” and had never “advised” Estelle of the identity of “another individual” who had been seen during surveillances and who appeared to be involved in Ailemen’s trafficking. Especially given the fact that the body of the affidavit was dominated by descriptions of the undercover work, the way this information was conveyed in this section encouraged Judge Jensen to infer that the government had been able to identify only one alleged courier and that it did not know who the other (non-courier) suspect was. Both of these inferences would have been false.
This page and one-half section of the affidavit includes two additional averments that are seriously misleading (in the first instance) or patently false (in the second). The misleading statement is this: “The Cl has limited information regarding the ‘Ailemen Organization’ and cannot further this investigation.” Two facts make this statement misleading. First, the affidavit fails to disclose that one of the principal reasons that Aaron Mouton’s information about Ailemen’s trafficking was limited was that the investigating agents had deliberately restricted his inter *1291 action with both Ailemen and Quarshie. So the limits on the utility of the confidential informant were self-imposed. TR 2:326-27.
Second, the affidavit failed to disclose the considerable contact Mouton had had with Quarshie and Ailemen and, as significant, how often Quarshie had tried to use Mouton as a vehicle for reaching undercover officer Estelle. The affidavit failed to disclose, for example, that Quarshie had tried to telephone Mouton almost every day in January and another eight times in February. Ex. 29. Nor did the affidavit disclose that Mouton had met directly with Ailemen (face to' face) on two occasions in the latter part of January, and that on one of these occasions Ailemen had appeared desperate to acquire two kilos of cocaine from Estelle and had told Mouton that if Estelle could not deliver the drugs Ailemen had alternate sources in Los Angeles. In this same unreported conversation Ailemen tried to use Mouton to communicate to Estelle that Ailemen was willing to arrange to courier Estelle’s heroin to Chicago. In addition, Ailemen gave Mouton information about how he packaged heroin during couriering to conceal its odor. Exs. 29 and 27; TR 3:374-5.
While the affidavit did disclose that Quar-shie had contacted Mouton on May 8th to communicate Ailemen’s interest in doing more business with Estelle, Agent Silano failed to inform Judge Jensen that the investigative team had used Mouton later in May to learn from Quarshie which “dialects” he and Ailemen spoke when discussing their drug trafficking. The affidavit also failed to disclose that during that conversation Quar-shie had told Mouton that Ailemen sold cocaine in Europe for about $90,000 a kilo. Gov.’s N. Nor did the affidavit reveal that the agents de-briefed Mouton on two additional occasions before they applied for the wiretap, on June 22nd and on July 27th. Gov.’s Q and R. During the de-briefing on July 27th the government had learned that Quarshie and Ailemen were using Mouton as a source for a background check on another possible buyer — and that Quarshie had told Mouton on July 22nd that Ailemen currently had a large supply of heroin for sale and had asked whether Estelle was in town. Gov.’s R.
The omission of all this information is significant for three reasons. First, the constant efforts by Quarshie and Ailemen to contact Estelle through Mouton expose more clearly than the information in the affidavit the intensity of Ailemen’s eagerness to engage in additional drug dealing with the undercover agent — and, thus, make it clearer than the affidavit did how much Estelle had gained Ailemen’s confidence. Second, the interactions with Mouton that were omitted suggest that Quarshie and Ailemen were quite prepared to use Mouton in their trafficking — and that they trusted him and looked to him as a rehable source of information (for example, when they turned to him for information about another prospective buyer). For this reason, much of the omitted information about Mouton’s interaction with Quarshie and Ailemen tended to contradict the assertion in the affidavit that the “Cl ... cannot further this investigation.” Aff. at 59. Finally, by omitting most of the information it had about Mouton’s interactions with Quarshie and Ailemen, the government also omitted at least one potentially important investigative lead that Mouton had developed: Ailemen had told Mouton that if Estelle would not provide the cocaine he needed, Ailemen had sources to whom he could turn in Los Angeles. Agent Silano’s affidavit never even intimated that the government knew, both from Mouton and directly from Ailemen,[93] that Ailemen engaged in drug transactions in Los Angeles and had sources of supply there.[94]
*1292 In the final sentence of this section of the affidavit Agent Silano affirmed that “No additional CIs [other than Aaron Mouton] have been identified to date.” This statement is material and false. Because Agent Silano obviously knew it was false, and because he clearly should have known that it was material to the necessity determination, its inclusion in the affidavit was the product of at least recklessness.
In addition to Aaron Mouton, the investigative team had acquired extensive evidence and help from another confidential informant, Nordahl Washington, the on-site manager of the building in which Ailemen resided.
When questioned about this sentence during the evidentiary hearing, Agent Silano offered the anemic, irrelevant and incredible excuse that when he wrote this sentence he intended to refer only to formally “registered” informants. TR 2:300-301. Of course, the word “registered” is nowhere to be found in this affidavit. Nor does the affidavit provide the issuing judge with any clue that the government intended to limit this disclosure in this way. More troubling is the fact that three pages later in the affidavit, when describing kinds of packages Ailemen received and visitors meeting in the lobby of Ailemen’s apartment building — information that Nordahl Washington had provided — Agent Silano described his source of this information as a “CL” Because he attached the label “Cl” to Washington in the affidavit (without ever acknowledging Washington’s existence), I conclude that Agent Silano was not testifying truthfully when he indicated that the reason he asserted in his affidavit that the investigation had been able to identify only one Cl was that he was referring only to “registered” informants.
What is most significant here, however, is the fact that, wholly independent of labels, the affidavit failed to disclose that Mr. Washington existed and that he had been providing the government with valuable information, secretly, for more than six months.
After describing his first interactions with Nordahl Washington in December of 1992, officer Gutierrez was asked whether it was “fair to say, from that point forward, [that] Mr. Washington was of assistance to the investigation?” Officer Gutierrez responded with only one word: “Absolutely.” TR 6:1182. As reported in the Chronological Portrait of the Investigation, above, Nordahl Washington provided the OCDETF team with (1) unrestricted access to the building in which Ailemen lived and the garage in which he and some of his associates kept their cars, (2) use of the trash/broom closet from which the surveillance camera was operated, (3) a description of the configuration of and security system for Ailemen’s apartment, (4) information about where he got his furniture, (5) his phone numbers, (6) how he paid his rent, (7) how long he had resided in the two different units he had occupied in the building, (8) identification of vehicles Ailemen used or in which he rode, (9) identification of vehicles used by his visitors, (10) license plate numbers, (11) descriptions of people who visited Ailemen, (12) times or dates when Ailemen had more visitors than usual, (13) the kinds of packages Ailemen received and which carriers delivered them,[95] and a report that (14) Ailemen was suspicious about his phone being tapped, had discovered the video camera, was concerned about being watched, and had altered the pattern of his goings and comings from the building. Gov.’s Y. It also is significant that Washington took the initiative to *1293 contact officer Gutierrez when Ailemen voiced his suspicions and that Washington lied to Ademen, on behalf of the investigative team, to try to persuade him that his suspicions were a figment of his imagination.
It is disturbing, to understate the matter, that Agent Silano, while purporting to offer a “full and complete statement” about the use of “normal investigative procedures” in this case,[96] failed to disclose that for more than six months the OCDETF team had been secretly receiving this kind of assistance from such a well-placed and fully reliable source. And there can be no doubt that Agent Silano was fully aware, before he submitted his affidavit, of the kind of help that Nordahl Washington was providing. See Exs. 22 and 23; TR 2:376-77; TR 3:607-610.
These omissions take on added significance when we appreciate that two pages later in his affidavit Agent Silano emphasized how difficult “physical surveillance” of Ailemen was and that any “prolonged or regular surveillance of the movements of the subjects would most likely be noticed.” Aff. at 60-61. While Nordahl Washington could not follow Ailemen and his associates, he was well positioned to provide information about comings and goings from the apartment — without substantial risk of triggering Ailemen’s suspicion. Clearly, a judge making a determination about what kinds of evidence and leads had been and could be developed through normal investigative techniques would want to know about a source like Nordahl Washington.[97]
G. Consensual Monitoring
Consensual monitoring of conversations with suspects can be a very important, productive tool for gathering evidence.[98] Among normal investigative techniques, it is the tool that comes closest to a wiretap. For these reasons, information about the actual and potential use of consensual monitoring obviously is material to a necessity determination. A judge considering a wiretap application clearly would want to know whether consensual monitoring had been used, what kind of information it had generated, whether suspicions by the targets or other circumstances imposed significant limits on its availability or utility, and what potential it promised for developing further leads or evidence over the future course of the investigation.
Despite the obvious materiality of this information, Agent Silano’s affidavit devoted a total of four sentences to this topic — and two of them (as explained below) are false. In addition, the information provided is seriously misleading in that it creates the impression that consensual monitoring was used only for telephone calls, when, in fact, as Agent Silano well knew, the undercover agent recorded many of his face to face meetings with Quarshie and Ailemen[99] — and in the process gathered both valuable evidence against them and significant investigatory leads. In fact, the two face to face meetings in which Estelle actually purchased heroin from Quarshie and Ailemen were recorded, as was the interaction between them when the fake dope was couriered to Chicago. TR 4:88 & 88. Moreover, Kellee Cooper’s lengthy, detailed explanation of how to smuggle heroin and how to act if questioned was recorded on both audio and video tape (another fact not disclosed to Judge Jensen). TR 3:546. Thus, the agents had succeeded in using consensual monitoring to gather deeply incriminating evidence directly against Ailemen and two of his co-conspirators.
*1294 The first two sentences of the short section in the affidavit that is devoted to consensual monitoring read as follows: “Since the start of this investigation UCA Estelle and the cooperating individual have utilized consensual monitoring. The technique has only been utilized in calls between either the UCA or the cooperating individual and Ellis Quar-shie.” Aff. at 59. Judge Jensen was not told, here or anywhere else in the affidavit, that consensual monitoring also had been used, extensively, to record face to face meetings — of which there had been at least four with Ailemen[100] and many more with Quar-shie. Nor was Judge Jensen told that Carl Estelle had recorded two telephone conversations he had had directly with Pius Ailemen. But the shortfall in the affidavit’s disclosures in this subject area do not stop with failing to mention that these calls were monitored. As serious, the affidavit did not even disclose the fact that these telephone conversations had occurred.
The two phone conversations, both of which occurred on February 16, 1993 (between the date Estelle bought the 100 grams of heroin from Ailemen and the date Ailemen had the fake heroin couriered to Chicago for Estelle) are quite significant for the necessity determination, a fact that could not have been lost on Agent Silano. Their significance has several sources and dimensions. First, the calls occurred only as a result of initiatives undertaken by Ailemen. He instructed Quarshie to give Estelle his (Aile-men’s) phone number and to tell Estelle to call him (Ailemen) directly. This fact is evidence of Ailemen’s growing confidence in Estelle. It is especially noteworthy that Ailemen provided Estelle with this capacity for direct communication with him after only the second sale — and after seeing Estelle face to face only three times (up to that point). Additional evidence of that growing trust is reflected in the content of these conversations — none of which was reported to Judge Jensen. In addition to discussing the couriering to Chicago, Ailemen (1) inquired again about Estelle trading cocaine for heroin, (2) told Estelle that he was going to Los Angeles the next day (February 17th) to get cocaine, and (3) asked Estelle if, when the courier arrived in Chicago, he (Estelle) would purchase an additional 100 grams of heroin — at a discounted price. Gov.’s H. All of this was in direct conversation and was recorded.
As important for the necessity analysis, the fact that Estelle had Ailemen’s phone number and the ability to speak with Aile-men directly meant that the potential utility of consensual monitoring of phone conversations was much greater than it would have been if the phone conversations only could have been with Quarshie. But the investigative team never even tried to take advantage of this direct phone access to Ailemen. Within about ten days of these direct phone conversations with Ailemen, the OCDETF team had decided to abandon all significant use of the undercover agent and to move to the wiretap as the principal investigative tool in this ease.
None of this was disclosed to Judge Jensen: he didn’t know that Ailemen had given Estelle (through Quarshie) his phone number, that Estelle had made these two calls, that the conversations had been recorded, or what was said during them. TR 2:355-58. Nor did the district judge know that the government had decided not even to try to capitalize on its ability to speak with Ailemen directly over the phone and to record his words. All of this is of such obvious pertinence to the necessity determination that I am compelled to conclude that Agent Silano intentionally omitted it from the affidavit and intentionally misrepresented the status of consensual monitoring in this case when he affirmed that “[t]he technique has only been utilized in calls between either the UCA or the cooperating individual and Ellis Quar-shie.” Aff. at 59.
Further support for the inference that the omission of these two important telephone conversations was not inadvertent derives from the fact that Agent Silano’s affidavit reports in detail all the other conversations *1295 with Ailemen or Quarshie in this time frame. In other words, it appears that the only conversations during this important period (early to mid-February) that Agent Silano did not mention in his affidavit are the two eonsensually monitored calls in which Estelle dialed Ailemen’s number and spoke directly with him. See Gov.’s F, G, and H.
The third sentence in the section of the affidavit devoted to “Consensual Monitoring” reads: “The UCA and the Cl have not contacted Pius Ailemen or his source of supply of heroin directly.” Aff. at 59. This is an astoundingly inaccurate sentence — and its presence in the affidavit evidences either mental sloppiness in the extreme (recklessness is too small a word) or intent to deceive. As just discussed, the fact of the matter is that Estelle, the UCA, spoke directly by phone with Ailemen twice on February 16th — with Ailemen’s active encouragement. Moreover, as a careful reading of the body of the affidavit itself discloses, Estelle met face to face with Ailemen on no fewer than four occasions: December 12,1992, and February 9th, 11th, and 19th, 1993. In addition, the investigative records reveal (but the affidavit did not) that Aaron Mouton, the only “Cl” whom Silano acknowledged, had met face to face with Ailemen twice in January of 1993. Exs. 27 and 29. Whether persons working for or cooperating with the government had opportunities to interact directly with Aile-men obviously is material to the necessity determination, and this patently false sentence disguised important information about the success of normal investigative techniques and could only have confused the reviewing judge about (or distracted him from) the accounts of the direct meetings between Ailemen and Estelle that were presented in overwhelming detail earlier in the affidavit.
Had the sections of the affidavit that purported to describe the use of undercover agents, confidential informants, and consensual monitoring been forthrightly written, they would have informed Judge Jensen that three undercover agents (Estelle, Mitchell and Lovett) and two confidential informants (Mouton and Nordahl Washington) had been used without generating suspicions in Aile-men. This part of the affidavit also would have informed Judge Jensen that Estelle and Mouton had considerable direct access to Ailemen and that he and his courier had told undercover agents Estelle and Mitchell (in several recorded conversations) a great deal — with no apparent hesitation — about how he accomplished his smuggling and where (geographically) he got his heroin and cocaine.
The affidavit also would have disclosed how easy it had been for Estelle to set up and conduct drug transactions with Aile-men — how soon after making himself available Estelle had been able to meet Ailemen face to face, and how promptly Ailemen had responded when, after Estelle had made himself scarce for the better part of two months, Estelle sought to set up more meetings and a second deal (in February of 1993). In short, Agent Silano would have made it clear that every time Estelle tried to connect with Aile-men, Ailemen responded not only promptly, but with proposals that went beyond the deals in which Silano and Holifield would permit Estelle to be involved (e.g., additional, larger transactions or joint ventures). These portions of the affidavit also would have reminded Judge Jensen that it was Estelle (at Silano’s direction) who terminated the interaction with Ailemen (months before the affidavit was submitted) and that even after Estelle stopped calling, Ailemen remained eager to engage in additional transactions— all of which could have been eonsensually monitored. All of this would have directly contradicted the impression, otherwise sought to be created, that it was difficult to generate evidence against Ailemen because he was so suspicious, secretive, and elusive.
H. Physical Surveillance
The next sub-part of the “necessity” section of the affidavit was devoted to an account of the use of “physical surveillance” in this ease. Aff. 59-61. It also contains inaccurate information and is misleading in more than minor ways.
As discussed earlier, Agent Silano suggested in this sub-section, without basis, that there could be “a real threat to the life of the undercover agent or informants” if Ailemen noticed that he was being surveilled. Of course, Agent Silano knew, well before he *1296 submitted his affidavit, “that Ailemen knew of his apartment being surveilled,” that he was being watched and that his phone was the subject of some kind of monitoring. Gov.’s Y (Gutierrez’ report for June 11,1993). But the affidavit did not disclose any of this to Judge Jensen.
In this sub-part of his affidavit Agent Sila-no also declared that “[i]n this particular case, surveillance succeeded only in corroborating “Pius’ ” travel to undercover meetings and heroin purchases, but revealed no evidence of the secret meetings he conducted or the private plans for delivery and distribution of heroin.” Aff. at 60. This sentence is misleading because the vast majority of the physical surveillances the agents undertook were limited to covering Estelle’s meetings and transactions with Quarshie or Ailemen. Of the twelve documented surveillances, only three did not involve a meeting between Estelle and Quarshie or Ailemen. And of those three, one was undertaken simply to provide security while officer Lovett, posing as Estelle’s girlfriend, delivered a bottle of cognac to Quarshie’s house. See Ex. 85; Gov.’s K. So, only the last two surveillances, on February 26 and March 3 of 1993, did not involve covering a scheduled undercover meeting.
In his affidavit, Agent Silano declared that “[s]urveillance(s) were initiated on Pius Aile-men on the following date(s):
December 10,1992
December 12,1992
February 9,1993
February 11,1993
February 19,1993
February 26,1993”
Then, after describing some of the counter-surveillance measures Ailemen and his associates had undertaken, Agent Silano averred that it was because such measures “make surveillance risky to the effectiveness of an investigation” that “additional surveillance has not been attempted since February 26,1993.” Aff. 60-61.
This presentation creates the impression that the only dates on which physical surveil-lances were attempted are the dates listed. That impression is false — even if we limit our examination to surveillances “on Pius Ale-men.” As indicated in the Chronological Portrait of the Investigation, above, agents also surveilled Alemen directly on March 3, 1993. Ex. 47; Gov.’s Y. It also is clear, from the documentary record, that the surveillance on December 10, 1992, was not “on Pius Alemen” — but only of Estelle’s meeting with Quarshie. Ex. 85.
This also is a subject about which Agent Silano appears to have given false testimony during the evidentiary hearing. At one point in the hearing, Agent Silano affirmed unequivocally that the six dates listed on pages 60-61 of his affidavit were the only dates on which Pius Alemen was the subject of surveillance (before the government submitted the application for the wiretap). TR 3:480-81. A few hours later, Agent Silano began shifting his testimony on this subject. When asked if the OCDETF team had attempted to surveil any of the suspects other than Aile-men, Silano responded by insisting that “there were many, many, many surveillances in which Mr. Ailemen was surveilled by surveillance agents, and if those surveillances led to particular individuals within the investigation, I’m sure we would have followed up.” TR 3:618-19. A few minutes later, the agent insisted that he “would probably have a 300-page affidavit if we listed every surveillance that we did in that particular [case].” TR 3:624.
At that juncture I asked Agent Silano this question: “So your testimony is there were lots of surveillances of Mr. Ailemen in addition to those identified between pages 60 and 61 of your affidavit?” Agent Silano’s response was: “Yes, your honor.” Agent Sila-no continued to testify falsely about this matter a few minutes later when he claimed that, when he prepared this section of his affidavit, he “summarized kind of like a random sampling of the surveillances that were done ____” TR 3:627. Subsequently, while being questioned about the undisclosed (in the affidavit) use of aircraft during the surveillances, Agent Silano affirmed that there were more than ten different occasions on which the investigative team used aircraft “to surveil Mr. Alemen’s movements.” TR 3:738.
*1297 I find that all of the testimony in which Agent Silano claimed that Pius Ailemen was the subject of physical surveillances on many more occasions than the six that are documented was untruthful. As Agent Silano himself confirmed, any such surveillances would have been recorded in the logs maintained by the members of the team from the Alameda County Narcotics Task Force — but those logs reflect only six surveillances of Ademen himself.[101] TR 3:625; Ex. 85 and Gov.’s K. Moreover, Agent Silano would have had no incentive to understate substantially the number of surveillances in his affidavit — after all, he was trying to persuade Judge Jensen that considerable effort had been devoted to normal investigative techniques. So the suggestion that the six sur-veillances he listed in the affidavit merely represented a “random sampling of the sur-veillances that were done” is incredible. TR 3:627.
The documentary record does indicate that there were additional surveillances that Agent Silano did not mention in his affidavit— on October 30, December 3, December 4, and December 11, 1992 — but all of these revolved around Estelle’s meetings with Quarshie and none involved Ailemen.
It also is pertinent to the issues raised by the defendants’ motion that the surveillance on February 26, 1993, yielded a potentially significant lead that was not reported in the affidavit. On that occasion, the surveilling officers watched Ailemen and Nathaniel Iheukwu drive to a “cheek cashing and money order business at the comer of 25th/Web-ster/Broadway” in Oakland. Ex. 85. Iheuk-wu went into this money order establishment twice, while Ailemen remained in the car. Agent Silano’s affidavit did not disclose that this surveillance generated this information — or that the investigative team took no meaningful steps, before submitting the wiretap application, to determine what could be learned from the money order business (or any other source) about what Iheukwu had done in that business or about any other financial aspects of his or Alemen’s business.[102]
The affidavit made no mention at all of the only other surveillance of Alemen that was not of an undercover meeting or deal. And even though it lasted less than two hours, the surveillance on March 3, 1993 also yielded a potentially useful piece of information: a description of an attractive young female whom Ailemen and Iheukwu met after engaging in counter-surveillance driving and acting as if they were concerned about being followed. Ex. 85, last document. Significantly, the description of the woman the officers observed that day seems to match descriptions of Mon-etta White, one of the suspected criminal associates of Ailemen’s from the 1989 case.
By not informing Judge Jensen that all but two of the surveillance efforts were of undercover meetings, and by not revealing that each the two independent surveillances had yielded a potentially useful lead, Agent Sila-no understated the potential utility in this case of standard physical surveillance techniques.
Agent Silano also did not disclose to Judge Jensen that officers working for him had access to Ailemen’s apartment building and to its parking garage — and that when they visited the premises to change the tape in the video camera they looked around, often noting which vehicles were in the stalls that Ailemen and his friends used. Gov.’s Y; TR 6:1188-89.
I. None of the Named Interceptees Is Known to Be Represented by Counsel
While not directly relevant[103] to the necessity issues, there is an additional misrepre *1298 sentation in Agent Silano’s affidavit that requires discussion here.
In the portion of his affidavit committed to “Minimization,” Agent Silano reported that he had learned through the U.S. Attorney’s Office and the Organized Crime Drug Enforcement Task Force that none of the named interceptees was charged with a crime in a pending indictment. He then wrote: “No attorney is known by me to represent any of the named persons, in a criminal matter, whose communications are sought to be intercepted.” Aff. at 66. During the evidentiary hearing, Mr. Vadas admitted that this representation in the affidavit was not accurate. TR 6:1310. It is clear that both Agent Silano and AUSA Nandor Vadas knew, before they sought authorization for the wiretap, that Sidney Gladney, one of the named interceptees, had been charged with smuggling heroin in Canada. Aff. at 53; TR II: 30-31; TR 6:1277, 1302. Moreover, both Mr. Vadas and Agent Silano assumed, when this affidavit was submitted to Judge Jensen, that Gladney was represented by counsel in that pending prosecution. TR 6:1309-1310; TR 3:560-61. In fact, during the “minimization” briefing that Nandor Vadas conducted and that Agent Si-lano attended on the same day the government sought authorization for the wiretap, Mr. Vadas made the following statement to the more than 30 assembled agents: “We are not aware in this case of any pending criminal charges against Ailemen or any of the people he has been conversing with, except for Sidney Gladney.” Gov.’s Ex AA. Given their knowledge and assumptions, both Mr. Vadas and Agent Silano had to have known that the assertion that Agent Silano had no knowledge of any of the named interceptees being represented by counsel in a criminal matter was in essence false and clearly was misleading.
VIII.
THE AFFIDAVIT: RECKLESSLY MISLEADING INFORMATION THAT WAS MATERIAL TO THE NECESSITY DETERMINATION
The Interview of Francis Idialu
One of the subparts of the “necessity” section of Agent Silano’s affidavit was devoted to “Interviews” (as one traditional investigative technique). After declaring that interviews of the “subjects of this investigation ... would only result in their being alerted to the existence of the investigation” and would not likely be productive, Agent Silano proceeded to provide Judge Jensen with “an example of this failed investigative technique.” Aff. at 64. Silano informed Judge Jensen that on June 3, 1993, in New York, the DEA had interviewed “[a] defendant, Francis Idialu.” According to the affidavit, “[t]he purpose of this interview was to obtain information concerning Idialu’s drug-courier arrest on January 30, 1993 and a possible criminal association with Pius Ailemen. After concluding the interview, Idialu did not disclose his United States contact nor other co-conspirators.” Id. The affidavit included no other information about this interview or about other possible uses of interviews to gather information about Ailemen’s trafficking.
It was fundamentally misleading to use the interview of Francis Idialu as an “example of this failed investigative technique” — and that fact was or should have been obvious to Agent Silano. I note first that the way Agent Silano structured this subpart of his affidavit creates the impression that Mr. Id-ialu was (both before and after the interview) one of the “subjects of this investigation”. At least after the interview, he could not have been so regarded.
Even before the interview, however, Agent Silano could have considered Idialu a suspect in the Ailemen case only through reckless reasoning. As explained in some detail in the section of this Report that discusses “The Credibility of the Affiant,” Agent Silano purported to believe, at least when he was testifying in mid-April of 1993 to the grand jury, that Ailemen had told Estelle that the police had taken off about a million dollars worth of Ailemen’s heroin around the end of January, 1993. Ex. 17, at 37-38. Ailemen never told Estelle any such thing. He never told Estelle that the police had taken off any amount of his heroin, to say nothing of a million dollars worth. Nor had he mentioned any *1299 thing about any loss of any kind around the end of January. Rather, Ailemen had told Estelle that his heroin came through JFK Airport in New York at the same time that a hijacking was under way with another airplane, thus diverting attention and facilitating the smuggling.
As Agent Silano admitted he knew, before he interviewed Mr. Idialu, the hijacking (which was the first at JFK in 16 years) occurred on February 11, 1993, almost two weeks after Mr. Idialu had been arrested. The agent also admitted that he never had any information from any source that would have connected Mr. Idialu’s arrest with any hijacking. TR 4:899. So, prior to the interview, the only bases for suspecting that there was any connection at all between Ailemen and Idialu were that Idialu was a Nigerian, that he had once lived in the Bay Area, and that he had been caught smuggling heroin. The way he was smuggling, however, was completely inconsistent with what the agents had known for six years about how Ailemen had his couriers smuggle drugs for him. Francis Idialu was a black male, not a white female. And he had carried the heroin in his suitcase, not in a body wrap. On February 19, 1993, Kellee Cooper had explained to the undercover agents, in a monitored and videotaped conversation, that couriers should never put the narcotics they were carrying “in anything that would be separated” from them. Aff. at 43. Thus, even before the interview, the basis for suspecting any connection between Ailemen and Idialu was soft, at best.
After the interview there was no basis for associating the two men other than the possibility that they were born in the same Nigerian province. Idialu informed the agents that he had not been to the Bay Area since 1989, that he had no contacts or associates there, and that on the only other occasion he had smuggled drugs into the United States he did so by ingesting balloons. Even though Agent Silano felt that Idialu was likely to tell the interviewing agents anything that would ingratiate him with them,[104] he mentioned absolutely nothing about Ailemen, a Bay Area connection, a Los Angeles connection, sources in New York, sources in London, Amsterdam or Paris, trading heroin for cocaine, selling cocaine in Europe, body-wrapping, being asked to smuggle jewelry or diamonds, female couriers, Sidney Gladney, Nathaniel Iheukwu, Robert Tinney, Keesha Duncan, or any other person ever associated with Pius Ailemen. Exs. 42 and 81.
Because the basis for connecting Mr. Idia-lu and Pius Ailemen had been so thin before the interview, and because after the interview there remained no basis (other than possible proximity of place of birth) for suspecting such a connection, it was misleading to suggest in the affidavit that this interview constituted evidence that the technique of interviewing “subjects of this investigation” was likely to be fruitless. By using this interview as an example, Agent Silano created the impression that the persons who worked with Ailemen would never disclose information that incriminated him or that exposed other parts of his “organization.” But since there was no basis, especially after the interview, for believing that Mr. Idialu ever had any such information, or ever had any connection with Ailemen, it was fundamentally misleading to use the experience of interviewing him to suggest any lessons about what might happen if people who really had worked with Ailemen were interviewed.
My concern about the misleading use of this “example” is heightened by two considerations. First, the affidavit did not make it clear to Judge Jensen that the interview of Mr. Idialu was the only interview of any person who might have been considered a suspect before the government sought authorization for the wiretap. Second, experience in the 1989 case suggested that, at least in some circumstances, persons who had participated in drug trafficking with Ailemen would be willing to provide the government with considerable information about his illegal activities and to testify against him. For example, after their arrests at O’Hare airport in 1988, couriers Bruce, Langaman, and Ta-deo agreed to be interviewed and gave the authorities detailed information about their *1300 work as couriers. Ex. 5 at 6-11, 17-18, 21 and 28. Similarly, after their arrests a few months earlier, Sheri Rene Weems and Du-duyemi Sola[105] had given investigators detailed information about their trafficking and had identified Pius Ailemen (from photo spreads) as the man for whom the heroin was destined. Ex. 5-B at 19.
Agent Silano and Mr. Vadas knew about all of this cooperation through the OCDETF proposals. At least Mr. Vadas also knew that Tiffany Valentine had been interviewed productively in connection with the first case (in January of 1990). She had re-surfaced as a suspect in the 1993 investigation. Exs. 7 and 86. Since she had agreed to cooperate in the earlier case, there was at least some possibility that, with an offer of immunity, she might have agreed to cooperate with the 1993 OCDETF team. It also is noteworthy that after Ademen was arrested on the current charges in December of 1993, Kellee Cooper, Tina Tauer, Kali Knapp, and Keesha Duncan all decided to cooperate with the prosecutors and to give them a great deal of incriminating information about Pius Aile-men. TR 2:431-32; TR 3:489-90; Exs. 38[106] and 40.
When asked why they had not even tried to interview any of the many suspects in the 1993 investigation before they applied for the wiretap, Agent Silano and Mr. Vadas said they were afraid that anyone interviewed would tip off Ailemen about the investigation. They also suggested that the interviews in the 1989 case had been successful only because the subjects knew they faced serious criminal charges if they did not cooperate. Before submitting the application for the wiretap in the case at bar, however, the OCDETF team knew that Ailemen already had discovered their video camera in the hallway outside his apartment and that he believed both that he was being watched and that his phone was tapped. Thus, as Agent Silano admitted during the hearing, there is little chance that Ailemen did not already know that he was the subject of an investigation. TR 5:994-95. And the fear that he might be tipped off was not sufficient to deter the agents from interviewing Mr. Idia-lu. Moreover, before they applied for the wiretap, the government had developed enough evidence against Cooper, Quarshie, Tauer, Lambert, Iheukwu, and Loreli Washington to credibly threaten them with prosecution if they did not cooperate and provide information. Finally, I note that Mr. Vadas testified that if he had understood the connection between Ailemen and the charges pending in Canada against Sidney Gladney he would have tried to secure Gladney’s cooperation and to interview him before submitting the application for the wiretap. TR 6:1280.
The principal point here is not that the government elected not to conduct interviews before applying for the wiretap, but that the affidavit did not clearly disclose to Judge Jensen that that decision had been made, or that interviews of several of Ailemen’s associates had been productive after arrests in the 1989 case, or that in the 1993 investigation the OCDETF team had developed sufficient evidence through traditional means to give the prosecutors the wherewithal to try to leverage the cooperation of one or more of a large number of “subjects of this investigation.” [107] Nor did the affidavit disclose that several of the suspects in the 1993 case had been implicated but not prosecuted in the 1989 case — making them even more vulnerable to threats of prosecution (the statute of *1301 limitations from the earlier matter not having lapsed). Disclosing this kind of information to Judge Jensen would have positioned him much better to determine whether the government really had made sufficient efforts to develop its case through normal investigative means.
IX.
THE AFFIDAVIT: ADDITIONAL MATERIAL OMISSIONS
Resources Not Utilized and Leads Not Pursued
In the pages that follow I will describe the material omissions[108] from the affidavit that I have had no occasion to mention in the discussion of material misstatements.
Agent Silano’s affidavit did not disclose to Judge Jensen that significant investigatory resources were available to him through the OCDETF team that he did'not try to use prior to the application for the wiretap. As discussed in the section of this Report devoted to the Credibility of the Affiant, I have concluded, despite his protestations to the contrary, that Agent Silano made little meaningful effort, before he and Mr. Vadas applied for the wiretap, to draw on the resources or the expertise of the Customs Service, the IRS, the INS, the FBI, or the Canadian office of the DEA. I also have found that had he made such efforts, he would have acquired significant evidence— both about Pius Ailemen’s involvement in the matters with which Sidney Gladney was charged in Canada and about many of the suspects’ extensive involvement in wire transfers of money. Exhibits 54 -67. It was at least reckless not to advise Judge Jensen that the investigative team had a good many leads (I discuss some below) that it had not pursued and that it had not attempted to capitalize on many of the resources that were available to it through the OCDETF structure.
Agent Silano testified during the evidentia-ry hearing that other agencies, and especially other offices of the DEA, were reluctant to commit resources to a case like this until a wiretap was in place — and that it was only after the wiretap was installed that any substantial support for the investigation was forthcoming. Agent Silano further testified that he had seen this pattern before — the pattern of anemic interest in and support for an investigation until a wiretap was in place. TR 3: 486-92; TR 4: 884-887. These alleged facts have great significance for the materiality determination — but they were not mentioned in either the affidavit or the application that the government submitted to Judge Jensen when it sought authorization for the wiretap. Moreover, Agent Silano’s assertions that he had seen this pattern before and that he was frustrated by the lack of responsiveness by other agency offices early in the life of this investigation, when only *1302 traditional methods were being used, lends substantial support to my finding that the DEA’s decision to move the center of investi-gatorial effort from traditional field work to the wiretap was legally premature, i.e., made far too early, after only very modest resources had been devoted to the development of this allegedly very important case through traditional techniques.[109]

Keesha Duncan

One of the most telling examples of the undisclosed and self-imposed limitations on the government’s commitment of resources to this investigation before it applied for the wiretap involved Keesha Duncan. As the affidavit indicated, Ailemen had disclosed many times that he got heroin from New York. Before the application for the wiretap, analysis of information generated by pen registers showed that Ailemen had made numerous calls to Keesha Duncan, who lived in New York. As the affidavit also reported, some of these calls had occurred at about the time (the first half of February, 1993) Aile-men received the shipment of heroin from which he sold the 100 grams to officer Estelle. Based on this information, Agent Sila-no came to believe, well before he submitted the affidavit to Judge Jensen, that Keesha Duncan was the source of supply for Aile-men’s multi-kilo heroin trafficking. TR 3:485-86; TR 4:788-790; Ex. 17 at 19.
This belief led Agent Silano to ask the New York office of the DEA for help investigating Duncan. Before the wiretap was authorized, however, that office refused to do anything but verify her address (something that had to be done in order to make the wiretap application). TR 1:211; TR 3:486-88. Agent Silano testified that he had asked the New York office to surveil Duncan, but that they were too busy to offer help. TR 3:487-88. In fact, before the wiretap was authorized no other investigative effort was undertaken with respect to Duncan at all— the agents did not even seek to install a pen register on 'her phone. Given the fact that Silano believed that Duncan was the source of supply for a drug trafficking organization that allegedly dealt regularly in such large quantifies of heroin and cocaine, given the alleged “high priority” of this investigation, and given the claim that primary goal of the investigation was to identify the source of the drugs that Ailemen was selling,[110] it is shocking that the government refused to commit any meaningful resources to investigating Keesha Duncan before it applied for the wiretap. I find that the fact that the government had made essentially no use of normal investigative means to try to gather evidence about Duncan was material to the necessity determination. I further find that the materiality of this information was obvious (and, therefore, foreseeable), and that its omission from the affidavit was the product of at least recklessness.

Robert Tinney

The affidavit also did not make it clear to Judge Jensen that the OCDETF team had committed virtually no resources to investigating Robert Tinney, even though he was identified in the affidavit as “a criminal associate of Ademen and possible source of supply of heroin” who had “multiple arrests for heroin distribution in the Washington, D.C. area.” Aff. at 52 and 53.
Apparently Tinney’s name first surfaced in this case through data generated by the pen registers or as a result of analysis of Aile-men’s phone tolls. Before he testified to the grand jury in April of 1993, Agent Silano had learned that Alemen had placed calls to the “Maryland area” right around the time he had sold heroin to undercover officer Estelle and that in these calls he had contacted “a heroin dealer there that has an extensive past.” Ex. 17 at 36. Silano had learned that this alleged dealer was Robert Tinney, who also was identified on the NADDIS printouts as a known associate of Ailemen’s. Ex. 86. But even though they suspected Tinney as a possible source, the OCDETF team did nothing to investigate him other than try to de *1303 termine whether the NADDIS system had any information about him and to ask the DEA office in Washington to forward criminal history information.[111] TR 1:201-203; TR 4:821-822.
When the Washington office forwarded the investigative reports that it had generated in connection with earlier matters, Agent Silano learned that in August of 1992 a confidential informant had identified Tinney as one of the five highest volume heroin dealers in the District of Columbia area. Other reports, simultaneously forwarded, indicated that Tin-ney had been trafficking “fairly heavily” for the preceding five or six years. TR 4:821-22; TR 1201-203. Despite the fact that it was primarily the desire to identify the source of Ailemen’s heroin that drove the request for the wiretap, the OCDETF team did nothing, before submitting the affidavit to Judge Jensen, to follow up on these significant leads. No effort was made to locate the “confidential informant” who had given such incriminating information about Tinney. No request was made for a pen register on his phone or for a mail cover at his address. No request was made to surveil him. None of his known associates were interviewed and no undercover agent attempted to establish a relationship with him. Nor did the affidavit forthrightly disclose that none of these investigative avenues had been traveled.

Mr. B. Aghayere and Tracey Asemota

Agent Silano’s affidavit disclosed that in October of 1992 Ailemen had called a “Mrs. B. Aghayere” in London and that the DEA office in that city had advised that the address at which Mrs. Aghayere resided “is being frequented by alleged cocaine courier Tracey Asemota.” Aff. at 49. During the evidentiary hearing, Agent Silano stated that he had called the DEA office in London about this London telephone number when it surfaced in the phone bills — and that the agents there had acquired the information that was set forth in the affidavit from English authorities. Agent Silano proceeded to testify, however, that the DEA in England neither had nor sought to acquire any additional information about either Mrs. Aghay-ere or Ms. Asemota. He had not asked agents in England to try to develop more information about these suspects and no one, to his knowledge, asked English authorities for any additional help pursuing these leads — despite the fact that the DEA had believed for years that Ailemen had extensive trafficking ties in London. TR 3:483; TR 5:960-65; Ex. 2; Ex. 7; and Ex. 17 at 35. Again, the affidavit did nothing to alert Judge Jensen to the fact that no resources had been committed to these matters.

Leads Through The Hijacking

As noted in the affidavit, on February 11, 1993, Ailemen told Estelle that his shipment of heroin had arrived that afternoon in the Bay Area after it had made it through John F. Kennedy airport in New York when attention was diverted to another airplane that was being hijacked. Aff. at 38. This information gave the authorities potentially significant investigatory leads — but they were not pursued. Agents did not try to identify the flights that had arrived at JFK at about the same time as the hijacked plane. Nor did they try to identify the flights that had arrived in the Bay Area that afternoon from JFK. With that information, agents could have checked the manifests or passenger lists — to see which passengers appeared on both the suspect flights arriving at JFK and the suspect flights leaving it for the Bay Area a few hours later. Agents also could have cheeked those lists for names of any of Ailemen’s suspected associates or couriers (from either the 1989 or the current case). The affidavit did not inform Judge Jensen that none of these obvious and traditional investigatory measures had been taken— even though the government had had this *1304 information for more than five months by the time it presented the wiretap application.

DHL, UPS, and Federal Express Records

While the affidavit advised Judge Jensen that the government knew that DHL, UPS, and Federal Express delivered packages to Ailemen’s building that were addressed to his apartment,[112] the government failed to disclose that it had taken no steps, before it applied for the wiretap, to see what it could learn from any of these companies (or from Nordahl Washington) about where the packages came from, who sent them, how often they arrived, how much was spent on this service, and how it was paid for.

Travel Records

In April of 1993 Agent Silano told the grand jury that Pius Ademen appeared to have an account with United Mileage Plus and that he and some of his associates “utilize a travel agency called Sun Trips.” Ex. 17 at 31. The Agent also informed the grand jury that “at the right time, what we will do, we will subpoena the records of his travel hoping that he uses the frequent flyer mileage to record all his travel.” The agent also reported that “the travel agency will be another good record.” Ex. 17 at 32.
The affidavit that the government submitted to Judge Jensen did not mention either of these leads. Nor did the affidavit disclose that the government had made no attempt to subpoena the records of either the frequent flyer club or the travel agency. TR 3:468469.[113]

Financial Records

Agent Silano’s affidavit failed to disclose that before July 29, 1993, the government had made no substantial effort to explore the financial aspects of Ailemen’s activities — even though the purposes of the investigation included trying to identify the “organization’s” financiers, trying to learn how they moved or laundered their money, trying to establish how Ailemen was paying for controlled substances and what he and his criminal associates were doing with the money they earned illegally. Aff. at 65; TR 4:777.
Before July 29, 1993, the investigating agents had identified several ears that were used by Ailemen and his suspected criminal associates (including, at least, Ellis Quarshie [two vehicles], Nathaniel Iheukwu, Kelly Lambert, Kellee Cooper, and Tina Tauer). Gov.’s Y; Ex. 85; and Ex. 17 at 21-22. The OCDETF team made no effort, however, to research where these cars were purchased, how they were paid for, or who paid for them. Officer Gutierrez testified, for example, that he had not tried to research DMV records to see if he could determine when or from whom any of the cars in which Ailemen had been seen were purchased. TR 6:1210-11. Nor had data bases been checked for reports by auto dealers of cash transactions involving $10,000 or more.[114] Agent Silano’s affidavit disclosed neither the fact that the government had identified the vehicles nor the fact that the government had done nothing to pursue leads about the financing of the purchases.
Similarly, the affidavit did not disclose that the government suspected that Kelly Lambert was involved not merely as a courier, but also in helping launder money from the drug operations. TR 3:640-41. Nor did the affidavit inform Judge Jensen that the investigators had identified a bank that Lambert used — but had done nothing to subpoena its records. Ex. 17 at 31. The government also suspected that Ailemen and his associates *1305 were using the Benham Group — but, again, the investigators made no effort to secure records from that institution. Ex. 17 at 31.
Nordahl Washington had told officer Gutierrez, as early as December 11, 1992, that Ailemen always paid his $1,400 rent in money orders. Gov.’s Y. But Gutierrez never asked Washington to inspect or photocopy any of these money orders and never took any other steps to determine where they had been issued, or by whom. When asked during the hearing if he had asked Mr. Washington if “Mr. Ailemen always paid with the same type of money order,” officer Gutierrez said “No, sir. I should have, though.” TR 6:1204. The government also knew, well before it applied for the wiretap, that Ailemen generally paid his large telephone bills (upwards of $3,000 a month) “by some form of negotiable instrument” — but the agents had not subpoenaed the records of the phone company, or interviewed any of its employees, to try to learn more about the source or form of these payments. Ex. 17 at 35 and 43.
As reported above, during a surveillance on February 26, 1993, agents had seen Aile-men and Iheukwu travel to a “check cashing and money order business at the corner of 25tb/Webster/Broadway” in Oakland. Ex 85. Iheukwu went into the business twice within a period of 20 minutes — while Ailemen remained in the car. Id. When he testified before the grand jury about six weeks later, Agent Silano acknowledged this activity and said that he assumed that Ailemen and his associates were using money orders from this business to pay bills. Ex. 17 at 43-44.
During the evidentiary hearing Agent Sila-no indicated that he had not made any inquiries directly of the cheek cashing/money order business because he was concerned that the business might be engaged in illegal activity itself or might alert Ailemen that the authorities were investigating transactions occurring there. No evidence was cited to support such concerns. Moreover, even if such suspicions were reasonable under the circumstances, the investigators could have acquired information about the business from other sources, e.g., local licensing agencies and law enforcement authorities. No such efforts were made.
Agent Silano did claim to have taken one step to try to learn more about this particular check cashing/money order business. He testified that well before he submitted his affidavit to Judge Jensen he had asked the IRS to “pull the tax records of that particular establishment [the check cashing business to which Ailemen and Iheukwu had been followed]. We were trying to see who the owners were and how they filed, if they filed CTR’s or CMIR’s for different financial transactions out of the ... particular establishment.” TR 2:385.
For the following reasons, I do not believe this testimony. First, it appears to be contradicted by the implication in Agent Silano’s testimony to the grand jury in mid-April of 1993 that no requests had yet been made of the IRS and that it would be Mr. Vadas, at some unspecified point in the future, to make them. Ex. 17 at 44.[115] Second, Mr. Vadas could not recall making any particular requests for help or for more prompt assistance from any of the OCDETF agencies— and could not recall any specific complaints by Agent Silano about alleged unresponsiveness by any other agencies. Third, there is no documentary record of any such request or any response to it.
Fourth, there were much more obvious and direct sources of at least some of the information Agent Silano purported to have sought from the IRS. For example, he could have checked with state or local governmental authorities (business regulators) to identify the owners/proprietors of the check cashing business, and he could have checked with the Oakland Police Department to see if it had any evidence that the business was being used for unlawful purposes. There also was a much more obvious source of information about CTRs and CMIRs — right within the OCDETF team. As Agent Gervacio testified, the Customs Service had ready access *1306 to data bases that recorded CTRs and CMIRs, as well as other kinds of financial information. TR 5:1022-27.[116] But Agent Silano did not ask Agent Gervacio to pursue this kind of information until after the OC-DETF team had submitted the application for the wiretap. TR 5:1022-27 and 1042-44. In fact, Silano hadn’t asked Gervacio to do much of anything before the wiretap was authorized. Id., at 1042. For all these reasons, I find that the investigative team made no effort, before applying for the wiretap, to develop information about the check cashing business that the government had reason to believe Ailemen and Iheukwu were using.
Agent Silano’s affidavit did not disclose that the government knew that Ailemen and Iheukwu had used this check cashing business, and did not disclose that no effort had been made to develop information from or about that establishment. Nor did the affidavit disclose that Ailemen paid his rent and at least some of his phone bills with money orders — but that no effort had been made (before applying for the wiretap) to learn where or when these money orders were issued.
Nor did the government make any effort, before it applied for the wiretap, to subpoena transaction records directly from Western Union or American Express. It was not until January of 1994, after the wiretap had been in place for more than five months and after Ailemen had been arrested, that the investigators received readily retrievable records about the suspects’ use of American Express MoneyGrams. Ex. 54. Those records contained a wealth of leads and potentially incriminating evidence. They showed a great deal of wire transfer activity by Tiffany Valentine, Dele Ailemen (Pius’ brother), Kali Knapp, Kelly Lambert, and Pius Ailemen. They also recorded less frequent wire transfer activity by, among others, Nathaniel Iheukwu, Keesha Duncan, Kingsley Ofomata, Monetta White, Jocelyn Lane, and Sola Abo-rowa (or Aborona). Significantly, many of the wire transfers were to or from London or New York.
Given the government’s knowledge that Alemen was regularly using money orders to pay large bills and that he and Iheukwu had used a cheek cashing/money order business in Oakland, given the relative ease and security with which records of this kind can be acquired from large institutional service providers, and given the fact that a major goal of the investigation was to learn how Ailemen and his associates were laundering the large sums of cash they turned over, I find that it was reckless of the OCDETF team not to have subpoenaed money order records before applying for the affidavit — and reckless not to have disclosed to Judge Jensen that no such subpoenas had been served. I also find that if the government had subpoenaed these kinds of records Judge Jensen would have seen that this normal investigative technique held considerable promise — and that that promise should have been further pursued before resorting to the wiretap.[117]
*1307 It also is pertinent to the issues raised by the defendants’ motion that the OCDETF team made no effort, prior to the authorization of the wiretap, to acquire financial data or records about Ellis Quarshie, Kellee Cooper, Robert Tinney, Keesha Duncan, Kelly Lambert, Sidney Gladney, Victor Onuagulu-chi or the businesses with which he and his sister Jean had been associated for many years.[118] Leads about their financial transactions were not pursued in the FINCEN data base, currency transaction reports, or anywhere else. No effort was made to acquire their tax returns.
Nor did the investigators make any inquiries about the real estate business that the affidavit identified as Gladney’s work address. The affidavit reported that Ailemen had made several phone calls to Gladney at Realty Information Systems of Oakland. That business was owned by Alvin Florida, Jr. During 1992, both the Oakland Police Department and the U.S. Customs Service had reason to suspect that Alvin Florida knew about and was involved in fraudulent activities, money laundering, or narcotics trafficking with Gladney. See Ex. 70. A Report of Investigation generated by the San Francisco office of the Customs Service, dated May 1, 1992, stated that Gladney and Alvin Florida were alleged to be “involved in narcotics and have ties to organized crime in Oakland, California. Gladney and Florida are also alleged to buy into various legitimate businesses. When the [business] becomes insolvent through neglect or excessive debt owed to Gladney [and][119] Florida, they buy out the owner(s) at reduced price.” Ex. 11. This same report also disclosed that Gladney had been arrested by the Oakland Police Department early in 1992 after being accused of feloniously defrauding the owners of the hotel in which he had been residing. During the course of that dispute Gladney reportedly had insisted that he had purchased a one-half ownership interest in the hotel’s restaurant from a couple who had lived and worked in England. This Customs Service Report, which focused primarily on allegations that Gladney had orchestrated the recruitment of young white females to smuggle diamonds,[120] was readily accessible to the OCDETF team that was investigating Pius Ailemen in 1993 through Agent Frank Gervacio, who was assigned to the current case as early as December of 1992. Ex. 83; TR 5:1061-64.
Since Gladney was alleged to be a principal player in Ailemen’s international drug traf- *1308 ficldng, the OCDETF team clearly should have run his name through the Customs Service data bases before concluding that normal investigative methods were unlikely to be effective. Had such a search of the Customs Service data bases been undertaken, it is likely that leads to the real property transactions alluded to this Report of Investigation would have been identified.

The Canadian Case in Which Sidney Gladney Was Charyed

Among the reckless or intentional omissions from Agent Silano’s affidavit some of the most significant related to what the government knew and what the government easily could have learned about a Canadian drug prosecution in which the principal defendant was Sidney Gladney.
After asserting that the government had developed “probable cause to believe” that Sidney Gladney had committed and would continue to commit offenses that involved importing and distributing drugs, and after reporting that, over some period that ended July 19, 1993, Ailemen had made ten phone calls to numbers associated with Gladney, Agent Silano’s affidavit provided only two additional pieces of information about Glad-ney (other than his work address and phone number): that he had been “identified as an associate of Pius Ademen in the 1989 investigation” and that, “according to DEA records [he] has a May, 1992, arrest for heroin distribution in Canada.” Aff. at 52-53 and 4849.
In the paragraphs that follow I describe substantial additional information that the government had developed implicating Sidney Gladney in Ailemen’s drug trafficking— as well as information that was readily available, months before the application was made for the wiretap, connecting Ailemen directly with the Canadian case against Gladney and disclosing what appears to have been a major overseas source of heroin. While I do not suggest that the government was required to disclose all of this information in its affidavit, one purpose of this account is to show how much evidence was accessible to the government, had its investigators proceeded with reasonable diligence and competence, without use of a uñretap. In the end, I conclude that it was at least reckless for the government not to have acquired the publicly available information about the Canadian case before submitting the affidavit to Judge Jensen, and that the omission of the key components of this information from the affidavit was the product of at least recklessness. I also find that if the government had disclosed to Judge Jensen the principal facts that the Canadian authorities had been able to gather, and that they had acquired this very significant evidence without use of a wiretap, he would have concluded that the government had not satisfied the necessity requirement.
I begin by describing some of the information the government had developed about Gladney in connection with the 1989 case— primarily to make the point that the information the government had developed before 1993 should have led to strong suspicions that Pius Ailemen was connected with any substantial international heroin trafficking in which Gladney was involved. In other words, the information to which the government had access before 1993 was more than ample to inspire active investigation of heroin smuggling charges against Gladney — to determine whether they implicated Ailemen and his “organization.” In this connection, it bears repeating that the government purported to believe, in mid-1993, that Ailemen’s acquittal on drug charges in 1990 had left “his heroin trafficking organization intact.” Aff. at 8.
In the investigation that preceded the 1990 trial the government had learned, among other things, that Ailemen had used Gladney’s car when he made one of the sales to an undercover agent and that he had used Glad-ney’s phone to make a call to an undercover agent. The government also had learned that Gladney and Ailemen had claimed to work for the same importing business (Timbuktu Fashions), that he had lived at the same address and used the same post office box as both Ailemen and Kelly Lambert for a period in 1987 and 1988, and that Ailemen had used Gladney to get information about an undercover vehicle that had followed Aile-men. Ex. 3 at 4 and 8; Ex. 5-B at 22-23 and 25.
*1309 During the work-up of the 1989 case the investigators had learned that, at least since 1987, Ailemen had orchestrated the recruitment of young white female couriers under the pretext that they would be smuggling “diamonds” or “jewels.” Ex. 5-A at 11; Ex. 7. The use of this ruse for recruiting purposes was fully described in the 1988 OC-DETF proposal that Agent Silano copied in December of 1992.
As noted above, by the spring of 1992 the San Francisco office of the Customs Service had underway an investigation of alleged diamond smugglers. Ex. ll.[121] The Special Agent in Charge of the San Francisco office of the Customs Service had acquired information that “young attractive white females [were] being recruited to smuggle diamonds from San Francisco, California to London, England.” Id. He had further information that this recruiting was being done at least in part by a woman named Holly Slinkard[122] on “instructions from Sidney Gladney of Foster City, California.” Ex. 11.
In addition to identifying some of the women who were suspected of being involved in the alleged diamond smuggling, this report noted that both Gladney and Alvin Florida were alleged to be “involved in narcotics and [to] have ties to organized crime in Oakland, California.” Id. While there is no evidence that Agent Silano or Agent Gervacio actually read this report before July 29, 1993, the report was readily accessible through Customs Agent Frank Gervacio, who had been assigned to the OCDETF team for the Ade-men case since December of 1992. TR 5:1029-1031,1040. Sometime before July 29, 1993, Agent Gervacio apparently queried the TECS system for the information and reports it contained about Pius Ademen,[123] but he did not make a simdar inquiry about Sidney Gladney (or any of the other suspects).
On November 13, 1992, a Constable Remington from Canada notified the Intelligence Unit of the Oakland Police Department that in April of that year Canadian authorities had arrested “Sidney Gladney ... for masterminding a 2 kdo smuggling attempt through Canada,” that Gladney had been released on bad, and that his next court date was November 17, 1992. Ex. 70. Constable Remington further advised the Oakland Police that Cindy Mary Roseoe had been arrested along with Gladney, and that she had advised the Canadian authorities that Glad-ney had approached her “on the premise of smuggling ‘diamonds’ from Canada into the United States, claiming the penalty was minimal if caught. In actuality, the package contained Heroin.” Id. The Oakland Police officer who recorded this information from Constable Remington went on to note that the “incident was similar to what Gladney wanted Cl # 2 to do while in England.” Id. This latter reference is to a report that had been made by a confidential informant to the Oakland Police Department about Gladney allegedly trying to recruit a male writer to pick up a package (allegedly of money) in England and bring it back to the United States. Ex. 70 (earlier entries).
During the evidentiary hearing, Agent Si-lano and officer Gutierrez denied having had any knowledge of this report to the Intelligence Unit of the Oakland Police Department before July 29, 1993 (or thereafter).[124] Officer Gutierrez, who had been a member of *1310 the Oakland Police Department since 1978 and who continued to have close ties with the Department while he was on assignment with the Alameda County Narcotics Task Force, testified that while he was working with the OCDETF team on the 1993 Ailemen case he regularly (between once a week and once a month) checked with the Intelligence Unit of the Oakland Police Department to see if it had any information that might be helpful to the investigation. TR 6:1230. I find, however, that officer Gutierrez must have asked only for information about Pius Ailemen, not about Sidney Gladney.[125] I find, further, that it was reckless not to ask the Intelligence Unit for information about Gladney at some point over the several month period before the wiretap was sought.[126] If such a request had been made, it is substantially more likely than not that the OCDETF team would have received the information that Constable Remington had given the Intelligence Unit in November of 1992.
If the OCDETF team had known (as it should have) what was in the OPD files about Sidney Gladney it would have been obvious that there were significant similarities between the kind of smuggling with which Gladney was charged in Canada and the kind of smuggling the government knew Ailemen had been involved in for years. That knowledge would have made the government’s duty to learn all that it could about the Canadian case (before applying for a wiretap) even more obvious. I find, however, that even without knowing about this particular set of entries in the files of the Intelligence Unit of the Oakland Police Department, the OCDETF task force knew enough about Gladney’s connections with Ailemen and about the Canadian charges to trigger a duty to acquire at least the publicly available information about the evidence in the Gladney case before reaching a conclusion about what evidence could be developed about Pius Aile-men and his “organization” through traditional investigative techniques.
Both Agent Silano and AUSA Vadas admitted during the evidentiary hearing that before the government applied for the wiretap they knew that in the Canadian case Sidney Gladney was alleged to have been using young white female couriers to try to smuggle multi-kilo quantities of heroin into the United States. Mr. Vadas testified, for example, that Gladney’s name resurfaced in the 1993 ease “several months before the wire was approved” (TR 6:1277) and that he knew that Gladney “had been stopped I believe at Toronto airport with two female couriers body-carrying heroin into Canada.” TR 6:1302; see also TR 6:1277. Despite the obvious parallels between the Canadian charges, as Vadas understood them, and how Ailemen was known to have couriered heroin both during the 1986-89 period and during 1992-93, Mr. Vadas testified that he did not instruct Silano to acquire information about the Toronto case and that he (Mr. Vadas) made no such effort himself because “at that time [pre-wire], I had nothing to link Mr. Gladney with Mr. Ailemen.” TR 6:1277.
Obviously, as he admitted in other parts of his testimony, Mr. Vadas had something to link Mr. Gladney and Mr. Ailemen: Mr. Va-das knew that Gladney had been a suspect in the first case, which Mr. Vadas had prosecuted, and Mr. Vadas knew that Gladney had resurfaced in the second investigation in sufficiently incriminating circumstances to permit Agent Silano to assert in the affidavit that the government had probable cause to believe that Gladney had been and would continue to be involved in a conspiracy with *1311 Ailemen to import and distribute heroin.[127]
What Mr. Vadas must have meant when he testified that he “had nothing to link Mr. Gladney with Mr. Ailemen” is that he did not perceive or suspect a connection between Mr. Ailemen and the conduct for which Sidney Gladney was charged in Canada. I find, however, that given everything Mr. Vadas knew about how Ailemen had orchestrated the couriering of heroin for so many years,[128] and about the connections in drug trafficking between Gladney and Ailemen, that it was reckless for Mr. Vadas not to have had a strong suspicion that Ailemen had some connection to the real world events underlying the Canadian prosecution. I further find that it was reckless of Mr. Vadas not to have acquired more information about the Canadian case before he submitted the application for the wiretap in this case.[129]
Like Mr. Vadas, Agent Silano also knew that for many years Pius Ailemen had been using young, white females to smuggle heroin internationally in multi-kilo quantities, that the means for smuggling that Ailemen preferred was body-wrapping, that Ailemen’s agents had recruited couriers on the pretext that they would be smuggling diamonds or jewels, and that Sidney Gladney had been a suspected accomplice of Ailemen’s in heroin trafficking since 1987. Agent Silano also purported to believe that the “organization” through which Ailemen worked had remained “intact” after the 1990 trial and that Sidney Gladney continued to be an active participant in the ongoing importation and distribution operations that Ailemen was orchestrating in 1992 and 1993. During the evidentiary hearing, Agent Silano acknowledged that before he submitted his affidavit to Judge Jensen he knew that in the spring of 1992 Canadian authorities had arrested Gladney and charged him with importing[130] a large quantity of heroin through the use of two female couriers. TR II at 30; TR 2:260. It also is clear that both Mr. Vadas and Agent Silano believed that the charges against Mr. Glad-ney were still pending at the time the affidavit was submitted. During the “minimization” debriefing on July 29, 1993, Mr. Vadas made the following statement in the presence of Agent Silano and many others: “We are not aware in this ease of any pending criminal charges against Ailemen or any of the people he has been conversing with, except for Sidney Gladney.” Gov.’s AA.
Just as with Mr. Vadas, I find that the information that Agent Silano had about the lengthy relationship in drug trafficking between Sidney Gladney and Pius Ailemen, about the way Ailemen had his drugs smuggled, and about the Canadian charges should have supported a strong suspicion that Aile-men was connected with the matters for which Gladney then stood accused in Canada.
There is some reason to believe that Agent Silano now shares this view. As I reported in the section that discusses “The Credibility of the Affiant,” the agent testified in the evidentiary hearing that, before he applied for the wiretap, he and other members of his team made great efforts to secure more information about the Canadian case, including more than ten phone calls that Agent Silano claimed to have made himself to the DEA office in Canada to try to persuade his counterparts there to take steps to secure information from the authorities in Toronto.[131] *1312 While I have concluded (as reported earlier) that Agent Silano’s testimony greatly exaggerates the efforts that he and Mr. Vadas undertook (Vadas admitted he made no such efforts), it is instructive that the agent felt constrained to portray the OCDETF team’s pre-wire efforts to acquire information about the Canadian as having been so substantial. I infer that, after the fact, Agent Silano understands that there really was no excuse (as I now find) for not pursuing the information about the Canadian ease much earlier and much more assertively — or for submitting the application for the wiretap before learning at least what the public record in Canada disclosed about Ailemen’s connection to that heroin trafficking charge.
If Agent Silano and Mr. Vadas had acted responsibly by seeking additional information from the Canadian authorities before they applied for the wiretap, it is substantially more likely than not that they would have received a great deal of information (much of it extremely significant for their investigation, as explained below) well before July 29, 1993. After all, Constable Remington, on his own initiative, had disclosed important elements of the case against Gladney to the Oakland Police Department as early as November 13, 1992. Moreover, there had been an extensive preliminary hearing in the Canadian prosecution that had begun at the end of September of 1992 and that had concluded in early February of 1993. TR 5:943 — 44. The evidence developed during those hearings was a matter of public record — and could easily have been retrieved.[132] And when Agent de Freitas and Carl Estelle finally flew to Toronto in October of 1993, the Canadian authorities, predictably, were most cooperative, sharing with their two American counterparts a great deal of evidence that had been generated during the investigation and prosecution[133] of the charges against Gladney.[134]
What the American agents would have learned from the public records in Canada and/or from their Canadian law enforcement counterparts would have been of great significance for the Ailemen investigation and clearly would have been material to Judge Jensen’s judgment about whether the government had satisfied the necessity requirement. Before describing some of the evidence that the Canadian authorities had developed, it is important to emphasize that no wiretap had been used in that case[135] — so all of the evidence and information I will describe had been generated by traditional investigative means, including consensual monitoring of conversations with undercover agents and/or informants.
Documents provided by the Canadian authorities evidenced the following activities and developments. In a reverse sting opera *1313 tion that they initially launched in November of 1991, and that involved the use of both undercover agents and confidential informants, some of whom traveled to Pakistan, the Canadian investigators had identified two Pakistani sources of multi-kilo quantities of heroin, as well as brokers who were interested in helping move the heroin to Canada or the United States. Ex. 55. One of the sources figured out that he was dealing with an undercover agent and pulled back (after sending four kilos of heroin to Canada). The second source sold three kilos of brown heroin (in Pakistan) to three unidentified Americans (two men and a woman) and arranged to broker a deal in which those same Americans would buy two of the four kilos of heroin (for $120,000) that had been shipped earlier to Canada and that remained under the control of the undercover agent. Id The American female who participated in the purchases in Pakistan informed the undercover agent that she and her American associates “used beautiful models and girls as couriers.” Id
In April of 1992 the undercover agent returned to Canada and shortly thereafter was contacted by the people who. were trying to arrange to buy the two kilos of heroin from him. One of the persons who contacted the agent by phone was a “Mr. P” from California. The DEA had known for years that Ailemen’s associates and others who dealt with him, including his couriers, often referred to him as “P” or “Mr. P” or “P Man”[136] and in December of 1992 he had told undercover agent Estelle to call him “P.” Gov.’s S.
Between the 24th and the 26th of April (1992) the undercover agent had no fewer than eight consensually monitored telephone conversations in which Mr. P participated. Mr. P clearly was orchestrating the purchase of the heroin.[137] During these conversations he gave the agent his phone number in Cali-fomia, told the agent that “the girls” would pick up the heroin and pay for it, that a young lady was en route from California to help complete the deal and that “his man” would be there soon with the money.
When Cindy Roscoe arrived to make the transaction, Mr. P instructed her to go to the local Western Union office where she would receive the money she needed to pay for her lodgings and incidentals. Roscoe retrieved $300 from the local Money Mart, then registered in a hotel under her own name, giving a Clearlake, California, address. On the 26th of April, Ms. Roscoe paid the undercover agent $10,000 (commission), took the heroin into her possession, and returned to her hotel room. Less than 15 minutes later Mr. P called to confirm that the deal had been completed; he told the agent that he was making arrangements for “the girl” to return to California. Later that day Roscoe was surveilled going in and out of Sidney Glad-ney’s room in the same hotel where Roscoe was registered. That night, another young white female arrived and spent the night in Roscoe’s room. After watching the two females and Gladney for most of the next day, the Canadian authorities arrested them. Id and Exhibits 56-67; see also Ex. 15; TR 2:62-270; TR 3:570-580.
The second white female (the one who had spent the night in Roscoe’s room) was Kim Ener of Rohnert Park, California. Ex. 55. Shortly after her arrest, she agreed to cooperate with the prosecutors. In interviews and later in testimony she gave considerable evidence against both Gladney and Pius Aile-men. TR 3:564-66. She also implicated Holly Slinkard, the woman whom the San Francisco office of the Customs Service was investigating that spring (along with Sidney Gladney) as a suspected diamond smuggler. TR 3:564; Ex. 11. Cindy Roscoe told the *1314 Canadian authorities that she had been recruited by Gladney to smuggle diamonds. TR 2:276. One of the California phone numbers that Ailemen had given the Canadian undercover agent apparently was subscribed to by Kali Knapp. TR 2:269-72. Finally, Sidney Gladney’s hotel bill included a charge for a phone call to Pius Ailemen’s phone in California. TR 2:275; Ex. 15.
As all of this makes clear, it would be an understatement of considerable proportions merely to say that the evidence generated by the Canadian authorities implicated Pius Ailemen in the attempted heroin purchasing and smuggling with which Sidney Gladney was charged. That evidence virtually compelled the conclusion that Ailemen was the orchestrator of the entire transaction. It also suggested that Ailemen was involved in the purchase of the other three kilos of heroin in Pakistan — and it offered a significant set of leads not only about international brokers, but also about at least one overseas source of the heroin Ailemen imported into the United States. Since a core rationale for the request for the wiretap in the ease at bar was to gather allegedly elusive information about Ailemen’s source of supply, the evidence generated by the Canadian authorities should have been extremely valuable to Agent Silano’s OCDETF team. More to the critical legal point, if the OCDETF team had had this information, all of which was learned without the benefit of a wiretap, it would have been clear that no case could be made that a wiretap was necessary — at least not until the agents had tried to mine the rich vein of leads and evidence that the Canadians had discovered.
I have concluded, for the reasons stated above, that it was reckless for Agent Silano and Mr. Vadas not to have acquired the information generated by the Canadian authorities before they submitted the application for the wiretap to Judge Jensen. I also have concluded that the omission from Agent Silano’s affidavit of at least some substantial description of that information was the product of recklessness — and that if Judge Jensen had been told, as he should have been, about how much the Canadian investigators had been able to learn by using normal investigative methods, he would have determined that the government had not made the showing of “necessity” that is required before a wiretap can be authorized.
X.
CONCLUSION AND RECOMMENDATION
The reckless omission from the affidavit of the information from the Canadian case— which clearly was material to the necessity determination — is sufficient, without more, to support a holding that the evidence gathered through the wiretap, or because of the wiretap, must be suppressed. As the other sections of this Report make clear, however, the material shortcomings of Agent Silano’s affidavit are by no means limited to the omission of the information developed during the Canadian investigation and prosecution. Rather, that affidavit contained many material misstatements and several other material omissions — all products of at least recklessness. In combination, these serious defects compel the conclusion that a district judge who was presented with an affidavit in which the misstatements were corrected and the omissions rectified never would have found that the government had satisfied the “necessity” requirement — and thus clearly would not have authorized use of the wiretap at that stage in the investigatory process. For these reasons, I respectfully RECOMMEND that the defendants’ motion to suppress the evidence gathered in and as a result of the wiretap be GRANTED.
IT IS SO REPORTED AND RECOMMENDED.

. The government’s proposed rule also runs afoul of the specificity requirement set forth by the Ninth Circuit in United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir.1985). See Part V.

. Although Estelle’s undercover investigation lasted from October 30, 1992, to March 3, 1993, from start to finish, there were only two months of continuous contact between Estelle and Aile-men when the long breaks caused by Estelle are taken into account. See Report and Recommendation at 1247 n. 3

. To compound matters, the affidavit, while purporting to offer a full and complete statement about the investigative procedures employed in the case, never disclosed that the investigative team had been receiving information from Nor-dahl Washington, who was a well-placed and reliable source.

. Agent Silano testified to similar, in fact greater, knowledge. Report and Recommendation at 1310-12.

. The interruption was made necessary, in part, by a discovery dispute that ultimately was resolved through in camera inspection of certain government documents, followed by a written disclosure by the court of some information about the contents of the documents. See “Or *1244 der in Response to Defendants’ Motion to Compel Production of Two OCDETF Proposals,” filed December 20, 1996. The acronym "OCDETF” stands for "Organized Crime Drug Enforcement Task Forces.”

. For example, I was able to understand how limited the pre-wire undercover and surveillance work on this case was, and to detect how early in the pre-tap period the government had made the fundamental shift from undercover and surveillance work to phone analysis, only after being alerted to these potential issues by an adversarial presentation, then spending hours carefully analyzing the affidavit and preparing my own compact chronological outline of the investigation.

. The consequential undercover and physical surveillance activity occurred at different intervals over a period of four months (October 30, 1992 through March 3, 1993), but during that time there were substantial periods of inactivity.

. Affidavit at page 10.

. During the evidentiary hearing, the government attempted to suggest that during these five months before it applied for the wiretap the investigative team continued to devote substantial resources to the development of the case and continued to press the use of normal investigative methods. TR 4:829-52. Unfortunately, most of the activity to which the government pointed during this period was the product of initiatives taken by others (e.g., Aaron Mouton, Nordahl Washington, or a representative from Cellular One), was intended only to maintain at the most minimal level some contact with Ellis Quarshie (the undercover delivery of the cognac on March 18 and the social dinner on April 8, 1993), or was supported by no reasonable expectation of productivity (the interview of Francis Idialu). All these matters are discussed in detail in the body of this Report.

.Agent Silano conceded that he worked on other cases during the period the Ailemen matter was under investigation, as did the agents assigned to the OCDETF team from the IRS and the Customs Service. TR 1:177-78. Undercover officer Carl Estelle also worked other cases while he was assigned to the Ailemen investigation, even during the period between December of 1992 and the end of February of 1993, when he had virtually all of the undercover contacts in this case. TR 5:1117.

. Quarshie provided samples of drug product and set up meetings and deals between the undercover agent and Ailemen.

. 18 U.S.C. § 2518(3)(b).

. Affidavit at pages 45 through 53.

.I make additional findings of fact in other sections of this Report. The findings in this section describe the investigation in the pending case from the late summer of 1992 through July 29, 1993, when Assistant United States Attorney Vadas and Agent Silano presented the application for and affidavit in support of the wiretap to Judge Jensen.
In some of these findings I state that Pius Ailemen (and others) engaged in conduct which would constitute a crime if proved beyond a reasonable doubt to a jury. In making these findings I am applying the less demanding “preponderance of the evidence” standard — and am working from the record developed in connection with the evidentiary hearing — which, of course, is quite different from the record one would expect in a jury trial under the indictment. Obviously, none of my "findings” represents an adjudication of criminal culpability.

. See the findings in the section of this Report where I examine the credibility of Agent Silano’s testimony during the evidentiary hearing.

. The suspected couriers from the first case who resurfaced in some way during the investigation of the second case included Kelly Lambert, Kellee Cooper, Tiffany Valentine, Tina Tauer, Kali Knapp (also known as Kali Hidalgo), and Monetta White. See Exs. 2, 3, 7 and 48.

. I make additional findings about the earlier prosecution, to the extent pertinent, in other sections of this Report.

. See, Ex. 17 at 4 and 41-42 (Silano and Vadas informed the grand jury that Ailemen was sentenced to 36 months in custody, but other documents indicate that the sentence as first imposed by Judge Conti was the five year maximum — see, e.g., Ex. 9).

. TR 2:279. Aaron Mouton is identified in investigatory documents as "SR3-93-0009.” Id. See, e.g., Ex. 27.

. Nordahl Washington and Loreli Washington are not related.

. I reviewed these two OCDETF proposals in camera. They remain in my files, under seal.

. The other two subpoenas were issued March 12 and April 28, 1993.

. Officer Gutierrez testified that he went to the building every day to change the tape. TR 6: 1187-1190. The reports of his investigative efforts that the prosecution produced in this case, however, do not support that contention. Instead, they reflect frequent but by no means daily visits to the site. In addition to several shorter discontinuities, the reports indicate that at one point there was an eight day hiatus between officer Gutierrez’ visits (February 14 to February 22,1993). Gov.’s Y.

. The acronym "NADDIS" stands for Narcotics and Dangerous Drugs Information System. This is a data base maintained by the DEA. TR 1:49.

. One of the investigators' purposes in asking Ailemen to transport the heroin to Chicago was ‘To identify a courier(s) that Ailemen [was] currently utilizing to smuggle the heroin into the United States." Ex. 81, pg. 2, bottom. As events unfolded, this purpose was achieved.

. Kellee Cooper had been identified during the 1989 investigation as a trusted associate of Aile-men's who was believed to have acted as a courier for Ailemen since as early as 1987. Exs. 5-B, 48; TR 3:546.

. In his Affidavit, Agent Silano stated that during the ride to the airport in the cab Estelle told Cooper that he "would not talk to her on the plane.” Aff. at 40. But in Estelle’s report about this trip, he stated that during this cab ride he told Cooper that he "would talk to her on the plane.” Gov.’s V. In fact, Estelle sat next to Cooper during the flight and they spoke at length. Aff. at 41 and Gov.’s V.

.. Agent Silano testified that, under a DEA policy that generally prohibited the Agency from engaging in acts that would release drugs into the community, the team would have been required to arrest Ailemen, and thus to bring their investigation to a close, if they had sold drugs to him or exchanged their cocaine for his heroin. See, e.g., TR 2:304.
*1256 Laler in the evidentiary heating, however, while trying to explain why undercover officer Estelle had led Ailemen to believe that he would be returning from Miami with cocaine to trade for heroin, Agent Silano claimed to have "worked investigations in the past that — that were — that have had successful results doing reverses or trading narcotics." 2:347-48.
Curiously, Agent Silano also testified that it was because his boss had prohibited spending more money buying drugs from Ailemen that "we were doing the undercover or reverse aspect to see, if we could get more drugs without making purchases.” TR 5:1004. After he offered this dubious testimony, I asked Agent Silano:
“The Court: So you were hopeful in April of doing a reverse, by which you mean making a trade of cocaine for heroin?
The Witness: Right, and see if we could get the narcotics that way.” Id.
This testimony is not credible. Not only does it contradict the agent's other, repeated testimony about why no such reverse was actively considered, but it also is belied by the fact that after the end of Februaiy, the investigative team made no effort at all to engage in any kind of drug transaction with Pius Ailemen. Undercover Agent Estelle did not even try to contact Ailemen, through Quarshie or otherwise, after Februaiy 19, 1993. See, e.g., TR 5:1004-1005. See also the other findings about the course of the investigation that are reported in the text, above.

.It is clear that Silano, de Freitas, Gutierrez and at least one other person participated in this meeting. The only document evidencing the meeting does not explicitly state that Estelle attended, but it does indicate that Gutierrez was accompanied by at least one other person (apparently from the Alameda County Narcotic Task Force). Given all the circumstances, it is appreciably more probable than not that Estelle attended the meeting. Gov.’s Y (Gutierrez' report dated 23 Feb. 93).

. TR 2:250-51.

. Ten days later, on March 5, 1993, there was another meeting of some key members of the OCDETF team: Silano, de Freitas, Nandor Va-das, representatives of the FBI, and two representatives of the Alameda County Narcotics Task Force. Gutierrez and Estelle did not attend. At this meeting the participants again discussed "the status of the investigation, surveillance attempts, and future plans." Gov.’s Y. It is possible that the decision to shift the focus of the investigation to a wiretap was made at this meeting. — but the absence of two of the four principal investigators (Gutierrez and Estelle) and the timing of the request for the pen register (Februaiy 24th) makes is more likely that Silano made the decision to go to the wiretap at the meeting of the key players on Februaiy 23, 1993.

. The pen register was authorized initially for 60 days. That authorization was subsequently renewed twice — past the time the application for the wiretap was submitted to Judge Jensen. Aff. at 45.

. Superseding Indictment, filed July 11, 1994, page 8, alleged overt act 48.

. There is a distinct possibility that this person was Monetta White, who had been identified as a suspect in connection with the 1989 case. In an interview with Agent Iseri in January of 1990, Tiffany Valentine described White as "a light-skinned black female, approximately 5’ 3”, approximately 125-130 pounds, and in her early twenties.” Ex. 7. The person Ailemen and his male companion met on March 3, 1993, is described in the surveillance report as "a FN, 20’s light comp., 5’ 2, 115 lbs, blk shoulder length hair, attractive.” Ex. 85.

. Gutierrez learned later that day that the car was registered to a specific office of Enterprise Rent-A-Car. Gov.’s Y. There is no evidence, however, that he followed up on this lead by attempting to identify the person to whom the vehicle was rented at that time.

. In his reports, Gutierrez refers to the black male driver of the BMW not as Iheukwu, but simply as "Ailemen's associate.” It is clear, however, that the person seen on these occasions was Iheukwu. Sometimes the government clearly identifies the driver who Gutierrez identifies as "Ailemen's associate” as Iheukwu. See Superseding Indictment, filed July 11, 1994, at pg. 8, paragraph 48. Moreover, the BMW in which this “associate” was so often seen was registered to Iheukwu’s common-law wife — Loreli Washington. See second page of Gov.'s Ex. Y.

. See Gov.'s Y, second to last page.

. Ex. 17 at 35.

. Silano told the grand jury that the calls to the Maryland area were to "a heroin dealer there that has an extensive past.” Ex. 17 at 36. It appears that the person to whom these calls were made was Robert Tinney.

. Ex. 17 at 31.

. Ex. 17 at 31-32.

. Ex. 17 at 31-32.

. Ex. 17 at 31.

. Ex. 17 at 40.

. Ex. 17 at 37 and 30-31.

. As explained in detail in the next section, Ailemen never told Estelle or anyone else connected with this investigation that he had ever lost (or had taken by the authorities) any amount of heroin — let alone a million dollars worth. TR 4:490.

. As discussed later in the text, Mr. Idialu was not interviewed until June 3, 1993.

. In the Affidavit, Agent Silano identifies this date as May 9, 1993. But the memorialization of the debriefing, written much closer in time (May 10th) to the event, reports that Quarshie had made the call on May 8th. Gov.'s L.

. During this debriefing Mouton also provided information about another suspect in an unrelated case. The transcript of the evidentiary hearing might be misleading about this debriefing— because questions might have been posed that mistakenly assumed that the parts of this report that were related to the other case had some bearing on the Ailemen matter.

. The fact that Quarshie was continuing to use Mouton as a source of information about people who wanted to deal with Ailemen is some evidence that Ailemen and Quarshie continued to trust Mouton and, it would appear, Estelle.

. The significance of OCDETF designation is explained in the text later in this section.

. Agent Silano was the lead case agent and he made virtually all of the major decisions about how the investigation would be pursued. TR 3:540; TR 6:1308-9. It was he who decided, initially, that authorization for a wiretap should be sought and, as noted earlier, he was essentially the sole author of the affidavit at issue here. TR 2:250-55, 394, 411-418; TR 3:539-40. Even though he had been a DEA agent for more than a decade by 1993, he had received little training in preparing affidavits for wiretaps. TR 1:150-151.

. My Order of December 20, 1996, did not specifically disclose the second of these statements, but because it is essentially subsumed in the first statement, which was disclosed, the government did not object to its disclosure here.

. The pages of the separate transcript for the last day of the evidentiary hearing were not numbered in sequence with the pages for the six days of hearings in December of 1993; I will cite the transcript for the evidence taken on February 3, 1997, as "TR II”.

.Affidavit at page 64.

. Ex. 86. I cannot tell (and I don’t think anyone else could either) when these various aliases were entered in the NADDIS database — but I suspect many of them were entered after the first investigation was closed.

. See TR 1:166, 170; TR 2:208, 241.

. The first arrests were made in the current case in December of 1993.

.TR 1:208.

. See, Exhibits 6 and 79. Agent Lori Pang was Customs’ representative on the OCDETF team for the 1989 case. TR 5:1059-62.

.When re-examined about this matter some six weeks after first testifying that he had attempted to use the NADDIS data base for this purpose, Agent Silano suggested that he also had used information from Mr. Vadas for this purpose. TRII at 31-34.

. TR2: 412-413; TR 6: 1342.

. TR 2:275.

. TR 6:1277, 1302.

. Customs Agent Frank Gervacio, for example, testified that he contributed very little to this investigative effort before the wiretap was autho *1271 rized, but that he would have done more if he had been asked. TR 5:1042-43.

. I describe the circumstances surrounding and the results of the interview of Mr. Idialu later in the next section of this Report.

. Agent Silano testified that other agencies and other offices of the DEA were generally not re--sponsive to his needs when the case was being developed only through normal investigative techniques, but that alter the wiretap was approved the level of interest in and support for this investigation improved dramatically. I explore the implications of this assertion in the next section of this Report.

.Another curiosity about this testimony is Agent Silano’s suggestion that he was trying to determine, from IRS records, who the owners of the check cashing business were and whether they "filed CTR's or CMIR's for different financial transactions____” TR 2:385. Why it was necessary, or sensible, to seek this kind of information from the IRS is not clear. When asked why he had not tried to identify the business’ owners by checking with local business licensing agencies he indicated, without much persuasive punch, that he had assumed the IRS agent would pursue the matter. TR 2:390. It also appears that there were much more likely avenues for getting information about CTR's and CMIR's— e.g., the currency transaction reports and financial data bases to which Customs Agent Gervacio testified he had access. TR 5:1022-27. In fact, later in the investigation, after the wiretap had been authorized. Agent Silano sought information about CTRs and CIMRs (in connection with Ailemen directly) through the data bases maintained by the Customs Service. Ex. 82.

. During his testimony to the grand jury on April 15, 1993, Agent Silano was asked, by a juror, whether Ailemen or Kelly Lambert, with whom he lived, had any visible means of support. In response, Silano said that both suspects appeared to be in the apartment, or in and out of it, all the time, and that "we have an IRS person assigned and I’m sure at the proper time when Mr. Vadas applies for an ex parte from the IRS, he’ll obtain that information.” Ex. 17 at 44. There is no evidence that Mr. Vadas ever sought this kind of information from the IRS.

. As explained in the next section of this Report, I am not at all convinced that, before the wiretap was authorized, Agent Silano actually asked the IRS for information even about the one check cashing business.

. Because I find that Agent Silano did not make significant requests for assistance from other agencies before July 29, 1993, it is not clear, as Agent Silano suggested, that agencies outside the DEA were reluctant to commit resources to this *1273 investigation because no wiretap had been authorized. The evidentiary situation is more complicated when we confine our inquiry to other offices of the DEA; as discussed in the next section of the text, there is some more reason to believe that Agent Silano made unsuccessful efforts to get help from other DEA offices before the wiretap was authorized — and that their level of interest in the investigation increased after, and only because, the wiretap was in place.

.“Agent Silano testified that he wrote the affidavit himself (TR 1:159; TR 2:394), with only technical [production and form] assistance from a legal tech' " (TR 2:393-96), that the draft he prepared was changed little by Nandor Vadas or as a result of input from DOJ and DEA offices in Washington, D.C. (TR 1:162-63; TR 2:412-17), and that while he had worked on drafts of wiretap affidavits in a few other cases, this was the first case in which a wiretap affidavit that he wrote was actually submitted to the district court as part of an application. TR 1:152. He also testified that he had had very little formal training “regarding the application for and the issuance of wiretaps.” TR 1:150-151.

. The testimony indicates that when he used the phrase "controlled delivery” Agent Silano was referring to the undercover agent's use of one of Ailemen’s couriers to transport fake heroin from the Bay Area to Chicago on February 19, 1993.

. The Affidavit, at 61-62, states that the review of the mail "was attempted on January 28, 1993,” but the description of the results of the mail cover earlier in the Affidavit indicate that investigative use of the mail cover continued until the latter part of March of 1993. Aff. at 55-56. And during the hearing, Agent Silano testified that the mail cover was in effect from the latter part of February until the latter part of March, 1993. TR 4:811.

. When pressed to explain the circumstances in other cases where he had done some work on an affidavit that never was submitted to a district judge, Agent Silano disclosed that in most of those cases some external event occurred that forced closure of the investigation before the application could be submitted, and that in one case another agent became the affiant. It is not clear from his testimony that there was any case where he drafted an affidavit and then the government decided, completely voluntarily, not to make a wiretap application. TR 4:828-29.

. I described the principal bases for this finding in the preceding section of this Report.

.I use the word "material" here to embrace information or statements that a judge would likely consider to be relevant, in this kind of setting, to a decision about whether the necessity requirement was satisfied. The information or statement is "material” if the judge deciding whether to authorize the wiretap would be expected to want to know the information, or would be expected to ascribe some significance to it, when he or she was resolving the necessity issue. Thus, a statement or information can be "material” even if it is not clear that correcting that one statement, or adding that one omitted piece of information, by itself, would have resulted in a rejection of the application for the wiretap.

. These additional alleged “co-conspirators” or "aiders and abettors” included Nathaniel Iheuk-wu, Loreli Washington, Victor Onuaguluchi, Tina Tauer, Tiffany Valentine, Kali Knapp, and Monet-ta White.

. Ex. 24.

. The "0393” at the beginning of this entry, and the "030193” at the end indicate that this infer-mation was pul into the NADDIS data base on March 1, 1993 — five months before the affidavit was submitted to Judge Jensen.

. The one courier to whom Agent Silano apparently alluded here was Kellee Cooper — whose involvement in transporting the fake heroin to Chicago for undercover officer Estelle was described in great detail in the Affidavit at pages 40-44.

. Interestingly, the American Express Money-Gram records that the government failed, inexcusably, to retrieve before the wiretap was authorized, showed that all of the approximately $37,000 that had been wire transferred to Tiffany Valentine in the Los Angeles, California, area between February of 1991 and May of 1993 had been sent from Cleveland, Ohio. Ex. 54.

. Ex. 5-B at 13. Iseri told the grand jury that “Natalie Carmen Hornsby [sic] was a citizen of England who used her American sister’s name to facilitate her international travel and that she had made at least two [smuggling] trips [for Ailemen], one to England, and one possibly to Paris, but we are still not sure on that.”

. Jean Onuaguluehi apparently also owned two other businesses that may have been connected with Timbuktu: Guluchi Leathers and Hair to Brag About. TR 1:74-75; Ex. 86.

. TECS is an acronym for Treasury Enforcement Communications System. TR 1:48.

. The case number on the reports in Exhibit 79 includes two digits that are not included in the case number in the TECS alert: the former is SF13HZ89SF0026, while the latter is SF13HZ9SF026.

. Evidence about calls from Ailemen’s cellular phone to Onuaguluchi may be discoverable in Exhibit 49 — but I have not attempted to analyze these voluminous records for this purpose.

. As I will explain later in this Report, Agent Silano’s affirmation that Ailemen’s heroin trafficking organization emerged from the 1990 prosecution "intact” was recklessly made — given the limited knowledge that he claims to have had in July of 1993 of the 1989 case and the evidence underlying it. The fact that he made the assertion about the organization remaining "intact” recklessly, however, does not mean that there were no significant links between the 1989 players and the 1993 suspects. In fact, the OCDETF team that Silano led in 1993 had access (through traditional tools) to considerable evidence that some of the people who were suspected of playing significant roles in the 1989 trafficking were at work with Ailemen again in 1993. But, for reasons best known to him. Agent Silano elected not to disclose that evidence to Judge Jensen.
These omissions were both material and recklessly made — because if Judge Jensen could have seen how much had been learned about Aile-men’s associates in a relatively short time through traditional means he would have been much less likely to conclude that the government had shown that the wiretap was "necessary" within the meaning of 18 U.S.C. § 2518.

. Aff. at 65. As noted earlier, the government made similar but more general averments at pages 4 and 57 of the affidavit.

. Several months after the government submitted the affidavit to Judge Jensen, Pius Ailemen was the victim of a knife attack in his hotel room in Washington, D.C. TR 1:196. But nothing of that sort had occurred or been threatened before the affidavit was submitted, and when the attack occurred, Ailemen was the victim, not the perpetrator. Id.

. It is possible that local authorities arrested Ailemen on local charges in April of 1989 — but the affidavit that Agent Iseri submitted in support of the complaint that was filed on the federal charges in the fall of 1989 reported considerable activity between Ailemen and undercover agents during April and May of 1989. Ex. 3 at 4-8. Moreover, the way the first and second paragraphs of Agent Silano’s wiretap affidavit are structured clearly invites the reader to infer that the alleged arrest in April of 1989 was on the charges that led to the trial in federal court in 1990.

. Agent Silano and Mr. Vadas also knew (through undercover agent Estelle) that Kellee Cooper had indicated that Ailemen was working in February of 1993 with "new girls (couriers)”. Aff. at 41; TR 4:800. Vadas also knew that neither Darnell Ferguson nor Archie May Gilbert — both of whom had been identified as criminal mates of Ailemen’s in the first investigation— had resurfaced in any way in the second investigation.

. These omissions are discussed in the section, below, that covers the omissions that I have not needed to discuss to expose or correct material misstatements.

. Of course, the surveillance camera was not "court ordered;” its use was merely authorized by Magistrate Judge Langford.

. The affidavit also did not disclose that during the undercover operations that preceded his arrest in 1989 Ailemen had told two undercover agents that he would take them to Amsterdam to negotiate directly there with a source of supply who could deliver ten kilos of heroin to Los Angeles. Ex. 3 at 16. The significance of this information is that it lends credibility to Aile-men’s suggestion in 1993 that he would entertain the idea of meeting in New York with Estelle and his people.

. The affidavit failed to disclose, for example, that Agent Silano had instructed undercover officer Estelle to start with small buys only, even though as early as December 4, 1992, Ailemen, through Quarshie, had made it clear that he wanted to sell in larger (kilo-level) amounts. TR 2:323. Along the same lines, the Affidavit failed to disclose (1) that on December 11, 1992, Quar-shie again told Estelle that Ailemen wanted to sell at the kilo level (TR 2:329-32); (2) that on December 21, 1992, Quarshie left a message on Estelle’s answering machine indicating that he (Quarshie) had tried to reach Estelle at least five times over the preceding few days (TR 2:349; Gov.'s E), (3) that on December 23, 1992, Quar-shie told Estelle that Ailemen had been asking about Estelle (TR 2:353-54; Gov.’s Ex. E), and (4) that on February 16, in telephone conversations, Ailemen had pressed Estelle directly to engage in additional transactions, but that Estelle had stalled to avoid having to commit any additional funds (TR 2:361; TR 5:1107-1108, 1134-35, 1153-55; Ex. 28).

. See also the omitted conversations between Ailemen and Estelle on February 16, 1993, described in the Findings of Fact, above, and discussed below.

. The significance of this omission grows in light of the fact that in the 1989 case Ailemen disclosed (to undercover officers) that he was trying to orchestrate the importation of huge amounts of heroin through Los Angeles. Ex. 3 at 16.
Moreover, if the government had acquired American Express MoneyGram records before it applied for the wiretap, as the government should have, it would have learned that Tiffany Valentine was in the Los Angeles area when she received virtually all of the $37,000 in wire trans *1292 fers that came to her between February of 1991 and May of 1993. Ex. 54.

. In the section of the affidavit devoted to "Results of Installation of Court-Ordered Camera,” Agent Silano reported that, "[according to Cl information, envelopes are left at the front door of the Bellevue Park Tower Apartment Complex, to include DHL, UPS, and Federal Express Parcels for apartment 2002. Visitors to 'Pius’ also meet downstairs in the lobby areas of the Belle-vue Park Tower Apartment Complex lobby area. These transactions and visits cannot be monitored as to the nature of the transaction, either legitimate or illegal.” Aff. at 62-63. It is clear that the source of this information was Nordahl Washington — but by identifying the source of this information only through the opaque phrase "[a]ccording to Cl information," after asserting three pages earlier that only one Cl had been used the case, Agent Silano invited Judge Jensen to infer that the source of this information was the one acknowledged "Cl” — Aaron Mouton.
None of the other information provided by Nordahl Washington was described in the affidavit.

. Aff. at 5.

. Agent Silano's affidavit also failed to disclose the fact that early in the investigation, on December 14, 1992, the property manager of the complex in which Ailemen lived, John Shahoian, had offered to assist the OCDETF team "in anyway [sic] possible.” Gov.’s Y, Bates number 000075. This omission is appreciably less significant than the government's failure to disclose the existence and role of Nordahl Washington.

. A dramatic and pertinent example of how much evidence can be gathered through consensual monitoring is afforded by the Canadian undercover operation (reverse sting) that led to the arrest of Sidney Gladney and two female couriers in April of 1992. See Exhibits 58-67. This subject is discussed in the last substantive subsection of this Report.

. Ex. 51 (showing some 18 recorded conversations before July 29, 1993 — some by phone, some face to face); TR 4:886-88.

. Estelle met face to face with Ailemen on December 12, 1992, and on the 9th, 11th, and 19th of February, 1993. Gov.’s S, T, U, and V.

. Five of the recorded surveillances of Ailemen were listed in the affidavit: December 12, 1992, and February 9, 11, 19, and 26 of 1993. The only other documented surveillance of Ailemen occurred on March 3, 1995.

. I explore more fully, below, the shortfalls in the OCDETF team’s pre-wire pursuit of evidence about the financial dimensions of Ailemen’s drug trafficking.

.As the discussion (later in this Report) of other material omissions makes clear, what the members of the OCDETF team knew or clearly should have known about Sidney Gladney, who is the subject of the misrepresentation to be discussed in the text at this juncture, is a matter of considerable moment for the necessity issues.

. TR 4:848.

. After providing information, Mr. Sola was released on bail. Sometime thereafter he became a fugitive. Ex. 5-B at 19.

. In a declaration she executed on September 12, 1994, Tina Tauer stated that if she had been interviewed before July 29, 1993, she would have given the federal agents the same information that she provided when she was interviewed on December 21, 1993 (right after Ailemen was arrested). I do not have sufficient information to ascribe evidentiary significance to this declaration.

.The affidavit did not inform Judge Jensen, for example, that the government had elected not to try to interview any of the seven couriers that the investigative team had identified as "current from the last investigation that are possible hits.” Ex. 17 at 37. Nor did it disclose the considerable evidence incriminating Nathaniel Iheukwu and Tina Tauer — or that the government had decided not to try to interview either of them.

. While I limit my discussion in the text to matters of more obvious consequence to the necessity determination, it bears mentioning that the government omitted from the affidavit a good many other facts about the investigation that arguably were relevant to this issue. For example, the affidavit did not disclose (1) that the agents had installed pen registers on the two telephones inside Ailemen’s apartment as early as December of 1992 and that this technique had yielded extensive investigative leads (Ex. 17 at 12, 19-20, 35, and 41), (2) that agents had captured on video and audio tape the conversation with Kellee Cooper in the hotel in Chicago where she provided so much information about how to smuggle drugs and how to act when confronted by authorities (Ex. 17 at 27), (3) that the cab driver who took Estelle and Cooper to the airport on February 19, 1993 was an undercover agent (Ex. 17 at 24), (4) that aircraft had been used to help with virtually all of the surveillances of Ailemen (TR 4:738) — and that he had never "lost” a surveillance team (TR 4:736 and 745), (5)that a private investigator hired by Ailemen had discovered the video camera outside his apartment (Gov.’s Y), (6) that Ailemen was on parole during the 1993 investigation and that the investigative team had decided not to tty to get information from or otherwise to enlist the assistance of his parole officer (TR 4:768 and TR 6:1289-90), (7) that Ailemen had made many calls (in the months preceding the tap) to telephones used by members of Jesse Jackson’s family and to the offices of the Rainbow Coalition in Washington, D.C. (Ex. 87; TR 4:730-33), and (8) that agents had identified many cars that Aile-men or his associates used (Ex. 17 at 21-22; Gov.’s Y).
Individually, none of these omissions is of great consequence — but in the aggregate they reinforce my overall conclusion that this affidavit does not present a substantially accurate picture of the investigation and what it had been able to achieve.

. Agent Silano testified that only four people devoted any substantial portion of their time and effort to this case before the wiretap was authorized: himself. Agent de Freitas, and officers Estelle and Gutierrez. TR 4:781-84. And, as noted earlier, none of these people devoted full time to this case at any juncture before the wiretap was authorized.

. TR 4:777.

. Agent Silano also suggested that he might have asked the IRS for information about Tinney, but I find that no such request was in fact made. See findings, above, re Credibility of Affiant, and note that at the time he testified to the grand jury Silano clearly implied that IRS records had not been sought on any of the suspects and that it would be up to Mr. Vadas to seek them — sometime in the future. Ex. 17 at 44. When asked at another juncture in the evidentiary hearing about pre-wire requests for records from the IRS, Agent Silano mentioned nothing about Mr. Tin-ney. TR 2:385. It also is noteworthy that Mr. Vadas could not remémber ever prodding the IRS for information about any of the suspects in this case. TR 6:1321-23.

. Aff. at 62.

. During the evidentiary hearing Agent Silano stated that he had decided not to subpoena the records of Sun Trips because he had "found out Sun Trips was some type of a resort — how can I put it, kind of a vacation, like a tour group or something like that, and I didn’t think it was relevant to the investigation.” TR 3:469. It is not clear why the fact that Sun Trips operated as a charter airline, instead of a standard commercial airline, would preclude the possibility of learning useful information from its records.

.Customs Agent Frank Gervacio testified that car dealers are among the kinds of businesses that are required to file currency transaction reports — and that the Customs Service has access through a data base to these reports. TR 5:1022-23. Agent Silano did not ask Gervacio to have these data bases searched until mid August of 1993, after the wiretap had been authorized. TR 5:1043-44.

. Responding to a grand juror's question about whether Ailemen or Lambert had any visible means of support, Agent Silano said: "we have an IRS person assigned, and I’m sure at the proper time when Mr. Vadas applies for an ex parte from the IRS, he’ll obtain that information.” Ex. 17 at 44. Apparently "the proper time” did not arrive before July 29, 1993.

. One of the data bases to which Gervacio had access was known by the acronym FINCEN, which stands for Financial Crimes Enforcement Network. TR 5:1026-27.

. One intriguing example of the kind of lead that surfaced when the government belatedly acquired the MoneyGram records involves a person associated with the name "Sola.”
The MoneyGram records indicate that on January 19, 1993, a person identified as "Sola Aboro-wa” (or “Aborona”) spent $200 to wire transfer $8,000 to Pius Ailemen care of an American Express office in Oakland. These records also identified "Sola’s” address as 19 Jones Road, Plaistow, London. Ex. 54 (in two different places, the first on page 28, the second later in the materials on an unnumbered page).
The name "Sola” also surfaced in Ailemen’s phone toll records. A person identified as "Olugbode Sola” was listed as a former subscrib-
er to a phone number in Nigeria that Ailemen had called sometime during the period covered by the 1992-1993 investigation. Ex. 87, page four of second set of records.
It is the following information that gives added allure to these modest leads. In August of 1988 federal agents had arrested Sheri Weems while she was trying to smuggle more than 700 grams of heroin into the United States through JFK airport in New York. Ex. 3. Weems’ smuggling trip had taken her through Los Angeles, Mali (in west Africa), and London. After Weems indicated that she had been instructed to transfer the heroin to a person named Duduyemi Sola, federal agents also arrested him. "Duduyemi Sola,” who was from the same area of Nigeria as Pius Ailemen, was carrying an Oakland phone number for Ailemen at the time of his arrest. About two months after being taken into custody, Sola identified Ailemen (in a photo spread) as the *1307 person to whom he was to deliver the heroin that Weems had tried to smuggle. Ex. 3; Ex. 5-B at 19-20 and 42. Weems also identified Ailemen— and acknowledged that she had met him on at least two occasions, once in Los Angeles and once in San Francisco. In addition, Weems admitted to having made at least two smuggling trips in the past to London.
After he had made some kind of plea arrangement with prosecutors in New York, Sola had been released on bail. He promptly disappeared. Agent Iseri believed, and told the grand jury in August of 1989, that Sola had fled because "he had more information to offer.” Ex. 5-B at 42.
"Duduyemi Sola” had not been apprehended through the time the government applied for the wiretap in the 1993 case.
All this information about "Sola” and Weems was readily available to Agent Silano — through Nandor Vadas (the lead prosecutor in the 1989 case), the OCDETF proposal from the first case that Agent Silano had copied in late 1992, the complaint that supported the affidavit in the 1989 case, and Agent Iseri's recorded grand jury testimony. See, e.g., Ex. 3 (pp. 2-3); Ex. 5-B (pp. 19-20). Of course, it is not clear that the "Sola Aborowa” who wired $8,000 to Pius Aile-men on January 19, 1993, is the same person who was arrested as "Duduyemi Sola” in 1988, or that either of these persons is the "Olugbode Sola” who had subscribed to a phone in Nigeria that Ailemen had called — but surely there is enough here to provoke more than idle curiosity.

. During the investigation leading to the 1989 case the agents had developed evidence connecting Victor and Jean Onuaguluchi, Sidney Glad-ney, Pius Ailemen and Natalie Hornsby with Timbuktu Fashions, an import/retail business that had at one point operated out of a Union Square store but later was run by Jean Onuagu-luchi out of her home in Oakland. See Ex. 5-B at 22-24. NADDIS printouts secured by the OCDETF team on August 12, 1993, suggested that Ms. Onuaguluchi also had operated businesses known by the names Guluchi Leathers and Hair to Brag About, as well as Couture De L Afrique. Ex. 86. There is no reason to infer that this information could not have been secured well before July 29, 1993, but it wasn't.

. I am guessing that the word is "and” at this juncture — this part of Exhibit 11 is cut off.

. The implications of the diamond smuggling accusations are discussed in the next sub-part of this Report.

. The copy of the Report that comprises Ex. 11 that was provided to the Court is so poor that some parts of the text are unreadable.

. One of the female couriers arrested with Sidney Gladney in Canada in April of 1992 was a Californian named Kim Ener, who began cooperating with the Canadian authorities shortly after her arrest. She gave statements and testimony that implicated not only Ailemen and Gladney in that smuggling, but also Holly Slinkard. TR 3:564-66.

. TR 5:1029.

.Officer Gutierrez testified that he never knew anything about a Canadian prosecution of Sidney Gladney until December of 1996 — and that he first learned about this matter during the eviden-tiary hearing before me. Because both Silano and Vadas knew about the Canadian prosecution, and about Gladney's ties to the East Bay and to Ailemen, it is surprising, to put it mildly, that they would not ask Gutierrez to see if the OPD had any useful information about Sidney Gladney. While I am somewhat skeptical of Silano's and Gutierrez’ testimony that they never knew about this report from the Canadian authorities, it is not so implausible that I am prepared to find it false.

. Gutierrez testified later in the proceedings (TR 6:1247) that he thought he probably had asked the Intelligence Unit for information about Gladney, but this testimony was equivocal and I find, as a matter of fact, that he never made such a request. Given the documents the Intelligence Unit had developed about Gladney, and the wide-ranging suspicions about him, the odds are quite small that that Unit would have failed to respond with the documents that make up Ex. 70 if Gutierrez had asked for information about Gladney.

. Gutierrez testified, not very plausibly, that he had learned that Gladney was a suspect by virtue of one of the surveillances. The last surveillance that could possibly have produced any such knowledge was on March 3, 1993 — some five months before the application for the wiretap was submitted.

. Mr. Vadas knew, for example, that Ailemen had made calls on his cell phone to Gladney's phone numbers at least ten times in the period preceding July 19, 1993. Aff. at 52-53. TR 6:1303.

. What Mr. Vadas knew about the couriering included the video and audio-taped instruction that Kellee Cooper had given undercover agents Mitchell and Estelle in the Chicago hotel room on February 19, 1993.

. Mr. Vadas testified that if he had known, before he submitted the application for the wiretap, that there was some connection between Ailemen and the Canadian case, he would have arranged to fly to Canada to interview Mr. Glad-ney (if Gladney was willing to cooperate). TR 6:1280.

. In fact, Gladney was charged with conspiring to purchase and export heroin [to the United States] and with possessing heroin for sale. See Ex. 12.

. If substantial efforts were made to acquire information about the Canadian case, this fact was omitted from the affidavit. And if the DEA office in Ottawa was unresponsive to Agent Sila-no’s allegedly repeated requests for help, this fact also was omitted from the affidavit.

. Agent Silano finally admitted that there was no DEA regulation that would have prohibited him, or someone at his behest, from copying public records in Canada without first securing permission from Canadian authorities. TR 5:997-98. But even if DEA regulations or agreements between authorities in the United States and Canada required American agents to go through official channels to acquire information in public records, there is no basis for a finding that such permission could not have been secured with relatively little time and effort. Instead, the record supports a finding, that I repeat here, that no such effort was made.

. The Canadian prosecution had proceeded through the equivalent of the preliminary hearing stage before the OCDETF team applied to Judge Jensen for the wiretap. Apparently the Canadian case against Mr. Gladney had not yet reached the trial stage, however, when I was conducting the evidentiary hearing in the case at bar.

. In June of 1994 Agent de Freitas again had occasion to seek the assistance of Constable Remington in Canada — so he called the Constable directly and spoke with him at least twice by phone, asking for some corroborative information. TR 3:583-85 and Ex. 68 (most of which is illegible).

. While some of the questions posed by defense counsel during the evidentiary hearing were based on an assumption that a wiretap was used in Canada (TR 3:576-580), the evidence before me indicates that the “investigative method” used by the Canadian authorities for capturing the incriminating conversations was not a wiretap, but consensual monitoring of conversations in which confidential informants and/or undercover agents participated. While documents produced from the Canadian case refer to two (sequential) authorizations "to intercept private communications,” it appears that at least one of the parties to every intercepted conversation was an undercover agent or informant. See Exhibits 55-67; TR 3:580.

. NADDIS printout for Ailemen in Ex. 86. Agent Silano admitted during the evidentiary hearing that he had known at least since the early stages of the 1992-93 investigation that one of Pius Ailemen’s aka's was P, or Mr. P. TR 2:302. During the 1989 case Agent Iseri had learned that at least some of Ailemen's couriers referred to him as “Mr. P” or, simply, "P.” TR 1:77.

. During the preliminary hearing in Canada, for example, one of the arrested couriers was asked about a taped conversation in which the undercover agent asked Mr. P for the $20,000 that the agent expected to receive (as commission). Mr. P responded by saying, allegedly: “That's not what they told me. Let me call Pakistan and I’ll call you back.” Ex. 13, 3 pages from the end.